Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3                      - - - - -
4
        Abbie Shibe,                  ) Judge Solomon
5                                     ) Oliver, Jr.
                Plaintiff,            )
6                                     )
           vs.                        )
7                                     ) Case No.
        Cardinal Credit Union, Inc., ) 1:21-cv-01436-
8                                     ) SO
                Defendant.            )
9
                       - - - - -
10
11                  Deposition of:
                     ABBIE SHIBE
12            Appearing Remotely from
               Cuyahoga County, Ohio
13
14
15                  March 7, 2022
                     2:32 p.m.
16
17
18
19
20
21     Reporter:  Kristin Wegryn, RMR, CRR
              Appearing Remotely from
22             Cuyahoga County, Ohio
23
24
25
```

```
                                            Page 2
 1        REMOTE APPEARANCES:
 2            On behalf of the Plaintiff:
                  SAMUEL ROBB, ESQ.
 3                Spitz Law Firm
                  25825 Science Park Drive
 4                Suite 200
                  Beachwood, Ohio 44122
 5                216.291.0244
                  sam.robb@spitzlawfirm.com
 6
 7            On behalf of the Defendant:
                  DAVID A. CAMPBELL, ESQ.
 8                ANDREA V. ARNOLD, ESQ.
                  Lewis Brisbois Bisgaard & Smith, LLP
 9                1375 East 9th Street
                  Suite 2250
10                Cleveland, Ohio 44114
                  216.344.9422
11                david.a.campbell@lewisbrisbois.com
                  andrea.arnold@lewisbrisbois.com
12
13
                          - - - - -
14
15        ALSO PRESENT:
16                Christine Blake, Cardinal Credit Union
17
18
19
20
21
22
23
24
25
```

Page 3

1                         I N D E X
2
3                EXAMINATION OF ABBIE SHIBE
4                                      Page    Line
5     BY MR. CAMPBELL...................4       9
      BY MR. ROBB.....................122      20
6     BY MR. CAMPBELL.................126       3
7
8                  EXHIBITS MARKED
9     Deposition Exhibit 1, Employee ...35     11
      Handbook, Bates-labeled
10    Cardinal000001 - 89
      Deposition Exhibit 2, ...........39      21
11    Plaintiff's Response to
      Defendant's First Set of First
12    Requests For Production
      Deposition Exhibit 3, Employee ...47     20
13    Verbal Warning, Bates-labeled
      Cardinal000238 - 239
14    Deposition Exhibit 4, Employee ...53     10
      Written Warning, Bates-labeled
15    Cardinal000245 - 246
      Deposition Exhibit 5, ...........59       1
16    Termination letter,
      Bates-labeled Shibe000007
17    Deposition Exhibit 6, List of ....72     15
      additional employees terminated,
18    Bates-labeled Cardinal000269
      Deposition Exhibit 7, ...........103     24
19    Performance evaluation,
      Bates-labeled Cardinal000229 -
20    234
      Deposition Exhibit 8, 2020 .......112     4
21    Goals, Bates-labeled
      Cardinal000235 - 237
22
23
                         - - - - -
24
25

```
                                              Page 4
 1        REPORTING REMOTELY FROM CUYAHOGA COUNTY, OHIO

 2              Monday, March 7, 2022, 2:32 p.m.

 3                      - - - - -

 4              ABBIE SHIBE, of lawful age, called for

 5      examination, being by me first duly sworn, as

 6      hereinafter certified, deposed and said as

 7      follows:

 8              EXAMINATION OF ABBIE SHIBE

 9      BY MR. CAMPBELL:

10         Q.    Could you please state your name for the

11      record.

12         A.    My name is Abbie Shibe.

13         Q.    And could you spell "Shibe" for the

14      record.

15         A.    S-H-I-B-E.

16         Q.    And what is your current address?

17         A.    7400 North Chestnut Commons Drive,

18      Mentor, Ohio 44060.

19         Q.    Okay.  Have you ever been deposed

20      before?

21         A.    I have not.

22         Q.    Okay.  I'm sure Sam has given you his

23      instructions.  Let me give you mine.

24         A.    Sure.

25         Q.    First of all, if you need a break at any
```

1          time, just speak up and I'd be happy to give you

2          a break, okay?

3              A.    Okay.

4              Q.    Okay.  Two -- and you'll just -- a lot

5          of times, you might know where we're going or a

6          nod of the head seems okay, like if we're just

7          talking, but if you could just verbally respond,

8          it will be a lot easier for the court reporter

9          and our transcript, okay?

10             A.    Absolutely.

11             Q.    Three, if there's anything that I ask

12         that you need me to repeat, if you need me to

13         explain, if you need me to break it down, just

14         speak up and I'd be happy to do so, okay?

15             A.    Okay.

16             Q.    Okay.  With that, we will get started.

17         Thank you for -- starting, you took a day of

18         vacation from your current employer; is that

19         right?

20             A.    I did.

21             Q.    Okay.  Well, let me ask you:  Are you on

22         any medications that could impact your ability to

23         testify truthfully today?

24             A.    I am not.

25             Q.    Okay.  Are you on any prescription

1      medications today?

2          A.    Yes, I am.

3          Q.    Okay.  Anything -- any prescriptions for

4      anxiety or anything, depression or

5      psychiatric-related?

6          A.    No, sir.

7          Q.    Okay.  Have you had any scripts,

8      prescriptions for those areas in the last five

9      years?

10         A.    No, sir.

11         Q.    Okay.  Do you have any work restrictions

12     today?

13         A.    I do not.

14         Q.    Okay.  And have you ever been through

15     litigation before?

16         A.    No, I have not.

17         Q.    Okay.  Have you ever filed -- I know you

18     filed a charge of discrimination in this matter.

19     Have you ever filed a charge of discrimination

20     before this case?

21         A.    I have not.

22         Q.    Okay.  And most employers have internal

23     procedures.  Are you familiar with those where --

24     open-door policies or, you know, complaining

25     under the harassment policy?

1          A.    In regards to?

2          Q.    For any employer.  I'm just asking you

3     about just in general with employers.

4                Does your current employer, for example,

5     have provisions whereby you can bring complaints

6     to your employer?

7          A.    Yes.

8          Q.    Okay.  So you know what I'm talking

9     about, where you have the ability to bring

10     forward complaints.

11                Have you ever brought forward any

12     complaints to any employers while still an

13     employee internally where you've said, hey, I'm

14     the victim of discrimination or harassment?

15          A.    No.

16          Q.    Okay.  Have you ever filed a workers'

17     compensation claim before?

18          A.    I have not.

19          Q.    Okay.  Have you ever filed for

20     unemployment?

21          A.    Yes.

22          Q.    Okay.  With this employer with respect

23     to Cardinal?

24          A.    Yes.

25          Q.    Okay.  Any others?

1          A.     When I was out of work in the past, yes,

2     I have filed unemployment.

3          Q.     Okay.  And as to any -- have you ever

4     been sued by anybody?

5          A.     No, I have not.

6          Q.     You have not.  Okay.

7                 And you've not been a party to any other

8     lawsuits?

9          A.     No, I have not.

10          Q.     Okay.  Have you ever been deposed

11     before, or is this the first time?

12          A.     I have not been deposed.

13          Q.     Okay.  Have you ever filed for

14     bankruptcy?

15          A.     Have I filed for bankruptcy?

16          Q.     Yes.

17          A.     Yes.

18          Q.     When was that?

19          A.     Over ten years ago.

20          Q.     Okay.  What chapter?

21          A.     I believe it was seven.

22          Q.     Okay.  Where are you working today?

23          A.     I work for CrossCountry Mortgage.

24          Q.     Okay.  What office?

25          A.     I am in their corporate office in the

1          Brecksville location.

2               Q.    Okay.  And what do you do there?

3               A.    I am a collateral manager.

4               Q.    Okay.  What does that mean?

5               A.    It means I manage a group that takes all

6          of the loans that have been closed across the

7          country and we process the collateral for those

8          loans.  And all of the loan documents are scanned

9          into a drive where they're saved, retained for

10         compliance in other areas of the company.

11              Q.    Okay.  How many employees do you manage?

12              A.    I have 20.

13              Q.    Twenty employees.

14                    Okay.  And how long have you been

15         employed by CrossCountry Mortgage?

16              A.    I have been employed there 14 months

17         now.

18              Q.    Okay.  Are you happy there?

19              A.    I am.

20              Q.    Okay.  Are you seeking new employment or

21         are you looking to remain there?

22              A.    I am looking to remain there.

23              Q.    Okay.  Have you sought employment since

24         you've obtained -- have you sought alternative

25         employment since you were hired by CrossCountry

1      Mortgage?

2           A.    I have not.

3           Q.    Okay.  Where did you work -- well, let

4      me ask you.  What is your salary at CrossCountry

5      Mortgage?

6           A.    My salary was just recently changed just

7      a couple weeks ago to 90,000.

8           Q.    Okay.  And what benefits do you -- are

9      you entitled to at CrossCountry?

10          A.    I have a full benefits package.  That's

11     your major medical, dental, vision, some

12     ancillary products for life insurance, et cetera.

13          Q.    Okay.  And where did you work prior to

14     CrossCountry?

15          A.    Middlefield Bank in Middlefield, Ohio.

16          Q.    What did you do for Middlefield?

17          A.    I was a branch manager.

18          Q.    Okay.  And how long did you work there?

19          A.    Ninety-one days.

20          Q.    Okay.  Why did you leave?

21          A.    I left because the income and a better

22     opportunity to come aboard to CrossCountry.

23          Q.    Okay.  So you actually had the job at

24     CrossCountry and you left Middlefield Bank for

25     the CrossCountry job?

Page 11

1          A.    Yes.  I took the Middlefield Bank job

2     because I was in a job search and I needed a job,

3     and I continued to look and I moved over to

4     CrossCountry.

5          Q.    Okay.  When did you start at Middlefield

6     Bank?

7          A.    October of -- would it be 2020.

8     (Ms. Arnold entered the deposition.)

9          Q.    Okay.  So you were out of work, what,

10    about...

11         A.    The end of March until October of that

12    year.

13         Q.    About six months?

14         A.    Correct.

15         Q.    Okay.  What did you do to find

16    employment?  What tools were you using?

17         A.    I use every tool available to me.  I

18    used Career Builder; I used Facebook; I used

19    Indeed.com, lots of web, you know, web search

20    engines, specifically job boards with the Labor

21    Department and, you know, searched for a job

22    daily.  That was the first thing I did each day.

23         Q.    Okay.  Did you have any offers from

24    Middlefield?

25         A.    Prior to Middlefield, is that what you

Page 12

1           stated?

2                Q.    Yes.

3                A.    No, I did not have any offers.  I had

4           several interviews, but not offers.

5                Q.    Okay.  Where did you -- do you recall

6           any places that you interviewed with?

7                A.    There was a manufacturing company out of

8           Akron that was looking for an operations manager;

9           there was another company, I can't recall the

10          name of it, but it was an operations type of job,

11          management job.

12               Q.    What were you looking for?  What kind of

13          jobs?

14               A.    I was looking for branch managers in the

15          financial world, since I've been in that industry

16          for 30 years.  I was looking for operations

17          managers in a bank, a credit union, a financial

18          structure, pretty much anything along the

19          financial realm.  I have a vast area of banking

20          and mortgage over the last 30 years, so with

21          management or operations are the two areas of

22          work that I have done the most in.

23               Q.    Okay.  Did you have interviews with any

24          other banks prior to Middlefield's offer?

25               A.    I did not.

1      Q.    Okay.  What was the -- with COVID and

2   the pandemic, what was it like in the financial

3   field market for employment during those

4   immediate months after COVID hit?

5      A.    Well, I think the job market overall was

6   at a standstill because of the unknown of COVID.

7   So it was -- the jobs in general were few and far

8   between for the first few months.

9      Q.    Okay.  How did, how did the COVID -- it

10   seems like a long time ago, two years ago now,

11   but the -- when we were having the shutdown

12   orders, how did those shutdown orders impact the

13   Ohio banks?

14      A.    How did the shutdown orders impact the

15   Ohio banks?

16      Q.    Yeah.

17            Well, do you recall what I'm talking

18   about, how Governor DeWine set forth essential

19   businesses, nonessential businesses, and work

20   restrictions for essential businesses?

21      A.    So you say banks as a general term.  Are

22   you referring to Cardinal or overall banks in

23   general?

24      Q.    I'm just asking you in general first.

25      A.    Oh, so, in general, personally, I bank

1      with a couple of different banks.  We had to use

2      the drive-through and the lobbies were closed for

3      a period of time.  Some of the hours were

4      restricted, depending upon what branch.  And then

5      the lobbies opened by appointment and they

6      eventually got back to, you know, doing business

7      as usual.

8           Q.    Okay.  Okay.  So as to Cardinal, did the

9      same type of restrictions apply to Cardinal?

10          A.    I can tell you that the talks of what

11     was going to happen prior to me being terminated

12     was that we were going to go to an A and B team

13     and the A group would be in certain days and B

14     would be at home, and then they would switch.  So

15     they were going to have some work from home and

16     they were going to have some work from the lobby.

17          Q.    Okay.  I take it that it was expected

18     that customers would not be coming into the

19     branches?

20          A.    I believe at that time it was going to

21     either be by appointment only or they were going

22     to do drive-through only.

23          Q.    Okay.  Do you know what ultimately

24     happened with Cardinal and with respect to how

25     they dealt with the COVID restrictions?

1          A.    Do I ultimately know?  Is that what

2     you're asking?

3          Q.    Yes.  Yes.

4          A.    I do not.

5          Q.    You don't know?

6          A.    I do not.

7          Q.    Okay.  So as to -- or what were your

8     dates of employment at Cardinal?

9          A.    December of '18 through March of '20.

10         Q.    Okay.  And tell me, where did you work

11    immediately prior to Cardinal?

12         A.    Prior to Cardinal, I worked for US Bank.

13         Q.    Okay.  What did you do for US Bank in

14    that capacity?

15         A.    In that capacity, I was a branch

16    manager.

17         Q.    Okay.  How long?

18         A.    I was a branch manager for US Bank a

19    couple of different times.  That particular time,

20    I had previously to that been the site operations

21    manager for US Bank Home Mortgage, which was

22    located in Rockside, and managed the mortgage

23    group.  They had made a decision to take our

24    group and to move it to Minnesota where the

25    headquarters were, so we all lost our jobs there.

1           And so when I lost the position there, I

2       moved over to the branch system where I was the

3       branch manager in the Wilson Mills office.  And I

4       believe I was there, I think maybe six months or

5       so.

6           Q.    Okay.

7           A.    Prior to --

8           Q.    I'm sorry.

9           A.    Prior to coming over to Cardinal, yes.

10          Q.    Did you leave because you found a better

11      job, or why did you leave US Bank?

12          A.    I left US Bank because, yes, I had found

13      a better job.  It was closer to home and I felt I

14      would be better suited there.

15          Q.    Okay.  Did you take a pay cut moving

16      from US Bank to Cardinal?

17          A.    It was a lateral move.

18          Q.    In terms of pay?

19          A.    Correct.

20          Q.    Okay.  Had you been a branch manager

21      prior to the Wilson Mills US Bank location?

22          A.    Yes.  I've been in banking for 30 years.

23      I have about 15, 16 years of what I call

24      brick-and-mortar branch management, and then I

25      have the remainder in an operations type of job

Page 17

1          with mortgage, payroll companies, et cetera.

2              Q.    Okay.  And I guess prior to Wilson

3          Mills, when you were branch manager for six

4          months, when was the time closest to that that

5          you were a branch manager in the past?

6              A.    I was an operations manager for US Bank

7          Home Mortgage for four-plus years prior to moving

8          over to the branch.

9              Q.    I understand.

10                   I'm asking you:  When were you a branch

11         manager prior to Wilson Mills?

12             A.    So let me think here.  It would probably

13         be in the branch setting about six or seven years

14         prior to that.

15             Q.    Okay.  Six or seven years prior to you

16         being at Wilson Mills as a branch manager?

17             A.    Correct.

18             Q.    Okay.  And where were you a branch

19         manager then?

20             A.    It was Regions Bank.

21             Q.    Okay.  Where were you a branch manager

22         at?

23             A.    The location?

24             Q.    Yes.

25             A.    It was in Grovetown.

1     Q.    In where?

2     A.    Grovetown.

3     Q.    Okay.  Where was that?

4     A.    Georgia.

5     Q.    Okay.  And why did you leave that job?

6     A.    I left that job for a better opportunity

7  to work with a company called ADP as an

8  operations manager.

9     Q.    Okay.  How long were you branch manager

10  for Regions Bank?

11     A.    I -- gosh.  I would say, without having

12  my résumé in front of me, a couple of years.

13     Q.    Okay.  And when was the time prior to

14  Regions Bank that you were a branch manager?

15     A.    I was a branch manager for a bank in

16  Georgia, as well.  And I'm trying to remember the

17  name off the top of my head.  We're going back

18  quite a few years.

19     Q.    Okay.

20     A.    It was, it was the same type of

21  situation.  The reason I had left there, there

22  was a merger and I had lost my job due to two

23  banks merging.

24     Q.    When you lost the prior --

25     A.    Yeah.  I believe it was Wachovia Bank

1          and I want to say Sun -- Sun something.  Anyway,

2          there was a merger and then we lost -- I had lost

3          my job and I went over to Regions.

4              Q.    Okay.  Okay.  As to -- I guess, I guess

5          let me ask you as to just in general as a branch

6          manager.  And I'm sure that each bank or credit

7          union you worked for would be a little bit

8          different.

9                    But, in general, it would seem to me,

10         from an outsider standpoint, that a branch

11         manager would be I guess an important and

12         potentially difficult job.

13                   Would you agree with that?

14             A.    Yeah, I would agree with that.

15             Q.    And I say that because, one, I'm

16         assuming you have some type of employee

17         supervision, employee management portion of your

18         duties, right?

19             A.    Yes.

20             Q.    And then, two, I'm assuming you have to

21         make sure that you comply with all of the state

22         and federal banking regulations?

23             A.    Correct.

24             Q.    And then, three, I'm assuming you're

25         trying to be a profitable bank?

Page 20

1         A.    Correct.

2         Q.    Anything else in big picture other than

3    those three?

4         A.    I think those are the three targets.

5         Q.    Okay.  And I'm assuming that not

6    everybody succeeds as a branch manager.  You've

7    been in banking for 30 years, but being a branch

8    manager may bring with it -- you could be in a

9    bad branch.  You could be in a difficult

10   environment.  You could just be -- I guess just

11   have a team that maybe isn't up to par, right?

12   There's lots of --

13        A.    Correct.

14        Q.    -- factors.

15              So tell me the difference, if you may,

16   just in general, did you -- am I correct as to

17   whether your Wachovia, Regions, Cardinal, or US

18   Bank, that some of the ways of doing business

19   would be different as a branch manager?

20        A.    Yes.  There are certain differences

21   between a bank overall from a credit union to a

22   bank.  Different banks do -- you know, have

23   different programs and the different ways that

24   they manage.  Each of them have, you know, their

25   uniqueness, I would say, but similarities, as

Page 21

```
 1          well.
 2               Q.    Okay.  How about, I guess, the demands
 3          on the branch managers?  We talked about I think
 4          four of them now:  Regions, Wachovia, Cardinal,
 5          US Bank.
 6                    Where would Cardinal fall, in your view,
 7          as to the demands on a branch manager between
 8          those four?
 9               A.    The demands on the branch manager at
10          Mentor, I mean, it is the district office.  It's
11          a large office.  So the demands are high.  It's
12          busy.  Lots of -- a lot -- customer -- a large
13          customer base.
14               Q.    Okay.
15               A.    We have, you know, anywhere from I
16          believe four to five, you know, employees on your
17          platform and, you know, seven or eight tellers
18          that you're responsible for.  So it was a larger
19          branch.
20               Q.    Okay.  Was it the largest branch that
21          you had managed?
22               A.    No.  It was about equal to the size I
23          had managed previously in multiple locations.
24               Q.    Okay.  Where?
25               A.    At Wachovia, at US Bank.
```

1          Q.    Okay.  Wilson Mills, you would say,

2     would be the same size as the Mentor?

3          A.    Yes.

4          Q.    Okay.  Okay.  So how did you find out

5     about the Cardinal position?

6          A.    I was referred by an employee that

7     worked there.

8          Q.    Okay.  Who was that?

9          A.    His name was Derrick.

10         Q.    Okay.  Do you know how to spell Derrick?

11         A.    D-E-R-R-I-C-K.

12         Q.    Okay.  Do you know Derrick's last name?

13         A.    I cannot recall, to be honest with you.

14         Q.    Okay.  What was Derrick's role with

15     Cardinal?

16         A.    He was a teller at the time.

17         Q.    Okay.  Had you worked with him before,

18     or how did you -- how did you know Derrick?

19         A.    I knew Derrick through his partner,

20     James Hill.

21         Q.    Okay.

22         A.    We exercised together.

23         Q.    Okay.  And what did Derrick tell you?

24         A.    He just told me that he heard I was

25     looking for a change of employment and he worked

Page 23

1          for Cardinal and it was a place he enjoyed

2          working and that he understood they had an

3          opening and they were looking for a branch

4          manager and was happy to pass my résumé along.

5               Q.    Okay.  Okay.  And who did you interview

6          with?

7               A.    I interviewed with Mario and Christine.

8               Q.    Okay.  Who is Mario?

9               A.    Mario at the time was the district

10         manager.

11              Q.    Okay.  What is Mario's last name?

12              A.    I couldn't spell it for you, but...

13              Q.    Okay.  What was his position when you

14         left?

15              A.    When I left, Mario was I think a cross

16         between the district and taking over a new role.

17              Q.    Okay.  And Christine who?

18              A.    Christine Blake.

19              Q.    Okay.  What was her role?

20              A.    CEO.

21              Q.    Okay.  Did you interview with anybody

22         else?

23              A.    Cindy, also, the HR rep.

24              Q.    Okay.  Do you know Cindy's last name?

25              A.    I don't recall.

1      Q.    Okay.  Was Cindy still there when you

2      left?

3      A.    She was.

4      Q.    Okay.  And you were given an offer of

5      employment with Cardinal?

6      A.    Correct.

7      Q.    Okay.  What position were you offered?

8      A.    I was offered the branch manager of the

9      Mentor office.

10     Q.    Okay.  Did you have an understanding of

11     why it was open, why the position was open?

12     A.    I don't recall why the position was open

13     when I took on the job.

14     Q.    Okay.  And approximately when did you

15     start?

16     A.    December of '18.

17     Q.    Okay.  December of 2018, you came in as

18     branch manager of the Mentor branch of Cardinal,

19     right?

20     A.    Correct.

21     Q.    Okay.  And I guess -- tell me about --

22     who did you report to as the branch manager?

23     A.    To Mario, the district manager.

24     Q.    I'm sorry.  Is that the whole time?

25     A.    Yes.

1       Q.    Your entire tenure?

2       A.    Correct.

3       Q.    Okay.  And then did you have

4    communications with Ms. Blake?

5       A.    Yes, I had communications with

6    Ms. Blake.

7       Q.    Okay.  And then as to Cindy in HR, did

8    you continue to have access to Cindy?

9       A.    Yes.

10      Q.    Okay.  So, tell me, 2019, how did -- how

11   was the year and what did you think about

12   Cardinal?

13      A.    How was the year from what perspective?

14      Q.    2019, how was it with Cardinal?

15      A.    It was, it was a challenging year from a

16   business perspective, from an employee

17   perspective.  There was a changeover with

18   employees, so there were some that had left and

19   we had to -- or we had to terminate and some that

20   we had to rehire.  And then some of those ended

21   up leaving, so we ended up the year short

22   multiple employees and bringing on some new

23   employees, as well, that year.

24      Q.    Okay.  Why all the changeover?

25      A.    When I arrived, I was told that, you

Page 26

1     know, I would sit back and I would kind of assess

2     the staff and, you know, make sure that they were

3     meeting and exceeding the goals for Cardinal.

4     And we had several that were not, and so there

5     were several that were terminated over the course

6     of that time, and which brought, you know, the

7     opportunity to hire on some new individuals.

8             And we also had one that actually

9     resigned and went and worked for another company

10    at that time, as well.

11    Q.    Okay.  Who was making the decision to

12    discharge the branch employees?

13    A.    Well, ultimately, as a manager, I filled

14    out certain paperwork and brought things to the

15    attention of my supervisor and, ultimately, you

16    know, went to HR and was reviewed.  And, at the

17    time, it was -- the decision was made to

18    terminate those individuals for, you know,

19    different reasons.

20    Q.    Okay.  Well, one resigned.  Did they

21    resign under threat of potential discharge?

22    A.    No.  They moved on to a different bank.

23    Q.    Okay.  And then how many employees were

24    discharged, do you recall, in 2019 from the

25    branch?

Page 27

1          A.    Two.  Two, to my knowledge.

2          Q.    Okay.  Do you recall what positions they

3     held?

4          A.    They were loan officers.

5          Q.    Okay.  And why were they discharged?

6          A.    One of them was not meeting the goals

7     that were set.  Compliance paperwork was not

8     being turned in properly, falling asleep at his

9     desk multiple times, and had been, you know,

10    talked to several times.

11         Q.    Okay.  How about the second one?

12         A.    The second one was basically the same

13    thing except for sleeping at the desk.

14         Q.    Okay.  Male or female?

15         A.    Male.

16         Q.    Okay.  Okay.  So tell me, tell me a

17    little bit about Cardinal.  How many branches

18    when you were hired in 2018 were there?

19         A.    Let me think about that for a second.

20    So we had Mentor, Willoughby, Lakeland,

21    Ashtabula, one out in Austintown.  I believe

22    five.

23         Q.    Okay.  Including Mentor?

24         A.    Yes.  So Mentor, Willoughby, Ashtabula,

25    Lakeland branch, and then Austintown.

```
 1          Q.    Okay.  Did that -- did the five branches
 2     remain the same during your employment?
 3          A.    Yes.
 4          Q.    Okay.  Any added?
 5          A.    No.
 6          Q.    Okay.  And as to the branch managers,
 7     did any of the branch managers change over in
 8     2019?
 9          A.    2019, if my memory serves me correct, I
10     believe we changed over Willoughby and we changed
11     over Lakeland, and that would be it.
12          Q.    Okay.  What do you recall about
13     Willoughby?
14          A.    Recall about Willoughby in regards to
15     the manager?
16          Q.    Yeah.  Who was there and do you know why
17     they were let go?
18          A.    I do not know why they were let go.  And
19     I -- honestly, I can't remember what the name of
20     the individual was.
21          Q.    Okay.  Male or female?
22          A.    I don't know.
23          Q.    You don't know.  Okay.
24                How about Lakeland?
25          A.    Lakeland, I wasn't aware of the previous
```

Page 29

1       manager.

2                   Oh, I take it back.  I retract that.

3       Yes, a manager of Lakeland was a woman by the

4       name of Gretchen.

5           Q.    Okay.

6           A.    I can't remember her last name.  And

7       then it was, it was taken over by a gentleman by

8       the name of Robert.

9           Q.    Okay.  Do you know any of the other

10      branch managers in 2019 aside from the Willoughby

11      and Lakeland?

12          A.    Meghan was a branch manager in Ashtabula

13      area.

14          Q.    Okay.

15          A.    And I can't recall the lady's name in

16      Austintown, but it was a female.

17          Q.    Okay.  So when you came on board, five

18      branches, three or four female branch managers?

19          A.    Three, to my knowledge.  It would be

20      myself, Meghan, and the Austintown.

21          Q.    Okay.  And you think the other two were

22      male?

23          A.    Well, Gretchen -- Gretchen was actually

24      a female.  She was Lakeland's manager.  So that

25      would be four.

1          Q.    You were hired there --

2          A.    Yeah.  Willoughby, I was not certain of

3     who was the manager prior to.

4          Q.    Okay.  So when you were hired, there was

5     at least four female branch managers?

6          A.    Correct.

7          Q.    Okay.  What's the -- like in Mentor, did

8     you have -- was it primarily male staff?  What

9     would be the breakdown?

10         A.    In regards to the branch staff?

11         Q.    Yeah, the branch employees.

12         A.    On my platform, I had about 50/50.

13         Q.    Okay.

14         A.    And on the teller line, all females and

15    one male.

16         Q.    Okay.  Okay.  And so I guess with the

17    banking, did -- would Cardinal -- what would you

18    say primarily -- [unintelligible] -- female

19    employees overall or --

20              THE REPORTER:  I'm sorry.  Say that

21    again.  Primarily...

22         Q.    With Cardinal, would you say that

23    Cardinal was primarily -- or not primarily --

24    majority female employees?

25         A.    When you say "Cardinal," you're talking

 1          about the entire group?

 2                Q.    Yeah, to your knowledge.

 3                A.    Myself?

 4                Q.    Yeah.

 5                A.    I wouldn't go so far to say "primarily

 6          female," no, I would not.

 7                Q.    And I'd change that to "majority."

 8          Would you go so far as to say "majority"?

 9                A.    I guess that would be a fair assessment,

10          yes.

11                Q.    Okay.  Okay.  So you're hired.  What

12          did -- I guess tell me, what did you think of

13          Mario?

14                A.    What did I think of Mario?

15                Q.    Yeah.  Was he a good manager?  Bad

16          manager?

17                A.    Mario was a busy guy.  He was there if

18          you had a question, but he had a lot of

19          responsibility.

20                Q.    Okay.  A good manager, or no?

21                A.    In regards to?

22                Q.    I'm just asking you.

23                      I mean, was he a -- did you think he was

24          good?  Bad?  Indifferent?  I mean, average?

25          Where would you put him as -- I mean, you've had

Page 32

```
 1            other managers.
 2                 A.    Sure.
 3                       Mario -- like I said, Mario was a busy
 4            guy.  I wouldn't say he was the worst manager
 5            I've ever had, but I wouldn't say he was the
 6            best.
 7                 Q.    Okay.  Go on.
 8                 A.    No.  I mean, like I said, I wouldn't say
 9            he was the worst and I wouldn't say he was the
10            best.
11                 Q.    Okay.  How about Ms. Blake?  Where would
12            you put her as CEO?
13                 A.    My only dealings with Ms. Blake was on a
14            manager meeting level, for the most part.  I
15            really didn't interact with Ms. Blake unless it
16            was a manager's meeting or a meeting of some sort
17            that I was in attendance with.
18                 Q.    Okay.  Got it.
19                       What did you think about Ms. Blake with
20            that limited involvement?
21                 A.    I would say that, you know, she was
22            there to run the credit union and she had very
23            high expectations in regards to our service, as
24            well as our goals.  And I always knew where we
25            stood.
```

Page 33

1           Q.    Okay.  And that's where I was going to
2      get to.  From an outside point of view, it looks
3      like Ms. Blake and the Cardinal management team
4      are -- they do have high expectations as to
5      customer service; is that a fair assessment?
6           A.    I would say in the credit union
7      experience overall.
8           Q.    What do you mean by that?
9           A.    So when a -- when a member would come
10     into the credit union, you know, the expectation
11     would be that, you know, they had a good
12     experience from the start to the finish.  And,
13     you know, from -- the difference between a bank
14     and a credit union, there's many.
15                But, you know, we, we were dealing with
16     members.  We weren't dealing with people that
17     were numbers.  And, you know, we had a
18     relationship with those individuals.  So, yes, it
19     was a more personalized approach.
20          Q.    Okay.  And that's good.
21                Were there guidelines or expectations as
22     to response time to member questions or concerns?
23          A.    Yeah, we had guidelines in regards to
24     concerns or returning phone calls and getting
25     back to our members.

Page 34

1          Q.    What were those?  What do you recall?

2          A.    Within 24 hours.

3          Q.    Okay.  Was that something that they just

4     would say, or is that something that they would

5     enforce?

6          A.    It really depended on the day, to be

7     honest with you.

8          Q.    What do you mean by that?

9          A.    Well, I mean, obviously, we want to make

10    sure that we're getting back to our customers as

11    quick as possible and that, you know, we get that

12    answer to them, whether it's via voicemail or

13    you're playing telephone tag.  You're making

14    those attempts.

15              The Mentor branch is a very busy branch,

16    so we are with customers or members pretty much

17    from the time we open the door until the time we

18    close the door.  So some of those things are done

19    after hours.

20         Q.    Okay.  But I'm assuming that you do it

21    after hours in order to meet that 24-hour time

22    frame?

23         A.    Absolutely, you would.

24         Q.    Okay.  My question to you is whether

25    management enforced the 24-hour rule or whether

1       it was sort of a statement without any teeth.

2           A.     Like I said earlier, I think that could

3       go either way.

4           Q.     Okay.  And then as to compliance issues,

5       was it -- was that important at Cardinal?

6           A.     Compliance was definitely important.

7       Ann Marie was our compliance officer.

8           Q.     Okay.  Okay.  Well, let me -- before we

9       take our first break, I'm going to show you the

10      employee handbook.

11                 (Deposition Exhibit 1, Employee

12                 Handbook, Bates-labeled Cardinal000001 -

13                 89, was marked for purposes of

14                 identification.)

15          Q.     And just -- do you recall getting a copy

16      of the handbook?

17          A.     Yes.

18          Q.     Okay.  Let me share my screen with you.

19                 Okay.  It doesn't look like I got the

20      screen.  Can you see my screen or are you

21      seeing --

22          A.     I do see your screen.

23          Q.     Can you see the handbook?

24          A.     I see "Employee Handbook 8 of '18."

25          Q.     It worked, so I am getting good at this.

Page 36

1           So I'm going to take you to page 15 of

2       this document and just ask you a little bit about

3       the handbook.

4           Did you actually get a copy of it or

5       were you -- did you just have one at the branch?

6       A.    I don't recall if I received a copy, a

7       paper copy or if I had that electronically sent

8       to me.

9       Q.    Okay.  Okay.  I'm assuming you had to

10      answer questions about it?

11      A.    I had it as a reference as needed and I

12      also had Cindy if I had a question.

13      Q.    Okay.  Okay.  And then let me ask you --

14      let's go through some of the employment policies.

15          Do you recall the Americans With

16      Disabilities Act policy?

17      A.    Sure.

18      Q.    Okay.  And this is, what, to help you

19      determine if your employees needed

20      accommodations?

21      A.    Right, reasonable accommodations

22      within -- you know, to be made for employment

23      purposes.

24      Q.    Okay.  Did you work with HR if any of

25      those issues came up?

Page 37

1        A.    Yes.

2        Q.    Okay.  Diversity.  What was your

3   understanding, understanding of the diversity

4   policy?

5        A.    My understanding is that, you know, we

6   didn't discriminate against any gender, and we

7   hired for specific reasons on talent and not

8   anything else.

9        Q.    Okay.  Let's continue on.

10             Employment at will, I think we

11   understand that.  Let me take you to the Equal

12   Employment Opportunity policy.  What did you

13   understand this policy to be?

14        A.    Basically, what it says.  I mean, equal

15   opportunity employment.

16        Q.    Okay.

17        A.    For either accommodations or any type

18   of, you know, nondiscriminatory -- all those

19   things.

20        Q.    Okay.  We see here reporting violations.

21   You understood that you could go to HR or to

22   Ms. Blake or to your manager if there was any

23   issues?

24        A.    If I had an issue, I would go to my HR,

25   yes.

```
1         Q.    Okay.  Prior to your termination, did
2    you ever complain pursuant to this policy to HR?
3         A.    About discrimination?
4         Q.    Yes.
5         A.    No.
6         Q.    Okay.  Did any of your employees
7    complain about you, to your knowledge?
8         A.    Not to my knowledge.
9         Q.    Okay.  Got it.  Okay.
10             MR. CAMPBELL:  Let me take us off that.
11             Okay.  Why don't we take a short break.
12   You want to come back at 3:25, Sam and Abbie?
13   Does that work?
14             THE WITNESS:  Yes.
15             MR. ROBB:  Yes.
16             (A recess was taken.)
17   BY MR. CAMPBELL:
18        Q.    Okay.  We're back after a short break.
19             Let me ask you:  Did anybody during your
20   employment make any, any sex-based comments to
21   you?
22             Do you know what I mean?
23        A.    During my employment at Cardinal?
24        Q.    Yeah.
25        A.    No.
```

Page 39

1          Q.     Okay.  Did anybody make any

2       inappropriate comments to you?

3          A.     No.

4          Q.     Okay.  How was it working at Cardinal?

5       I mean, obviously, we're now after discharge.

6       Prior to the discharge, what did you think of

7       Cardinal?

8          A.     I enjoyed working at Cardinal.  We had a

9       great team that I had in the Mentor office and we

10      accomplished some great results together during

11      the time I was there.

12         Q.     Okay.

13                THE REPORTER:  I'm sorry.  Could I ask

14      you real quick, you said "prior to the" -- it

15      sounded like "district."

16                What was the word?

17                MR. CAMPBELL:  "Discharge."

18                THE REPORTER:  Discharge.  Thank you.

19         Q.     Okay.  I'm going to share my screen and

20      show you what will be marked as Exhibit 2.

21                (Deposition Exhibit 2, Plaintiff's

22                Response to Defendant's First Set of

23                First Requests For Production, was

24                marked for purposes of identification.)

25         Q.     Okay.  Can you see that document?

Page 40

1          A.    Yes.

2          Q.    Okay.  Do you remember going through

3      some responses to a request for admissions with

4      your counsel?

5          A.    Yes.

6          Q.    Okay.  And I'm just going to roll

7      through some of them.  I think we just verified

8      that Cardinal's written policies included an

9      antidiscrimination policy, and you agreed with

10     that, right?

11         A.    Yes.

12         Q.    And they also prohibited harassment, and

13     you agreed with that, right?

14         A.    Correct.

15         Q.    Number 3, that you were responsible for

16     enforcing the policy against discrimination, you

17     agree with that?

18         A.    Yes.

19         Q.    And I take it you were responsible for

20     enforcing, at least in the Mentor branch, that

21     employee handbook, right?

22         A.    Yes.

23         Q.    Okay.  What did you do when -- if you

24     were terminating an employee, did you have to run

25     it by HR?

1          A.    Yes.  I -- there was a process if we
2     were terminating an employee that we would need
3     to have a conversation with Cindy.  Obviously, my
4     district manager would refer me to Cindy 99
5     percent of the time; although, he was aware of
6     whatever I was speaking to Cindy about.
7          Q.    Okay.
8          A.    And then, based on the recommendations
9     of Cindy, we would make those decisions.
10          Q.    Okay.  I guess was Cindy there to also
11     verify that the decision was consistent with
12     Cardinal's policies and the law?
13          A.    Cindy was HR, so yes.
14          Q.    Okay.  Was there any discharge or
15     disciplinary decision that you were recommending
16     that Cindy or Mario rejected or asked you to
17     delay?
18          A.    No.  Any of the recommendations or the
19     write-ups, or whatever we had done, went through
20     that process and it was determined that we would
21     terminate the individuals.
22          Q.    Okay.  Okay.  Got it.
23               So as to the -- well, let me just take
24     you down through this COVID-19.  Was there a
25     general reduction in force at Cardinal due to

1        COVID-19?

2            A.    I'm sorry.  I didn't hear the first part

3        of that.

4            Q.    Was there a general reduction in force

5        at Cardinal due to COVID-19?

6                MR. ROBB:  I'm going to object, but you

7        can answer the question.

8            A.    I know that I lost my job at Cardinal

9        during COVID-19.

10           Q.    Okay.  Do you know if others did, as

11       well?

12           A.    I'm familiar that there were some

13       others, but I don't know how many exactly.

14           Q.    Okay.  Okay.  Does it surprise you that

15       it would include 14 employees?

16           A.    Yes.

17           Q.    Okay.  Why would that be?  Why would you

18       be surprised?

19           A.    Why would I be surprised that the staff

20       was reduced by 14?

21           Q.    Yes.

22           A.    Well, because we just talked about the

23       Mentor branch itself being the flagship branch of

24       the Cardinal Credit Union, and so one of the

25       important pieces of that branch is their branch

1        manager and their assistant manager because,

2        specifically, obviously, in times of such COVID,

3        you have to have individuals who are responsible

4        for maintaining the calmness to the branches, as

5        well as having the experience to move through

6        something like that.  And they dismissed both of

7        us, so I was surprised, yes.

8            Q.    Okay.  You're saying that you and

9        your -- you're saying your assistant branch

10       manager were let go?

11           A.    Yes, to my knowledge.  Yes.

12           Q.    Okay.  Okay.  So you do know at least

13       one other person was let go due to COVID-19?

14           A.    Correct.

15           Q.    Okay.  But my question to you was

16       whether you -- it surprised you that 14 total

17       employees were impacted.

18           A.    And my answer was yes, I was surprised.

19           Q.    Okay.  And, as to your branch, how many

20       other people in your branch, aside from you, were

21       impacted by the COVID-19 reduction?

22           A.    I'm not sure other than my assistant

23       branch manager.

24           Q.    Okay.  Who was your assistant branch

25       manager?

```
 1          A.    Jason Riter.

 2          Q.    Okay.  Do you know why Jason was let go?

 3          A.    No.

 4          Q.    Okay.  So you and Jason were both let go

 5     the same day, or how did you find out about it?

 6          A.    I found out when he called me up and

 7     asked me on that Sunday night when I was given

 8     the news that I was being reduced due to

 9     COVID-19, that I was losing my job by Cindy.  I

10     received a phone call from him asking me if I had

11     received a call.

12          Q.    Okay.  And he told you that he had been

13     let go, as well?

14          A.    He did.

15          Q.    Okay.  Okay.  And do you know anybody

16     else who was let go?

17          A.    I do not.

18          Q.    Okay.  So on that -- and I guess I would

19     say, knowing that your assistant branch manager

20     was let go, as well, what made you think that

21     your sex was involved in the decision to select

22     you?

23          A.    What made me realize that my sex was the

24     reason I was reduced?  Is that what you're

25     stating?
```

```
1          Q.    Yeah.
2                Or why would you think that if -- I
3     guess I would say, it would be one thing if I was
4     working and I was let go and Andrea became --
5     took over my role, I might say, oh, you know, it
6     was because, you know, they wanted to let go of
7     me and here's my assistant who is all of a sudden
8     becoming the partner.
9                I guess your assistant branch manager
10    was male who was being let go at the same time,
11    so I guess, with those facts, what made you think
12    that your sex could have played a role in the
13    decision?
14         A.    Well, it's the decision of that day and
15    many things that, you know, transpired after
16    that.
17                So I would say that I was a female
18    branch manager.  I was the only female branch
19    manager, to my knowledge, that was reduced that
20    day.  And, as we went down the road, we had male
21    branch managers that were not reduced that
22    were -- had not been with the company as long as
23    I had and were less performing than I was.
24         Q.    Okay.  Now, how did you know they were
25    less performing?
```

1          A.     Well, because we have Monday meetings at

2     Cardinal where we sat with Christine and the

3     entire management team and we reviewed not only

4     individual goals, but we reviewed branch goals.

5                So it was very visual to all where every

6     one of us stood both via the branch and

7     individually.

8          Q.     Okay.  Okay.  So you'd have those

9     meetings on Mondays.

10               And what made you think that you were

11    outperforming other branch managers?

12         A.     My staff and my actual goals and what I

13    was achieving month after month after month.

14         Q.     Okay.  Okay.  And I guess my question to

15    you would be:  Was it because the Mentor branch

16    was bigger or was size taken into account?

17         A.     So, of course size is taken into

18    account, but I would say, from an individual

19    standpoint, I was the top out of the entire

20    company for 2019 for referred real estate loans.

21               I also did 100-plus percent for my

22    branch for the year 2019, and my goal was a

23    million dollars a month.  And so when you're

24    looking at individual goals and branch size, yes,

25    Mentor was larger than any other branch; however,

Page 47

1          we surpassed our goals.

2                    And the impact that Mentor has on

3          Cardinal's bottom line is much greater than what

4          a Willoughby or a Lakeland or, say, an Ashtabula

5          would have, making sure that that goal was met

6          each month.  And exceeding that goal is critical

7          to the overall company goal.

8              Q.    Okay.  Were there female branch managers

9          that were retained after the COVID reduction in

10         force?

11             A.    That were retained?

12             Q.    Yes, that were not picked to --

13             A.    Yes, there were.

14             Q.    Okay.  How many?

15             A.    To my knowledge, Meghan and the

16         Austintown branch manager were both female.

17             Q.    Okay.  Okay.  So -- okay.  Let me take

18         you to another exhibit.  I'm going to take you to

19         Exhibit 3.

20                    (Deposition Exhibit 3, Employee Verbal

21                    Warning, Bates-labeled Cardinal000238 -

22                    239, was marked for purposes of

23                    identification.)

24             Q.    Can you see that document on your

25         screen?

```
 1              A.    Yes, I see it.
 2              Q.    Okay.  So I'm going to scroll through
 3         it, first of all.
 4                    Have you seen that document before
 5         today?
 6              A.    I have.
 7              Q.    Okay.  Is that your signature on that
 8         document?
 9              A.    It is.
10              Q.    Okay.  Okay.  So why were you given
11         this?
12              A.    I'd have to read it specifically.
13              Q.    Okay.
14              A.    This was a follow-up conversation I
15         think you referenced earlier.  So I didn't return
16         this phone call to this particular individual.  I
17         received an email from them on December 28th.  I
18         didn't follow up until January 4th.  That was,
19         obviously, around the holiday time.  I had
20         reached out and left this individual a message.
21         And I did have a couple of PTO days, but when
22         this write-up was presented to me, obviously,
23         that wasn't considered.
24                    So that's what this write-up is.
25              Q.    Okay.  It looks like there was previous
```

Page 49

1          warnings about this type of issue in 2019?

2               A.    That's a coaching.  It's a conversation

3          about a phone call.  Yes.

4               Q.    Okay.  About who?  Who would have done

5          that, Mario?

6               A.    That would have come from Mario.

7               Q.    Okay.  And those were, what, three

8          coachings where there were items talking about

9          customer service?

10              A.    This was -- I don't know, actually,

11         because I don't see the coaching here, so I can't

12         answer that.

13              Q.    Okay.  Okay.  And then the consequences,

14         it looks like, to just verify, it is expected to

15         follow up with member or staff within 24 to 48

16         hours acknowledging communication.

17                   Did I read that right?

18              A.    Yes.  Correct.

19              Q.    Additionally, if stating to member of

20         staff that you will respond by a specific date,

21         it is expected to meet deadline.

22                   Did I read that correct?

23              A.    Correct.

24              Q.    Any further discussions will result in

25         further disciplinary action, 30-day probationary

Page 50

1        effective January 27, 2020.

2                Did I read that right?

3        A.      Correct.

4        Q.      Okay.  Do you know if any other branch

5        managers were on probation?

6        A.      It was a common knowledge and it was a

7        common practice that many people at Cardinal were

8        on coaching and write-ups.  It's just the way

9        they operated.

10       Q.      Okay.  So did you take it seriously

11       or -- I don't know how to take that answer.  Was

12       it something that you just expected to get or

13       where did it fall?

14       A.      It was -- you know, it was honestly

15       something that people expected.  It just

16       depended.  There was no consistency with it.  I

17       didn't return a phone call within the 24 to 48

18       hours.  There was -- there were reasonings behind

19       that.  I hadn't reached the individual and, yes,

20       I was written up for it.  And, you know, so it

21       just depends.  Sometimes you were written up for

22       it, sometimes you weren't.

23       Q.      Okay.  Well, like on this occasion,

24       there was an inspection.  Did Mario and the team

25       look through the records of the branch to verify

1     customer service?

2     A.   I'm not aware what Mario did to verify

3     the customer service.

4     Q.   Okay.  How did he find out that there

5     was a delay?

6     A.   I don't know.

7     Q.   You don't know.  Okay.

8     You didn't disagree, though, that you

9     had not spoken to the customer in that amount of

10    time?  The member.

11    A.   I explained to Mario at that particular

12    time that I had tried to reach out to the member

13    and that I did not get the member.  And that I

14    had been off a few days, but none of that

15    mattered.

16    So you sign the form whether you agree

17    or not -- or you don't agree by signing, you

18    know, that you received it.

19    Q.   Okay.

20    A.   So I signed it.  And I didn't agree with

21    it, but I signed it.

22    Q.   Okay.  But whether you were out or

23    not -- I'm not saying that it wasn't holiday

24    time.  You certainly could have asked your

25    assistant manager or somebody else to follow up

Page 52

1      with that member, right?

2          A.    That particular member only wanted to

3      speak with me.

4          Q.    Okay.  Well, I guess I would say that if

5      you were going to be out, what they're saying is

6      you would say to the member, I'm going to be out

7      for the next two days, can we talk January blank,

8      right?

9          A.    I did leave the member a message.  I

10     just didn't get to speak to that member.

11         Q.    Okay.  Okay.  Well, I guess you didn't

12     agree with it.

13              I mean, I guess I would say holding the

14     employees up to the response, did you hold your

15     employees up to those, those guidelines and

16     expectations?

17         A.    My employees were held to guidelines and

18     expectations; however, there were times that

19     things happened and they didn't make that call.

20     And it didn't mean that they didn't, you know,

21     try to reach a member or to try to reach out.  It

22     may have taken a little bit longer.

23         Q.    Did you discipline if they failed?

24         A.    I followed the policies and procedures

25     of Cardinal, as anybody else would.

Page 53

1          Q.    Does that mean you disciplined them?

2          A.    If that was our procedure and they

3     didn't follow it, yes.

4          Q.    Okay.  Okay.  Well, let me take you to

5     the next exhibit, the next document on the

6     screen.

7          A.    Yes.

8          Q.    Okay.  This is going to be marked as

9     Exhibit 4.

10              (Deposition Exhibit 4, Employee Written

11               Warning, Bates-labeled Cardinal000245 -

12               246, was marked for purposes of

13               identification.)

14          Q.    And I'll scroll down through.  Do you

15     recognize this document?

16          A.    Yep.  These were some compliance

17     documents that were turned in later than they

18     were supposed to be, which they were to be turned

19     in to our compliance officer.  They were turned

20     in later than they were supposed to be.  They

21     were in a drawer, and our staff for the day had

22     not literally picked them up and put them where

23     they needed to belong and I was disciplined for

24     that.

25          Q.    Okay.  Well, it looks like account cards

```
1      were to be submitted at deadline --
2      [unintelligible]
3              THE REPORTER:  I'm sorry.  It looks
4      like...
5         Q.   It looks like the account cards were
6      located -- had a deadline for December and
7      January and February.
8              Did I read that right?
9         A.   Yes, you are reading that accurately.
10        Q.   Is that accurate or no?
11        A.   That's what it says.  It's accurate,
12     yes.
13        Q.   Okay.  And this random inspection, what
14     did they -- tell me about those.
15        A.   So account cards were turned in -- what
16     this means is that there was an account card that
17     someone had not turned in, so meaning that not
18     all -- it wasn't like all the account cards did
19     not get turned in.  The account cards got turned
20     in, but someone had an account card missing, or
21     they still had it for December, January, and
22     February.  So that's what that means.
23        Q.   Okay.  How about they weren't audited?
24     What does that mean?
25        A.   Meaning that because an employee
```

1    potentially had an account card on their desk and
2    it didn't make it into the group, then it didn't
3    get audited by Ann Marie in the timely basis that
4    it needed to.
5        Q.    Okay.  Was that something that you
6    required your employees to do, or should have?
7        A.    It's something that we require the
8    employees to do.  But you may remember the
9    conversation we had a little earlier about that
10    particular time frame where we had quite a bit of
11    rollover in staff and we had new staff that was
12    on board.  So part of that was a learning curve,
13    as well.  Part of that was left over from staff
14    members that didn't complete things properly that
15    were there.
16        Q.    Okay.  It looks like you were placed on
17    now a 60-day probationary period from February
18    19th.
19        A.    Correct.
20        Q.    Okay.  Do you -- and you signed that
21    document, right?
22        A.    Yep.
23        Q.    And I take it that -- is that something
24    that you considered normal again, or where did
25    this fall?

1          A.    I felt that this particular write-up

2     was -- it was, it was, it was unnecessary based

3     on the branch and what it had recently gone

4     through, with the rotation of staff members that

5     had been terminated, with new staff members that

6     had come on, and with the remainder of staff

7     members I had trying to manage the Mentor members

8     in accordance to what we do each day and making

9     sure that we got through all of the requests.

10          So, unfortunately, there were several

11     that were missed and I was written up over it.

12          Q.    Okay.  I guess I would say if you're

13     dealing with new employees or employee turnover,

14     wouldn't that make your job and the assistant

15     manager's jobs that much more important?

16          A.    Our, our jobs are very important, and

17     the important piece of that job was waiting on

18     the staff members -- or the members that were in

19     front of us to get those loan applications

20     through, to answer their questions, to deal with

21     the checking accounts or the savings account.

22          So we were member-focused and

23     member-facing, and so our time at that particular

24     time was spent making sure that all the members

25     were serviced because we were down multiple staff

Page 57

1          members in that area.

2               Q.    Okay.  I guess what I'm getting at is,

3          if there was new employees, it would seem to me

4          that you and the assistant manager would be

5          really making sure the employees were doing --

6          following the procedures and being onboarded

7          correctly?

8               A.    That's all part of the job.  Correct.

9               Q.    Okay.  It seems like you are saying that

10         because there were new employees, that it should

11         be I guess not considered or discounted.

12               Is that what I'm hearing?

13               A.    Well, no, not discounted because most of

14         that was cleanup from employees that were exited,

15         that had been terminated, and so there was stuff

16         left behind and -- that had to be gone through.

17         And, you know, there were messes that needed to

18         be cleaned up, and so some of that fell within

19         those parameters.

20               Q.    Okay.  Was your assistant manager

21         disciplined, as well, for these events?

22               A.    No, he was not.

23               Q.    Okay.  How do you know that?

24               A.    Because I was disciplined as the branch

25         manager.

Page 58

1          Q.    Okay.  You don't know if he got the same

2     type or anything along those lines?

3          A.    He did not.

4          Q.    He did not.  Okay.

5                Did you think that the two pieces of

6     discipline were discriminatory?

7          A.    No.

8          Q.    Okay.  Do you know of anybody else who

9     actually had been put on, I guess, put on -- any

10     other branch manager who was put on a 60-day

11     probationary period?

12          A.    I don't know anyone specifically.  It

13     was well known that it was a common occurrence

14     within Cardinal for people to be written up for

15     things of this nature.

16          Q.    But you don't know of any -- you can't

17     point to anybody that has happened to?

18          A.    Correct.

19          Q.    Do you know if -- when COVID hit, if any

20     other branch managers were on a probationary

21     period?

22          A.    I do not.

23          Q.    Okay.  Okay.  Well, let me ask you --

24     and why don't we -- I'm going to share my screen

25     again.

Page 59

1              (Deposition Exhibit 5, Termination

2              letter, Bates-labeled Shibe000007, was

3              marked for purposes of identification.)

4         Q.    Okay.  Can you see that letter?

5         A.    Yes.

6         Q.    Okay.  So how did you get this letter?

7    Well, I guess, first of all, do you recognize it?

8         A.    Yes, I do recognize the letter.

9         Q.    Okay.  How did you get this?  Was it

10   handed to you?  Mailed to you?  How did you get

11   notice?

12        A.    I received the original notice on a

13   Sunday evening about 7:00 from Cindy in HR via

14   telephone call, calling me.  I could hardly

15   understand her.  She was sobbing to tell me that

16   I was being released due to COVID-19, staff

17   reduction, and that I needed to listen to this

18   paragraph she needed to read me.  And she was

19   very sorry and she hung up.

20              And she told me not to report on Monday;

21   that my job had been -- you know, I was out of a

22   job due to COVID-19 and that's why I was being

23   released.

24        Q.    Okay.

25        A.    I received this in the mail I think a

1      few days later.

2            Q.    Okay.  It sounds like Cindy either liked

3      you or was upset by the need to do a reduction

4      with being faced with COVID?

5            A.    I'm not sure.  I think she was very

6      upset to have to make phone calls on a Sunday

7      evening to let people know that they were being

8      reduced due to COVID-19.

9            Q.    Okay.  Okay.  Well, I guess I would say,

10     did you have a good relationship with Cindy?

11           A.    Cindy and I worked well together with

12     the items that, you know, we worked together over

13     the, you know, time I was there, yes.

14           Q.    Okay.  Okay.  And then do you know who

15     made this decision?

16           A.    I don't know who made the decision.

17           Q.    Okay.  Okay.  And with COVID-19, do you

18     know if it impacted -- if it would have

19     necessitated a reduction because the members were

20     not visiting the branches?

21           A.    If you were to ask me, I would say it

22     would have been even more important to have

23     leadership and your manager there guiding your

24     staff with the changes that were being faced with

25     the branch and how we were going to operate due

1      to COVID, whether that be via drive-through, by

2      appointment only, making outbound phone calls, or

3      just, you know, keeping calm to the water.  I

4      would absolutely think you would need your leader

5      there to support that.

6          Q.    Okay.  Well, that's a different question

7      than what I asked you.  I was asking initially --

8      sorry.  Initially, I was asking you about whether

9      the members not visiting the branch would

10     potentially impact the man- -- I guess the FTEs

11     needed in order to staff the branch.

12         A.    Well, when you look at COVID-19 -- and

13     no one knew exactly how long that was going to

14     last or what that looked like or how long

15     anything would be changed within the structure.

16     And, due to those changes, that could create

17     additional work for everyone to make sure that

18     our members were still taken care of in whatever

19     modified ways that we were doing that.

20         Q.    Okay.  Well --

21         A.    I did not expect for them to reduce the

22     staff to that level.

23         Q.    Okay.  Well, certainly, I can tell you

24     that -- I mean, it was a shock to my system

25     looking and seeing the government shutting down

Page 62

1       businesses and many businesses not open.

2               That didn't, didn't surprise you or

3       shock you as a branch manager, looking at the

4       world and having uncertainties?

5       A.      Well, as an essential employee in a

6       workforce where we didn't close, to your point

7       earlier, it did shock me that we were taking key

8       people out of the branch to not be able to manage

9       through what was happening in the world, to your

10      point.  So yes, it did shock me.

11      Q.      And, again, my question to you, Ms.

12      Shibe, was more to the point of -- I mean,

13      this -- we can agree that this was unique.

14              Certainly, in the last 30 years of your

15      banking experience, you've never had the federal

16      and state government coming in to say, hey, we're

17      going to shut down businesses --

18      [unintelligible] -- right?

19      A.      I'm sorry.  You broke up at the end

20      there.

21      Q.      Over your 30 years in banking, have you

22      ever had a situation where state or federal

23      governments have come in and shut down many

24      businesses indefinitely?

25      A.      I have not.

1          Q.    Okay.  And my question to you is just

2     simply not whether you thought you were important

3     to the process, but you wouldn't look at this

4     with much uncertainty if you were the CEO of

5     Cardinal and say where's the business going to go

6     in two months or three months?

7          A.    That's not a decision that I made.

8     So...

9          Q.    I'm not asking you whether you made the

10    decision.  I guess I'm asking you -- I mean, you

11    were seeking out employment.  It sounded like you

12    agree that many of the financial institutions

13    were not hiring due to the fact of the

14    significant impact COVID had on them and their

15    customers' operations, right?

16         A.    Well, the funny thing is that, you know,

17    I would agree with you except Cardinal, 60 days

18    later, posted my position out there on the

19    website recruiting a branch manager for the

20    Mentor facility.

21         Q.    Okay.  Well, most certainly -- I guess I

22    would say May 15th and March 15th were two very

23    different days in 2020, were they not?

24         A.    What I said was that they posted the

25    position for someone to take the place of the

Page 64

1    branch manager in Mentor 60 days later on their
2    website.
3         Q.    Well, and what I'm saying to you is, the
4    difference between March 15th when the world was
5    shutting down and May 15th when the world was
6    starting to reopen were very different times in
7    the life span of a business in 2020, right?
8         A.    I don't know where you're getting --
9              MR. ROBB:  Objection.  Objection, but
10   you can answer, Abbie.
11        A.    I don't know where you're getting March
12   to May.  I was referring to 60 days from the end
13   of March when I was released to the position
14   of -- my branch management position being posted
15   looking for a replacement 60 days later on the
16   website.
17              So I'm not sure where May comes in.  I
18   know that they did permanently put someone in
19   that position in May, but that was posted for
20   hire 60 days later.
21        Q.    You're saying 60 days after somebody
22   went in in May.  I don't understand what --
23        A.    No, no.  Sixty days after I lost my job
24   due to COVID-19, Cardinal advertised my job, the
25   Mentor branch manager, looking for a replacement

Page 65

1      on their website.

2            Q.    Okay.  And what I was saying to you, Ms.

3      Shibe, was real simple.

4                  On March 15th, or at the end of March,

5      we were going into a very uncertain time; would

6      you not agree with that?

7            A.    I'd agree.

8            Q.    Okay.  And by the time the 60 days came

9      up -- and you're saying it was the end of March,

10     so we're talking June.  In June in Ohio, many

11     businesses were reopening.  In fact, I believe

12     most businesses were reopened by that time,

13     right?

14                 MR. ROBB:  Objection.  You can answer.

15           A.    I don't know whether most businesses

16     were opened or not as a whole.

17           Q.    Okay.  You weren't paying attention to

18     the market and what was going on with respect

19     to -- with respect to the openings of businesses

20     if you were seeking alternative employment?

21           A.    I was seeking my employment through

22     the -- I was seeking my employment through the

23     computer.  I didn't go to many places because I

24     was focused on looking for a job.  And my income

25     was very much reduced on unemployment, so I was

Page 66

1     not out visiting any businesses.

2         Q.    Okay.  Well, I didn't ask whether you

3     were visiting.  I was wondering if you were

4     paying attention to the progression of the

5     shutdown orders.

6         A.    What is your question?

7         Q.    Well, my question is:  Did you have an

8     understanding that on March 15th, many businesses

9     were shut down by the State of Ohio, and that by

10    the time --

11        A.    I'm aware --

12        Q.    -- June 15th came around, most of those

13    businesses were reopened, right?

14            MR. ROBB:  Objection.  You can answer.

15        A.    I don't have knowledge whether most of

16    those businesses were open.

17        Q.    Okay.  How about if most of those

18    businesses were permitted by law to be reopened?

19        A.    I do know that, you know, we were

20    progressing and making changes, you know, during

21    that period of time but, again, I don't know if

22    it was the majority.

23        Q.    Okay.  Okay.  Well, let me ask you this.

24    I mean, I understand that you may believe your

25    position was different than other positions.

1           Do you agree or disagree that heading

2      into COVID-19 and seeing many businesses shut

3      down by law, that that may necessitate in a CEO's

4      mind, hey, we should reduce staff in order to

5      maintain the profitability of the credit union?

6           MR. ROBB:  Objection.  You can answer.

7      A.    I was reduced in staff.  I was released

8      from Cardinal due to COVID-19.  Do I agree with

9      that?  I do not agree with that.  Was it

10     necessary?  I'm not a CEO, so I don't know.

11     Q.    My question isn't whether your position

12     was necessary.

13          My question is:  You're the CEO looking

14     at the fact that many of your credit union

15     members may not be working; that your branches

16     are not going to have individuals coming into the

17     branch; that you don't know what tomorrow is

18     going to be.  Do you agree or disagree that a

19     reduction of force at a credit union would make

20     business sense?

21          MR. ROBB:  I'm going to object again,

22     and you can answer.

23     A.    I don't have enough facts as of -- to

24     what determining factors Christine or anyone else

25     looked at during that course, so I don't know.

Page 68

1          Q.    Isn't a credit union, I guess I would
2     say a little different, as you point out, that
3     the members are essentially the owners of that
4     credit union, right?
5          A.    Correct.
6          Q.    And, I mean, the members are making
7     certain -- I mean, that's part of the reason why
8     they had high expectations of customer service,
9     because, essentially, your owners are coming in
10    and you want to make sure your owners are happy,
11    right?
12         A.    Correct.
13         Q.    And then, as to the bottom line, it's
14    not like you're sitting there with reserves and
15    we can go into the red or we can lose money.  I
16    mean, this is a credit union that has to make
17    certain it's there for its members, right?
18         A.     Which is exactly my point.  Yes.  During
19    times like this, COVID-19, you would need your
20    leaders in place to make sure that your members
21    were taken care of in whatever capacity we could
22    take care of them, whether that be via the
23    drive-through or via an appointment or whatever
24    the changes needed to be made during the times
25    that we were in.

1          Q.     Well, that would be a -- I'm sure a

2     great luxury for everybody to have unlimited

3     funds and to be able to say, hey, we're not only

4     going to keep our staff, but we're going to

5     increase the staff, right?

6               But you also -- you have competing

7     aspects.  You have fewer customers or no

8     customers coming into the branch, right?

9          A.     I don't know.  I wasn't there.

10          Q.     Okay.  You don't know about the banks?

11     You didn't keep track on how the banks were

12     impacted?  If you were seeking employment, how

13     COVID was impacting the banks?

14          A.     How COVID was impacting the banks and

15     the positions that were available, you know,

16     those are two different things.  I mean, there

17     were people -- places that were hiring such as

18     Cardinal.  It had advertisements out there, so

19     yes --

20          Q.     Okay.

21          A.     -- I am aware.

22          Q.     Okay.  Well, I take it you, you think

23     that if the customers weren't visiting the

24     branch, that your branch would be busier; is that

25     what you're telling me?

Page 70

1          A.     So if the customers aren't coming into

2     the branch but they have things that need to be

3     taken care of or they have needs, they're going

4     to have to do that over the phone.  They're going

5     to have to do that via the drive-through.

6     They're going to have to do that via scheduled

7     appointment.

8              There were all different ways that the

9     customers -- just because we had COVID and we had

10    shutdown didn't mean that the banking or the

11    needs of our members stopped.  We had to find

12    flexible solutions to be able to service our

13    customers during those particular times.

14             Same as the branch that I particularly

15    bank at, my own personal bank.  You know, the

16    world didn't stop.  We just changed as to how we

17    had to deal with our members and with banking in

18    general for that period of time.

19         Q.    I guess let me ask you.  I mean, here

20    you come.  You certainly prior to -- when were

21    you terminated?

22         A.    I was terminated on March 22nd.

23         Q.    Okay.  So on March 22nd.  And, by that

24    time, there had already been business closures

25    for about a week, right?

Page 71

1          A.    Yes.  Things were starting to change in

2     that period.

3          Q.    Okay.  Were you as branch manager

4     thinking about, hey, I may need to reduce staff

5     or I may need to reduce cost, how am I going to

6     do that?  Were you thinking in that fashion?

7          A.    No, because my CEO was coming up with

8     plans as of to how we were going to be proactive

9     and how we were going to manage those members and

10    keep our staff in place by creating an A team and

11    a B team.  And some would work at home partially

12    and the others would be in the branch.  And there

13    were other duties that were being set aside for

14    the other individuals to keep them working.

15         Q.    Okay.  I guess I would say -- I guess I

16    would say I am surprised that you, as a branch

17    manager, where you -- it sounds like you were

18    responsible for the ultimate performance of the

19    branch, right?

20         A.    I was responsible for the ultimate

21    performance of the branch, not the company.

22         Q.    Okay.  Understood.

23               But it would seem to me that a branch

24    manager seeing this -- and I can't imagine you

25    would disagree with this -- see this unique

1      hopefully once-in-a-lifetime experience here and

2      you're not thinking, what am I going to do to go

3      to my CEO and say, you know what, I'm being

4      proactive and I think we can reduce head count.

5      I think we can reduce hours.  You weren't

6      thinking at all about that?

7          A.    That wasn't my job because Christine, as

8      the CEO, had already come into play and had made

9      the changes in the plans and put it in place so

10     that she could retain the employees, as well as

11     the member service.  And that's where she came up

12     with the A and the B team that went into effect

13     the Monday after I was terminated on the Sunday.

14         Q.    Okay.  Let me share my screen again.

15               (Deposition Exhibit 6, List of

16               additional employees terminated,

17               Bates-labeled Cardinal000269, was marked

18               for purposes of identification.)

19         Q.    Okay.  Can you see this document?

20         A.    Yes.

21         Q.    Okay.  So it looks like here -- and I'm

22     going to represent to you that these are all of

23     the employees who were impacted by the COVID-19

24     March reduction.

25               Do you recognize any of these names?

Page 73

1               A.    I do.

2               Q.    Okay.  And who -- which one is your

3       assistant branch manager?

4               A.    Jason Riter.

5               Q.    Okay.  Jason Riter.

6                     And he's listed as loan officer.  Was

7       that the wrong title?

8               A.    He was the assistant manager, but yes.

9               Q.    Okay.  Anybody else from your branch?

10              A.    Rona Snyder.

11              Q.    Okay.  Anybody else?

12              A.    Rachel Spiker was a float.  She was a

13      float to my branch and other branches.

14              Q.    Okay.  Anybody else?

15              A.    Gil, Gilbert Vignero.

16              Q.    Okay.  What was Gil's position?

17              A.    He was a loan officer.

18              Q.    Okay.  Anybody else?

19              A.    Audrey Rasmussen was a part-time teller.

20              Q.    At your branch?

21              A.    Correct.

22              Q.    Okay.  Anybody else?

23              A.    Kaitlin Stenger was a seasonal worker at

24      Mentor.

25              Q.    Okay.  So it looks to me that Mentor was

Page 74

1        the largest branch and took probably the largest

2        hit, maybe not percentage-wise, but in terms of

3        position eliminations.

4                Do you agree or disagree?

5        A.    I would agree.

6        Q.    Okay.  And it looks to me that

7   Ms. Blake was looking at this with the number of

8        tellers being let go, that Ms. Blake was thinking

9        that the number of customer hours in the branches

10       was going to be reduced.

11               Do you agree or disagree with that?

12       A.    I don't know what Ms. Blake was thinking

13       when she reduced the tellers.

14       Q.    Okay.  Well, certainly, if she was

15       reducing that many tellers, it would seem to me

16       that Ms. Blake was thinking that the customer

17       flow and amount of work for the tellers was going

18       to be drastically reduced, right?

19       A.    I don't know.

20               MR. ROBB:  Objection.

21       Q.    Okay.  Well, you're saying -- it sounds

22       to me as if you were deferring entirely to

23       Ms. Blake, right?

24       A.    What I was stating -- you stated to me

25       earlier that you were surprised as a branch

Page 75

1        manager I was not proactive in identifying that

2        we needed to reduce staff.

3                We also stated that -- and it was

4        something that we've never experienced ever going

5        through a shutdown of this nature.  So what I

6        stated to you was that Ms. Blake, as the CEO of

7        Cardinal Credit Union, had come up with a plan

8        that she was going to, you know, put into motion,

9        and that was to divide the branches into A and B

10       teams, keeping us half at home working and the

11       other half in the office.  And that, as the CEO,

12       was her plan.

13       Q.    Okay.  Well, that was I guess one

14       portion of the plan because she had to also deal

15       with the six-foot rule, right?

16       A.    Well, that was, that was, that was the

17       reasoning in dealing with the six-foot rule.  So

18       half the staff was in the branch, the A team half

19       the week, the Bs were at home doing other things,

20       then Bs came into the branch and As went home.

21       Q.    Okay.  So she -- she's thinking about,

22       okay, I've got a six-foot rule; number two, we

23       are allowed to stay open because we're an

24       essential business; and, number three, now I need

25       to see how this COVID shutdown is going to impact

Page 76

1    our business, right?

2         A.    If that's how she looked at it, yes.

3         Q.    Well, wouldn't you expect that?

4               I mean, would you not expect if all of

5    your members are -- or the vast majority of your

6    members were being laid off, you know, furloughed

7    or laid off, that would seem to be a pretty big

8    issue for the branch, right, for the bank?

9         A.    Well, you know, one of the things that,

10   you know, transpired when all of your members are

11   laid off or furloughed, they're going to be

12   looking for programs to defer payments.  They're

13   going to be looking for extensions.  They're

14   going to be looking for services throughout the

15   bank.

16               So, you know, on the flip side, it's

17   going to increase your traffic and your phone

18   calls because your members are going to need help

19   because they're not working, and they're going to

20   want to make sure that they -- that Cardinal

21   could provide that.

22               I know that for first off, I had to

23   defer and utilize that program on a loan that I

24   had and I had to fill out some paperwork and I

25   had to speak to somebody on the phone.  And I am

Page 77

1    quite sure I wasn't the only one that had to do

2    that.

3         Q.    Okay.  Like I said, it would be great to

4    be able to have unlimited resources and keep

5    everybody on board and to have no reduction or

6    even have more people to service those members.

7    But, at the end of the day, when the members are

8    losing their jobs and businesses are not open,

9    that could have an impact on a credit union,

10   right?

11        A.    It could.

12        Q.    Okay.  I mean -- and you have to protect

13   the members' assets, right?

14        A.    I don't -- I'm not a CEO, so I don't

15   know all the decision pieces that Ms. Blake

16   looked at when she made those decisions.

17        Q.    Okay.  Okay.  Well, assuming that that

18   list is the complete list, obviously, there was a

19   lot of positions that were impacted by the

20   reduction of force, right?

21        A.    Yes.

22        Q.    Okay.  And do you know why Ms. Blake

23   chose your position to be eliminated?

24        A.    I do not.

25        Q.    Okay.  Why would Ms. Blake look at your

1    sex when making the decision?  Why do you think

2    Ms. Blake would, as being a female CEO, would

3    somehow decide she wanted to eliminate somebody

4    because they were female?

5         A.    Well, I would -- if I was the CEO, CEO

6    and I was looking at all of those things, I would

7    say this:  The only person that was a female

8    manager that was released was myself in the list

9    that you just provided.

10        Q.    Okay.

11        A.    So the fact that my performance had been

12   what it was, managing the flagstar [sic] branch

13   of Cardinal, and the fact that Ms. Blake also

14   published my job 60 days later after she reduced

15   it due to COVID-19 and then filled it with a

16   less-performing male, that would tell me that I

17   was discriminated against.

18        Q.    Okay.  Well, my question to you is:  Why

19   would Ms. Shibe -- or not Ms. Shibe -- Ms. Blake,

20   a female CEO, decide she wanted to discriminate

21   against you because you're female?

22        A.    I don't know why Ms. --

23              MR. ROBB:  Objection.

24        A.    -- Blake made that decision.  I don't

25   know when Ms. Blake made that decision.

Page 79

1          Q.    Okay.  Well, I mean, that does seem a
2     little odd, right?
3               MR. ROBB:  Objection.  You can answer.
4          A.    Again, I don't know why Ms. Blake made
5     that decision.
6          Q.    Okay.  Well, I guess I would say, you're
7     alleging that Ms. Blake made the decision because
8     of your sex, and I'm asking you, what makes you
9     believe that?
10         A.    I guess I'll repeat what I just went
11    over.
12              So of your list, I was the only female
13    branch manager that was reduced that same -- for
14    the specific reason for COVID-19.  And that
15    particular position was reposted 60 days later
16    and it was filled with a less-performing male.
17         Q.    Okay.  And I guess I would say it's one
18    thing to disagree, okay?  Anybody can -- it's
19    natural and it makes sense and -- hey, I don't
20    think that I agree with that decision.  I mean,
21    there's lots of decisions at law firms that, if I
22    were making them, I might make it differently,
23    but that doesn't mean that the decisions were due
24    to my race or my sex or my age.  It may be that I
25    just disagree and it wasn't the right decision.

1           Where would you put Ms. Blake's decision

2     as to eliminating your position?

3           A.    I would say my position -- I was

4     eliminated and I was discriminated against based

5     on my sex.

6           Q.    Okay.  So you stand by that you think

7     Ms. Blake picked your position to eliminate

8     because of your sex?

9           A.    Yes.

10          Q.    Okay.  Okay.  And so with respect to

11    that, I guess -- your assistant manager was let

12    go.  Would that not seem to signal you that -- to

13    you that Ms. Blake did not think your branch was

14    performing as well as you believed it was?

15          A.    Well, my performance -- I was not

16    released due to performance.  In fact, my

17    performance was stellar in 2019 into 2020, so

18    much that Ms. Blake gave me a review on February,

19    the middle of February 2020, gave me a good

20    review with raving results of my performance and

21    gave me a bonus less than one month before she

22    terminated me.

23          And I was invited to a best-of-the-best

24    awards dinner with the director of lending in

25    February with all of the top performers for the

Page 81

1      year of 2019.

2          Q.    Okay.  Well, let me ask.  Would it

3      surprise you that there was no branch manager in

4      Mentor from the date of your separation until

5      April 27th, 2020?

6          A.    Does it surprise me?

7          Q.    Yes.

8          A.    No, it doesn't surprise me.

9          Q.    Okay.  So it would seem to me that --

10     I'm assuming that Mario and others in management

11     stepped in to manage the branch, right?

12         A.    I have no idea.  I was not there.

13         Q.    Okay.  Well, certainly, that, that

14     aspect of it would save money and would let

15     headquarters be focused on their, their primary

16     flagship branch, right?

17         A.    If that's what happened.  Again, I don't

18     know.  I was not there.

19         Q.    Okay.  Well, I'm just asking you.

20               And then Jonathan Livingston, who is

21     Jonathan Livingston?

22         A.    I have no idea.

23         Q.    Okay.  You don't recall him being a

24     branch manager?  Or a district manager.  I'm

25     sorry.

Page 82

1          A.     Jonathan -- Jonathan Livingston?

2          Q.     Yes.

3          A.     Jonathan -- Jonathan Livingston, if my

4      memory serves me correct, was the individual that

5      for a very brief moment took over Mario's job and

6      then left to go back to his original job.

7          Q.     Okay.  What was his original job?

8          A.     He worked for KeyBank, I believe.

9          Q.     Okay.  Do you understand that

10     Mr. Livingston, for a very brief period of time,

11     took over the Mentor branch manager duties from

12     Mario?

13         A.     I have no knowledge of that.

14         Q.     Okay.  And then, finally, Jared Furnia,

15     who is Jared Furnia?

16         A.     Jared Furnia, when I worked for

17     Cardinal, was the Willoughby branch manager.

18         Q.     Okay.  And did you understand that Jared

19     eventually took the Mentor branch manager spot?

20         A.     I do.

21         Q.     Okay.  Okay.  And so that was not until

22     May of 2020, correct?

23         A.     From what I understand, Jared officially

24     took that job in May of 2020 but was there much

25     earlier than that.

Page 83

```
 1          Q.    Okay.  And then, as to the other
 2    branches, with respect to the other branch,
 3    branch managers when you were let go, there was
 4    Audrey Blews?  B-L-E-W-S.
 5          A.    Yes.
 6          Q.    Okay.  Meghan Berkman?
 7          A.    Correct.
 8          Q.    And then Rob Petrie?
 9          A.    Correct.
10          Q.    Where was Rob the branch manager?
11          A.    Lakeland College.
12          Q.    Lakeland College.
13                Was Lakeland shut down, do you know?
14          A.    I have no knowledge of that.
15          Q.    Okay.  Would it surprise you that the
16    Lakeland branch was actually shut down?
17          A.    Would it surprise me?  No, it wouldn't
18    surprise me.  Huh-uh.
19          Q.    Okay.  Did you understand that it was
20    shut down due to COVID?
21          A.    I had no knowledge that it was shut down
22    or if it was operating, you know, via a different
23    capacity.  I have no idea.
24                MR. CAMPBELL:  Okay.  Okay.  Why don't
25    we take a short break.  Why don't we come back at
```

1      4:30, then we'll wrap up probably about 5:00.

2      Does that work?

3                   THE WITNESS:  That works.

4                   MR. ROBB:  One quick question, Dave.

5      Did you admit the list of terminated employees in

6      as an exhibit?

7                   MR. CAMPBELL:  Yeah.  Yeah.  That's

8      Exhibit 6.

9                   MR. ROBB:  6.  Okay.  I just wanted to

10     be sure for my records.  I missed that.

11                  MR. CAMPBELL:  Okay.  I'll email them to

12     you afterward.

13                  Okay.  We'll be back in 11 minutes.

14                     (A recess was taken.)

15     BY MR. CAMPBELL:

16        Q.    Okay.  I think we're almost wrapped up

17     here.  I just have a little bit to finalize.

18                  Okay.  So I guess I would say this:

19     With your knowledge of the banking industry, did

20     other banks around Northeast Ohio and Ohio go

21     through reductions in forces during COVID?

22        A.    I have no knowledge whether they went

23     into a reduction of forces.  The only thing I can

24     say from my personal understanding is they

25     changed some ways that they did business.  But,

Page 85

1          as far as reducing their staff, I have no

2          knowledge of that.

3               Q.    You don't.  Okay.

4               You do have knowledge that they weren't

5          necessarily hiring as much after COVID, at least

6          for the first six months or so?

7               A.    Correct.

8               Q.    Okay.  What did -- I know you were only

9          there for 91 days.  Where were you at your first,

10          first job after --

11               A.    Middlefield Bank.

12               Q.    Okay.  What did Middlefield do during

13          the, during the shutdown?

14               A.    We were open completely, branches

15          interior and exterior.  We had a requirement for

16          masks.  We had a drive-through that operated as

17          normal and the interior of the bank operated as

18          normal, as well, with the loan officers and the

19          manager and the assistant, you know, in the same

20          capacity as we were.

21               Their difference was the mask mandate.

22          We had a reduction of the amount of people that

23          we were allowed to have in the lobby at any given

24          time based on the space of each individual

25          branch.  My particular branch was 13, so we could

Page 86

1    have 13 people.  We had a process where we marked

2    out the floor so that when they came in, they

3    knew where they could stand.  And we monitored

4    the doors on busy days to allow individuals in to

5    adhere to that 13 in the lobby at any given time.

6        Q.    Okay.  I'm talking about are you

7    familiar with what Middlefield did when COVID

8    hit.  Did they have a reduction?  Did they stop

9    hiring?  What did they do?

10       A.    I was working at Middlefield during that

11   period and I was hired in still full COVID.

12             So what they did was mask mandate and

13   reduced amount of individuals allowed in branches

14   at any given time.

15       Q.    Okay.  But you weren't there on March

16   15th.  I mean, so my question is:  Do you know if

17   they did a reduction?  Did they stop hiring, or

18   did they just go business as usual?

19       A.    I'm not aware what they did on March

20   15th because I was not there.

21       Q.    Okay.  Okay.  And then, as to

22   Cardinal -- I guess I take it you were surprised

23   by the, by the phone call eliminating your

24   position?

25       A.    I was surprised by the phone call about

Page 87

1       eliminating my position because of the meeting

2       that we had just had on Friday with Ms. Blake

3       that had put a plan in place to divide the

4       branches and the teams up to that A and B team I

5       spoke about earlier.

6            Q.    Okay.  Well, and I guess I would say

7       that plan most certainly wasn't just -- it wasn't

8       necessarily deciding -- well, let me take a step

9       back.

10            The plan was there to make sure that the

11       six-foot rule was complied with, right?

12            A.    That was the only plan I was aware of on

13       Friday when the word came down that we were

14       dividing staff in order to continue to service

15       our members and to meet that six-foot rule, to

16       your point.

17            Q.    Okay.  Okay.  And so she -- she

18       announced the way that you were going to handle

19       the six-foot rule, which obviously was different,

20       right, as to how you were going to be servicing

21       customers, right?

22            A.    Correct.

23            Q.    Okay.  So that was announced.

24            And did she say anything about

25       reductions in force or anything like that?

Page 88

1          A.     She did not.

2          Q.     Okay.  Okay.  And so -- and I guess, I

3     guess with that said, do you know if any of the

4     other branch managers were on probation at the

5     time of the reduction in force?

6          A.     I do not.

7          Q.     Okay.  If you were told you were the

8     only one on probation at that time, would that

9     impact your decision as to whether Ms. Blake

10     selected your role based on your sex?

11          A.     It would, it would not impact the way I

12     feel or my decision on the sex aspect of that

13     because I wasn't -- you know, I was -- I wasn't

14     released due to my performance.  I was released

15     due to COVID-19.

16          Q.     Okay.  Well, that makes sense, but you

17     don't think that, that they were looking at the

18     branch managers, that they couldn't, that they

19     couldn't maybe look at --

20                 For example, one of the branches -- and

21     I take it that you agree, one of the branches

22     shut down, right?

23          A.     Which branch are you referring to?

24          Q.     I believe we said Lakeland had shut

25     down.

1          A.     Yeah, not to my knowledge.  But I think

2     you said that Lakeland had shut down during the

3     COVID -- I'm not aware that they did or that they

4     didn't.

5          Q.     Okay.  Well, I guess I would say if they

6     were eliminating a branch manager role and

7     somebody was on a 60-day probationary period,

8     would it be inappropriate if Ms. Blake said, hey,

9     I've got somebody on a 60-day probationary period

10    and with a -- I guess let's just understand what

11    that means.  I mean, one more piece of

12    discipline, you could have been subject to

13    discharge, right?

14         A.     Well, in any other world, that might be

15    correct, but in the Cardinal world, no.  I've

16    seen many people be on final written warning,

17    including staff members of mine, and it be

18    completely washed off and they're back to

19    starting again.

20         Q.     Okay.  Well, I guess I would say:  Do

21    you know of any branch managers who were on

22    60-day probationary periods?

23         A.     I do not.

24         Q.     Okay.  And, I mean, the good and the bad

25    is, the Mentor branch was the flagship, right?

1          A.     Correct.

2          Q.     And was headquarters -- how close was

3     headquarters to your branch?

4          A.     We were in the same building.

5          Q.     Okay.  So if there's any surprise audit

6     for anybody coming to check anything out, I mean,

7     you had the management team, the executive team

8     right there, right?

9          A.     Correct.

10          Q.     So, I mean, the good of it is, is you

11     are at the largest branch.  You've got lots of

12     customers.  You've got lots of members -- I'm

13     sorry -- coming through.

14               Can you still see me?

15          A.     I can see you.

16               THE REPORTER:  You froze for a couple

17     seconds.

18               MR. CAMPBELL:  Okay.  My computer went

19     out.  Give me one second.

20               Okay.  We might pop back.  I think I

21     accidentally turned something off.

22               Okay.  We're back.  Okay.  Can you still

23     hear me?

24               THE REPORTER:  Yes.

25               MR. CAMPBELL:  Okay.  We're back.  Had a

1       little bit of an issue with it.

2       BY MR. CAMPBELL:

3           Q.    So the good and the bad, you had the

4       eyes of the executive team there, as well, right?

5           A.    Correct.

6           Q.    Okay.  So I guess I would say, you don't

7       know what Ms. Blake made her decision on, do you?

8           A.    I do not.

9           Q.    Okay.  If Ms. Blake made her decision

10      based upon your 60-day probationary period when

11      looking at the branch managers, would that change

12      your view?

13          A.    It would not.

14          Q.    It would not.  Okay.

15          And how do you know that Ms. Blake

16      wouldn't look at that -- those two warnings and

17      think that those were significant issues in her

18      eyes?

19          A.    I don't know whether she would or she

20      wouldn't.

21          Q.    Okay.  Well, I guess I would say -- I

22      mean, here's somebody who is looking at them.

23      Here's somebody who hired you, right?  I mean,

24      she didn't hire you because she disliked women,

25      right?

1        A.    I -- Ms. Blake did not hire me because

2    she disliked women, no.

3        Q.    Okay.  Do you know, did she -- or do you

4    believe she discriminated against anybody else?

5        A.    I have no knowledge of whether she did

6    or if she didn't.

7        Q.    Okay.  You have no knowledge.  Okay.

8             Okay.  Well, here's somebody who hired

9    you.  You said that you got good evaluations, so,

10    presumably, you were happy at those times, right?

11        A.    My evaluation was less than 30 days

12    before Ms. Blake decided to terminate me.

13        Q.    Okay.  Well, Ms. --

14        A.    The same, the same evaluation where

15    Ms. Blake gave me a bonus, less than 30 days

16    before she decided to terminate me.

17        Q.    Okay.  Was the evaluation for 2019?

18        A.    The evaluation was for 2019 and it

19    transpired and through, really, to the time that

20    I was evaluated, which was in the middle of

21    February of 2020.

22        Q.    Okay.  Well, was it -- I mean, however

23    you want to frame it.  You have 30 days of

24    discipline in 2020, and most certainly your

25    evaluation for 2019 is not going to be negatively

Page 93

1          impacted for discipline in 2020, right?

2               A.     I mean, it was noted in there, in my

3          review, correct, yes, for whatever I had during

4          that period.

5               Q.     During the period up to the point of it

6          or during 2019?

7               A.     The review was in February of 2020 for

8          2019, but it was an overall review of 2019 and

9          whatever part we had of 2020 prior to --

10              Q.     Okay.  You believe --

11              A.     Yes.

12              Q.     And was Ms. Blake part of that?

13              A.     Ms. Blake was not involved in my review.

14              Q.     Okay.  You don't think she would have

15         had to review and sign off, or where do you come

16         down on that?

17              A.     You mean in the room or...

18              Q.     No, not in the review, not --

19              A.     No.

20              Q.     -- actually there, but being part of it.

21              A.     My review, I'm sure she had, you know,

22         had to sign off on the review.  Like I said, I

23         was, I was given a review by Mario, who was my

24         direct who, you know, ultimately reported to

25         Ms. Blake.  That's his direct.  I'm sure she

Page 94

1          understood the review.  I'm sure she had to

2          authorize the bonus I was given at that

3          particular time.

4               Q.    Okay.  Well, were you happy with the

5          review?

6               A.    I was happy with most of the review.  I

7          disagreed on several parts of the review because

8          it had never been discussed with me previously

9          and I actually ended up speaking with Cindy in HR

10         about that.

11              Q.    Okay.  What were those parts?

12              A.    I can't tell you exactly what it is

13         today, two years later, but there were a couple

14         of areas in there that I had disagreed about, and

15         I brought that to Cindy's attention.

16              Q.    Okay.  And what did Cindy do about it?

17              A.    She spoke to Mario about it and told

18         Mario that an employee should never -- it should

19         never be basically a surprise to an employee.

20         And if you were going to put something in the

21         review, there should have been further

22         discussions documented prior to and there was

23         not.

24              Q.    Were there performances issues?  Is that

25         what you were upset about?

Page 95

1          A.    Not so much an issue, but I didn't agree

2     with the rating on the scale that he gave for

3     those particular areas.

4               THE REPORTER:  Excuse me one moment.

5          (Record paused momentarily.)

6               THE REPORTER:  Very sorry for that.

7               MR. CAMPBELL:  No problem.

8     BY MR. CAMPBELL:

9          Q.    Okay.  So tell me, what was your overall

10    ranking or rating?

11         A.    My ranking was good overall.  I just was

12    not pleased with a couple of the areas that I was

13    rated less than I felt I should have without

14    really any documentation or prior discussions.

15         Q.    Okay.  So you had had an issue.

16               And I guess did you have any issues with

17    Mario?

18         A.    Did I have any issues with Mario?

19         Q.    Yeah.

20         A.    You know, Mario was -- Mario was --

21    didn't return calls very quickly.  He wasn't --

22    his availability was not very good when you

23    needed him.  And Mario, when you asked for

24    something or you needed something, you always had

25    to go back for a second time or a third time to

Page 96

1      ask for it because he didn't do it.

2          Q.    Okay.  Okay.  So any other problems with

3      Mario?

4          A.    No.  I mean, Mario -- I had very little

5      dealings with Mario, to be honest with you, other

6      than, you know, your normal conference calls,

7      your Monday morning meetings.  Mario had other

8      branches he was responsible for and he wasn't

9      around very often.

10         Q.    Okay.  Okay.  So you have your review

11     and I take it that you weren't -- did you get a

12     pay raise?

13         A.    The way Cardinal does pay raises, which

14     was my first understanding of how they do it when

15     you make a certain amount of money, is they give

16     you a raise in the form of what they call a 1

17     percent bonus.  And it's a lump sum bonus for the

18     year, and that's what they give you.

19         Q.    Okay.  So you got the 1 percent bonus.

20     Was that the max, or where did that fall into?

21         A.    That was the max that you would get if

22     you got it at all.  Yes.

23         Q.    Okay.  Okay.  So you got that.  And so

24     you got, you got that aspect of your -- of the

25     evaluation.  And so, presumably, that was

Page 97

1    reviewed and approved by Ms. Blake.

2            So I guess let me ask you with respect

3    to then.  So you get that review.  You also

4    have -- you're on probation for 30 and 60 days.

5    What did Mario tell you about the probation?  I

6    mean, what did he tell you about it?

7        A.    Mario didn't tell me a whole lot about

8    the probation at all.  It was basically this is

9    why you're going on probation.  If you had

10   anything to say about it, he wasn't really

11   interested because he'd already made a decision

12   this is what he was doing and signed the paper.

13   Whether you agree with it or not, it doesn't

14   matter, basically.

15           You know, by signing it, it didn't mean

16   that you agreed with it.  And that it was very

17   short, sweet.  There was never really any

18   detailed conversation.

19           And, like I stated before, it was not

20   abnormal in any way, shape, or form for someone

21   to get called in by myself or Mario or Cindy and

22   have a write-up of this nature.  It was, it was

23   an odd thing, in all the years of banking, but

24   there was a lot of this going on where my

25   experience in other organizations are -- there is

1       disciplinary action; however, it wasn't to this

2       level for minor things of this nature.

3           Q.    Okay.  Well, I guess I would say, at

4       this level, I thought you were telling me that

5       you didn't consider it really a serious issue.

6           A.    I wouldn't say that I didn't consider it

7       a serious issue.  What I'm saying is,

8       unfortunately, it was more the norm than it

9       should be for individuals to be on such

10      disciplinary action of this, in the graded level

11      of the 30 to 60 to, you know, potentially the

12      final.

13              I had seen, personally, people be on

14      final writtens go through this entire process and

15      go back to being that, you know, in their eyes,

16      we'll say, that stellar employee where it all

17      just went away.  In other organizations I've

18      worked for, that was not my experience.  If you

19      were in a 30 or a 60 or a 90, then you were going

20      down the path of potentially being terminated.

21      That was not the way Cardinal operated.

22          Q.    Okay.  Well, let me ask you:  Who -- I

23      can see you saying that as to some of your

24      employees.  And most certainly, I guess I would

25      say, I mean, any organization would be giving --

1      I would think would be giving the probationary

2      period to hopefully improve performance, right?

3         A.    Correct.

4         Q.    Okay.  So your employees coming through

5      and I guess being back to page 1, did you

6      disagree with that, or did you support them, I

7      guess, coming off of the probationary period?

8         A.     In one particular instance, I wasn't

9      given really any -- wasn't asked for my opinion

10     at all whatsoever.  One particular employee, it

11     was washed away by Ms. Blake.

12        Q.    Okay.  Who was that?

13        A.    Jason Riter.

14        Q.    Okay.  So your assistant manager, what

15     had he done?  What had he done to get that issue?

16        A.     He hadn't turned something in.  It

17     wasn't something that I had put him on.  This was

18     prior to me coming he was on previously.  But he

19     was on a warning of that nature.  He was on it

20     and then he got escalated to a final written

21     warning for similar items of whatever the -- what

22     he had done.  I can't remember exactly.  And then

23     he was -- everything was good.

24        Q.    Okay.  Okay.  Had you disagreed with

25     that?

Page 100

1          A.    I didn't -- I disagreed with how it took

2          place.  It wasn't something that I was -- that I

3          had any knowledge from in any other organization

4          that I had worked for, so not something I had

5          really seen.  Not necessarily agreed or

6          disagreed.  I felt there was inconsistencies with

7          discipline overall with Cardinal.

8          Q.    Okay.  Okay.  Well, tell me, when you

9          make that comment, what were the other

10         inconsistencies?

11         A.    It just depended which way the wind was

12         blowing or how Christine got out of bed that

13         morning whether someone was going to be

14         disciplined for something that potentially she

15         came across.

16         Q.    Okay.  So you thought that Christine was

17         inconsistent?

18         A.    Correct.

19         Q.    Okay.  Who else was she inconsistent

20         with, I guess, on?

21         A.    It was just overall inconsistencies is

22         what I'm saying in regards to --

23         Q.    Well, who else?  I mean, you can't say

24         overall inconsistencies and then say there's

25         Jason Riter and nobody else.

1      A.    There are other examples, but I cannot

2    tell you the specifics or recall the specifics.

3    But the overall disciplinary action I would say

4    is inconsistent based on my experience.

5      Q.    Okay.  But can you think of any other

6    person that you can point to in that?

7      A.    Not at this time.

8      Q.    Okay.  Anyone else in your branch?

9      A.    Not at this time.

10      Q.    Okay.  So you don't have anybody else

11    there.

12          Is there anything else, I guess, as to

13    it with respect to this -- so did you speak up

14    and tell Ms. Blake that you thought that your

15    assistant branch manager should be let go?

16      A.    I did not.

17      Q.    Did you think he should be let go?

18      A.    I did not think he should be let go.

19      Q.    So did you agree or disagree with what

20    she did?

21      A.    I agreed with what she did; however, I

22    don't think he should have gotten to that level

23    to begin with.

24      Q.    Meaning he shouldn't have gotten -- what

25    level did he get to?

1           A.    He was on a final written warning.

2           Q.    Okay.  So he was on a final written

3      warning and you didn't think he should get that

4      level.

5                 Was he on that when you got on board?

6           A.    No.  He ended up getting put on it when

7      I was there.

8           Q.    Okay.  Okay.  What was he put on it for

9      again?

10          A.    I don't recall.  I think it was

11     something to do with -- it was a paperwork issue.

12          Q.    Okay.  Okay.  And when did he come off

13     of it?

14          A.    I don't recall the date he came off of

15     it.

16          Q.    Okay.  Okay.  So he came off of it, and

17     I guess my question to you is:  How do you know

18     any other branch managers were put on

19     probationary status?

20          A.    What was the question?

21          Q.    How do you know if any other branch

22     managers were put on probationary status?

23          A.    I don't know.

24          Q.    Okay.  I think you told me that it was

25     not unusual that a branch manager would be put on

1    that.
2         A.    It isn't unusual.
3         Q.    Well, who do you -- who else was put on
4    probationary status?
5         A.    I don't know.  I'm just saying it was
6    not -- it was not abnormal for anyone to be on
7    coaching, write-ups, probationary status,
8    whatever you want to call it.  It was a standard.
9         Q.    Okay.  Well, standard for your employees
10   in the branch.  I mean, I get that.
11        A.    It's standard overall at Cardinal.
12        Q.    How do you know that?  You're making a
13   statement and you don't have any evidence to
14   support it, do you?
15        A.    What I'm saying is, it was a standard of
16   the way that disciplinary was handled.
17        Q.    Okay.  How do you know that any other
18   branch manager during your tenure at Cardinal
19   were placed on probation?
20        A.    I don't know specifically.
21        Q.    Okay.  Okay.  Okay.  Let me show you --
22   I think I've got your evaluation.  Let me show
23   you the evaluation.
24             (Deposition Exhibit 7, Performance
25             evaluation, Bates-labeled Cardinal000229

Page 104

```
 1               - 234, was marked for purposes of
 2               identification.)
 3       Q.    Okay.  Can you see my screen?
 4       A.    I can.
 5       Q.    Okay.  Is this it?
 6       A.    It appears to be, yes.
 7       Q.    Okay.  It looks like the review date is
 8   12-10-19, right?
 9       A.    Yes.  I'm sorry.  For '18 to '19, yes.
10       Q.    Okay.  So it wasn't done February of
11   2020, right?
12       A.    Well, I'm sorry.  No, I don't agree on
13   that.  My review date was for 12-10 of 2019.
14   That was my -- when I was supposed to be
15   reviewed.  But, as I stated earlier, Mario didn't
16   do anything that he was supposed to on time.  I
17   didn't get that review handed to me until
18   February.
19       Q.    Okay.  But that doesn't mean that they
20   were reviewing you for January and February.  I
21   mean, I guess I would say, if you had a great
22   2019 and then your January was terrible, do you
23   think they should do an evaluation for 2019 and
24   say you're terrible because your January was bad?
25       A.    He has 2020 listed in my review I think
```

Page 105

1        on several things, if I remember correctly.

2             Q.     Let's go through it and let's see.

3        Let's go through and just see how it runs.

4                    The sales performance, comments from

5        employee, you got yourself -- you gave yourself a

6        5.  He gave you a 4.

7                    Did you agree or disagree with that?

8             A.     Mario never gives anyone a 5, he told

9        me.  The fact that I was number one in the entire

10       company for gross in real estate and I grew my

11       branch over 100 percent of my $12 million goal, I

12       guess I did not agree with that.

13            Q.     Okay.  Now we have knowledge of job.

14       This is know how to perform essential duties.

15       You put yourself a high performer, again, number

16       5.

17                   He says in number 2, and you're still

18       learning.  Did you agree or disagree?

19            A.     I disagreed on that, and that's one of

20       the ones I spoke to Cindy about.

21            Q.     Okay.  Well, I mean, you are a

22       first-year, right?  You were in your first year?

23            A.     First year with Cardinal, not my first

24       year in banking or management or any of those

25       things.

Page 106

1          Q.    Okay.  I must say this.  I mean,
2     everybody's different, but if somebody said to me
3     how was your year last year, David, I don't think
4     I'm going to give myself too many fives.  I'm
5     probably going to, in my view, probably be a 3 or
6     a 4 at best.  So I'm not going to...
7               I mean, here you are in your first year
8     and you're saying knowledge of the job at
9     Cardinal, that you're a high performer and you
10    know everything.  I guess that seems surprising
11    even to me.
12         A.    Well, I don't know if you've seen my --
13               MR. ROBB:  Objection.  He didn't -- is
14    there a question in there?
15         Q.    I mean, it seems surprising that you
16    would, you would say that on a review for it
17    being your first year.
18               MR. ROBB:  Again, is there a question?
19         Q.    Yeah.  It seems surprising.  Do you not
20    agree?  Ma'am?
21         A.    I'm -- I don't agree.  Like I said, I
22    wasn't -- I was a first-year manager for
23    Cardinal.  I wasn't a first-year manager coming
24    out of college.  I had 28 years of experience,
25    and my results was not of a first-year rookie.

Page 107

1          Q.    Okay.  Well, he does mention coaching

2     discussions.  And we looked at your verbal.

3     There were coaching discussions on the verbal,

4     right?

5          A.    Correct.  Uh-huh.

6          Q.    So it would seem to me that he did give

7     you a heads-up there.

8               Policy compliance, he put his 3 and,

9     again, you put a number 5, right?

10         A.    Correct.

11         Q.    Okay.  Again, you're brand-new and

12    you're saying you're a high performer; that

13    you're at the top of the pile.  I mean, that

14    seems a little surprising, does it not?

15         A.    No.  I was at the top of the pile.  I

16    was the top of the pile.

17         Q.    Okay.  Decision-making, we have a number

18    4 for you.  You had a 4 there and he gave you a

19    3.

20              And time -- efficiency and time spent on

21    researching decisions, needs to improve.

22              Do you agree or disagree with that?

23         A.    I didn't disagree with that.

24         Q.    Okay.  Employee management, he says

25    number 2.  And you gave yourself a 4.

1          A.    It also says I also spoke with Cindy

2     about this one.  That was the second one.

3          Q.    Okay.  Well, he says -- and I guess I

4     was -- when you were describing the turnover, I

5     was thinking it seemed to be a little abnormal.

6               And he mentions that, right?  Turnover

7     in 2019 was abnormal, right?

8          A.    It was abnormal, but, unfortunately,

9     when I took over the branch, we had a lot of

10    people that actually Mario had recruited and

11    hired that were not performing and had not been

12    disciplined or held to the standards.  And that

13    was my job and I was told that when I was hired,

14    that I may have to, you know, review staff and we

15    may have to turn some staff because they weren't

16    meeting or exceeding the job expectations.

17         Q.    Okay.  Well, they don't blame the errors

18    that come up in 2020 on turnover, right?

19         A.    Well, what I said was that one of the

20    reasons that we had some late things turned in

21    late and we had some things missing was the fact

22    that we had turnover and then we had some new

23    staff members and we were still taking care of,

24    you know, the most important thing, which was our

25    members.

Page 109

1            So those were the reasons behind.  When

2       you're down three staff on the platform and you

3       only have five, that's a significant percentage

4       of your group, so we were very short staffed.

5       Q.    Well --

6            [Overtalking]

7            MR. ROBB:  Excuse.

8            THE REPORTER:  I'm sorry.  I'm not

9       hearing.

10      Q.    That would seem to go for management, as

11      well, Ms. Shibe.

12           I mean, certainly, we want you to hold

13      people to standards, but if you get rid of the

14      entire staff, it may be a problem, right?

15      A.    It wasn't my sole decision to get rid of

16      the entire staff.  And we didn't get rid of the

17      entire staff.  We got rid of the team members

18      that were sleeping at their desk and that were

19      not performing.

20      Q.    Okay.

21      A.    And we hired -- we rehired with staff

22      members that did a very good job.

23      Q.    Okay.  And you end up with a 3.6 out of

24      5, which did you agree or disagree with that?

25      A.    I disagreed based on the two components

1      that we just spoke about, which were the

2      components I spoke to Cindy about.

3          Q.    Okay.  Okay.  So you got your review.

4      And so the review laid out -- I mean, certainly,

5      I guess I would say this:  I don't see the review

6      as -- I mean, it would seem to me that I might

7      have a few concerns.  I mean, especially if

8      you're getting that review later, right?

9              I mean, here's, here's, here's some,

10     some concerns that you are having on -- from

11     Mario, your manager, who is giving you some

12     concerns, and you're getting that right when

13     you're also getting disciplined, right?

14         A.    Correct.  My review was given to me over

15     two months late after it was supposed to be given

16     to me, and I had to get HR involved to even get

17     the review completed because one of the things

18     that we prided ourself on at Cardinal was making

19     sure that we had those reviews prepared and that

20     we had them delivered at those annual review

21     marks.

22         Q.    Okay.  So you had that issue with the

23     evaluation.  So I certainly don't see that

24     evaluation -- I guess maybe I'm wrong -- as being

25     one that I would be happy with.  I guess I would

Page 111

1      say that would seem to me to raise some concerns
2      about whether they believed -- "they" being
3      Cardinal believed that my performance is good,
4      right?
5          A.    Which is why, based on my performance, I
6      took those questions to Cindy.
7          Q.    Okay.  So then you get your two warnings
8      and they both say "probation."  And you go from a
9      30-day probation to 60-day.  I guess you asked
10     Mario, or did you ask HR about, hey, I want to
11     know what does this mean?  Am I, am I close to
12     discharge?
13         A.    There was no conversation of that
14     nature.
15         Q.    Okay.  Well, did you -- you didn't
16     think, hey, I want to find out because -- I mean,
17     to me, I guess I would say I certainly would be
18     looking at that and would have some concerns
19     as -- you didn't have any concerns being on
20     probation and having a 3.6 on your evaluation?
21         A.    Well, according to Mario, a 3.6 was
22     great.  So I guess you have to look at the
23     overall, you know, expectations and who is
24     looking at the -- who is looking at the skew.
25              According to Mario, he doesn't give any

Page 112

1     5s.  So, you know, I don't exactly know how he
2     marked, but he felt his markings was a solid
3     year.
4                (Deposition Exhibit 8, 2020 Goals,
5                Bates-labeled Cardinal000235 - 237,
6                marked for purposes of identification.)
7         Q.    Okay.  Okay.  Well, now let's look at
8     some expectations.  There's a meeting on March
9     10.  Tell me about this.
10        A.    These are just the standard -- these are
11    just standard expectations for a branch manager.
12    And we were going to meet -- because he gave me
13    this review, I believe it was like the middle of
14    February is when I actually got this review.  So
15    we were going to do a checkpoint back a month
16    later, I think on the 10th of March.
17        Q.    Okay.  Well, it looks like the
18    checkpoint -- it would seem to me when I read
19    through these, it's there saying, hey, we need to
20    make sure your branch is doing the right things
21    and that you are doing the right things, right?
22        A.    That was the expectation, yes.
23        Q.    Okay.  Well, this isn't just normal.  I
24    mean, I'm reading this as saying, hey, Ms. Shibe,
25    we need to make sure that your performance

1      improves, right, or else you could be discharged?

2      A.    These are the -- no, I don't read that

3      into it at all.

4            These are the areas that he rated me to

5      be lower on, and these are the things that he

6      wanted to see more of in the, in the coming year

7      in 2020.

8      Q.    Okay.  Well, I mean, number one, there's

9      a lot of things that he needed to see better on,

10     right?

11     A.    These are the -- these are the items

12     that are standard for management.  Like, these

13     are the things that -- when you say "what is your

14     job responsibilities," all of these things fall

15     under the job responsibility of a manager.

16            So --

17     Q.    Okay.

18     A.    -- he was reviewing this with me and

19     adding additional things on there that he rated

20     me lower on, and then we were going to review it

21     a month later.

22     Q.    Okay.  And you didn't -- you weren't at

23     all concerned in meeting this expectation,

24     getting an evaluation of 3.6 and being on a

25     30-day and then a 60-day probation?

Page 114

1          A.     I was concerned on the rating of the 3.6

2     because of the two areas that he rated me low on.

3     And, as I stated previously, none of those

4     conversations about needing to learn the computer

5     or additional depth of these reports or this or

6     that was ever discussed with me previously, which

7     was my issue with HR; that if you're going to --

8     if something ends up on a review, that should

9     have been taught or it should have been shown how

10     to do those things by, say, the district manager

11     or whoever was going to train a manager, a newer

12     manager, to your point.

13          And those had not been brought to my

14     attention prior to him putting them in my review,

15     which is why I believe he went into detail about

16     those specific expectations and what 2020 would

17     look like.

18          Q.     Okay.  Well -- [unintelligible] -- no

19     different than you.  I mean, one of your

20     employees could say, hey, you know, I would have

21     liked to have my branch manager follow up and

22     give me the full evaluations as we go.

23          But just because somebody doesn't come

24     up to me and tell me, hey, during the course of

25     the year, that, hey, you're doing bad, it doesn't

Page 115

1      mean that I'm doing good, right?

2          A.    Well, as a manager for over 30 years, if

3      I'm finding -- if I'm telling an employee

4      something in a review that they've never heard

5      prior to that you want them to learn some

6      additional things or you want them to do better

7      and grasping the reporting or this or that, then

8      I haven't done my job as a manager because I

9      haven't taught them.

10             And I didn't know at that particular

11     time that these are things that he wanted because

12     he never shared those.  So to hear that for the

13     first time in a review was my concern, and that's

14     why I went to see Cindy.

15         Q.    Okay.  Okay.  Well, but my point is that

16     it may say, hey, I want you to -- you know, maybe

17     Mario, in your world, could have done a little

18     bit better and given you a heads-up as you went

19     along, but it still doesn't excuse if you're not

20     performing up to expectations, right?

21         A.    Well, you don't know what you don't know

22     in regards to the section I was speaking about.

23     In regards --

24         Q.    Okay.

25         A.    You know, if I've never been trained or

1      I've never been shown this is what you need to

2      do, then you just don't know that.

3           Q.    Okay.  I get that.

4                 But you're also rating yourself as a

5      number 5.  I mean, I could see -- I mean, quite

6      frankly, I could see if you're rating yourself as

7      a 2 and saying, hey, Mario, I really need help on

8      some of these areas, but you're rating yourself a

9      5.

10          A.    Well, in the -- my overall performance,

11     once again, for 2019, meeting and exceeding my

12     goal of $12 million for the overall branch, as

13     well as terminating those employees, rehiring new

14     staff -- and, personally, the number one

15     contributor for the whole entire branch system as

16     a real estate contributor for the year, I felt I

17     did have a 5.

18          Q.    Okay.  Well, I guess it seems to be

19     inconsistent with you saying "I don't think Mario

20     did his job" when you are, at the same time,

21     saying, hey -- you know, going to HR and saying,

22     hey, I didn't get a heads-up on this stuff.

23          A.    If Mario wanted me to do more reporting

24     and some of the things that he mentioned in those

25     categories, as my direct boss, it would have been

Page 117

1          Mario's job to train me, show me, or defer me to

2          someone that could do that for me.

3               Q.    Okay.  Okay.  And so, with that said, as

4          to the -- now, in looking at those -- I mean,

5          looking at your evaluation, looking where you're

6          at, are you really standing by that you were the

7          highest-performing branch manager at Cardinal?

8               A.    Absolutely.  And that --

9               Q.    What do you base that on, I guess?  What

10         are you basing that conclusion on?

11              A.    I am basing it on I had the largest

12         branch.  My goal was the highest of $1 million

13         each month.  I had to meet 100 percent of that to

14         make a $12 million annual goal.  And, personally,

15         I was responsible for performing not only as a

16         branch level, but as an employee.

17                    And each Monday we sat together

18         collectively with Christine and all the branch

19         managers and we went over weekly results,

20         month-to-date results, and year-to-date results,

21         and I was top during that period.

22                    And there's -- I mean, it was a weekly,

23         a weekly meeting.  And, at the end of the year,

24         the results proved to be, you know, meeting and

25         exceeding my goals for Mentor branch for 2019.

1          Q.    Okay.  And I get that, but it's not as

2     if you came in and all of a sudden changed

3     procedures or anything like that.  I mean, you

4     came in and you had the highest-performing branch

5     in the flagship branch when you came in.  I mean,

6     if you weren't getting those numbers, I'm

7     assuming there would have been all kinds of

8     issues, right?

9          A.    Well, I could say this:  The previous

10    branch manager of that branch, they did not

11    contribute to the level that I had.

12          So I'm not sure -- you're saying I took

13    over a branch that had performed at that level

14    consistently previously and, to my knowledge,

15    that wasn't correct.

16          Q.    Okay.  I wanted to ask you before and

17    you didn't know who was in that spot.  You didn't

18    know why they were let go or anything like that.

19          A.    I did not know -- I did not know who

20    they were, but I did know when I came into the

21    branch where they were at from a performance

22    standpoint.  That, I did know, yes.

23          Q.    And I'll just close it at this.  I mean,

24    I look at the -- I mean, from my standpoint, I

25    mean, here's somebody who has been -- you know, I

Page 119

1          could -- I get your argument if you were just out

2          of college and you didn't necessarily understand

3          the issues, but you've been in the banking

4          industry for 30 years.  You're in 2020 before

5          COVID hits, you get a 30-day probationary period,

6          a 60-day probationary period, and your, your

7          review was at 3.6 and all you can tell me...

8                    And I'll ask the next question.  You

9          thought that that was good; that you were not

10         only --

11                   [Overtalking]

12            A.    No, no, no.  Let me correct you on that.

13         No, I didn't think that that was good.  But

14         Mario, who set the bench line -- that's the

15         district manager -- he stated to me no one gets

16         fives.

17                   So if the highest benchmark is 4 and

18         you're looking at the review from the person who

19         created that review to be the highest benchmark

20         is 4, my average of 3.6, in his world, is pretty

21         good.

22                   In my world, if I have a 1 through 5,

23         I'm expecting that if you give a 5 performance,

24         you're going to be given a 5, and that wasn't the

25         case.  So the measurement of that review is why I

Page 120

1     went to HR.

2         Q.    Okay.  Did you ask HR what -- where 3.6

3     fell on the spectrum of the branch managers?

4         A.    They, they, they stated that that was --

5     you know, that would be a good review.

6     Obviously, they said to me you're getting a

7     raise/bonus, which is what they considered at the

8     1 percent.  And, in their mind, there was no

9     problem with that review.

10             Like I said, if you're saying that the

11    district manager doesn't give out 5s and 4 is his

12    highest benchmark, having no prior knowledge to

13    that, then I guess a 3.6 is good.  But, in my

14    mind, when you have a 1 through 5 being the top

15    rating and you get a 3 point -- you give the

16    performance I gave and then you get a 3.6, no, I

17    wasn't satisfied with that.  I didn't feel that

18    that accurately measured my performance for the

19    year.

20        Q.    Okay.  Well -- so okay.  We'll -- who

21    would be witnesses in your -- to support your

22    case that you were discriminated against by

23    Ms. Blake due to your sex?

24        A.    I believe I have submitted a list of

25    individuals that we would call.

Page 121

1          Q.    Okay.  Well, who, who, who would have --

2     for right now -- I know you have Liz, but right

3     now, who would you tell me could support your

4     case?

5          A.    I would have to get back to you with a

6     list and think of that -- think through that

7     thoroughly.

8          Q.    Okay.  You can't tell me anybody right

9     now that could say, yes, I think that Ms. Shibe

10    was the top-performing branch manager and I can't

11    believe she was selected?

12         A.    I mean, if you're asking me that

13    question, then I would say, of course, I would

14    say Mario would absolutely have to tell you,

15    based on all of the reports and the data that we

16    went over each week on the branch managers and

17    the performance; I would say our director of

18    lending who ran those reports and had the weekly

19    meetings and the huddles; I would say anyone in

20    our mortgage department who took all of my branch

21    and my personal referrals and reported each week.

22    Robert Ernstein reported each week on individual

23    referrals, branch loans that closed, and our real

24    estate pipeline in general.

25              So there would be -- there would be a

Page 122

1      variety of people that would tell you or support

2      the numbers that I'm talking about both

3      personally and for the branch in itself.

4                 MR. CAMPBELL:  Okay.  Okay.  I think I'm

5      wrapped up.  Let's take a short break.  Let's

6      come back in five minutes, Sam, and then we'll

7      wrap up.

8                 MR. ROBB:  All right.  Sounds good to

9      me.

10                MR. CAMPBELL:  Okay.  Thanks.

11                (A recess was taken.)

12                MR. CAMPBELL:  Okay.  Well, Ms. Shibe,

13     thank you very much for taking the time.  I don't

14     have any more questions today, unless Sam has any

15     questions.

16                MR. ROBB:  I just have a few quick

17     questions for you, Abbie.

18                THE WITNESS:  Sure.

19                EXAMINATION OF ABBIE SHIBE

20     BY MR. ROBB:

21          Q.   Prior to today, had you ever seen what

22     was introduced as Exhibit 6, which was the list

23     of individuals terminated by Cardinal Credit

24     Union?  Had you seen that document before today?

25          A.   I had not.

Page 123

1          Q.     That was not presented to you when you

2     were terminated and when you received the

3     termination letter; is that correct?

4          A.     That is correct.  On the phone when I

5     spoke to Cindy that evening, it was specifically

6     about me.  And the only other paperwork I got was

7     the letter that we viewed today.

8          Q.     And then for your performance reviews

9     and those Monday meetings that you previously

10    referenced, would you guys go over statistics of

11    how the bank was performing by their numbers?

12         A.     Yes.  So everything in the Monday

13    morning meetings was based on real live numbers.

14    So it was what we had done in regular loans and

15    then what we had done in real estate, which were

16    the two buckets that we were held accountable for

17    from a branch manager standpoint.

18              And then we would go over dollars,

19    ranking everyone in the company from one to the

20    bottom.  And we actually even had, like, the

21    green zone, the yellow zone, and the red zone,

22    meaning that month-to-date or year-to-date, if

23    you were in this zone, then, obviously, you were

24    good.  If you were needing improvement or you

25    were in the red zone, this is where you needed

Page 124

1    to, you know, focus your energies.

2              We also had detailed lists of referral

3    business through the mortgage department each

4    week, and we would go over all of the referrals

5    that -- branches and individuals.  Top performers

6    were announced each week via Christine in those

7    meetings for the referrals to our mortgage

8    partners, as well as the loans that had closed

9    and then what the overall branches that were on

10   top, as well as individuals each week.

11        Q.    And were you ever in the red zone that

12   you referenced?

13        A.    No, never.  I took Mentor over in

14   December of '18, and part of the compensation

15   with Cardinal was salary plus bonus.  If your

16   employees met their goal each month with doing

17   the individual things that they did, that was one

18   bonus that you received.

19              And if the -- as a branch manager.  And

20   if the branch manager met the goal of the branch,

21   which in my case was a million dollars of new

22   growth each month, then there was an additional

23   bonus that was received, and I was successful in

24   achieving that each month.

25        Q.    So were you ever in the yellow zone that

Page 125

1      you referenced?

2          A.    No.  I, I met my goals for 2019 and I

3      exceeded what the expectations were of me

4      personally and for my branch for that year.

5          Q.    So you were always in the green zone,

6      then, correct?

7          A.    Correct.  In fact, I was usually the top

8      three rotating week by week, depending on what

9      had booked out each week and how things were

10     going.

11            And, like I said earlier, as far as the

12     mortgage referrals and the individual mortgages

13     that were closed for 2019, I was the number one

14     in the company for the most referrals and the

15     most dollars closed for that year.

16         Q.    And, to your recollection, did any male

17     branch managers ever rank above you during these,

18     these meetings?

19         A.    They may have ranked above me for a week

20     based on bookings, but, at the end of the day,

21     based on the size of my branch, the goal of my

22     branch and the percentages, I would say no.

23            MR. ROBB:  I have nothing further.

24            Dave and Andrea, if you guys have some

25     questions based on those.

Page 126

1           MR. CAMPBELL:  Yeah, just briefly.

2           EXAMINATION OF ABBIE SHIBE

3    BY MR. CAMPBELL:

4      Q.   Ms. Shibe, those are just pure sales

5    numbers, right, that you were going over on

6    Mondays?

7      A.   Yes, pure sales numbers for the

8    individuals and branches.

9           MR. CAMPBELL:  Okay.  Okay.  No further

10   questions.

11          MR. ROBB:  We will read.

12          (Signature is not waived.)

13        (Deposition concluded at 5:27 p.m.)

14                  - - - - -

15

16

17

18

19

20

21

22

23

24

25

Page 127

```
1                    CERTIFICATE
2
3      The State of Ohio,    )
4                            )        SS:
5      County of Cuyahoga.   )
6
7           I, Kristin Wegryn, a Notary Public
       within and for the State of Ohio, duly
8      commissioned and qualified, do hereby certify
       that the within-named witness, ABBIE SHIBE, was
9      by me first duly sworn to testify the truth, the
       whole truth, and nothing but the truth in the
10     cause aforesaid; that the testimony then given by
       the above-referenced witness was by me reduced to
11     stenotypy in the presence of said witness;
       afterwards transcribed, and that the foregoing is
12     a true and correct transcription of the testimony
       so given by the above-referenced witness.
13
            I do further certify that this
14     deposition was taken remotely at the time and
       place in the foregoing caption specified and was
15     completed without adjournment.  I do further
       certify that I am not a relative, counsel, or
16     attorney for either party, or otherwise
       interested in the event of this action.
17
            IN WITNESS WHEREOF, I have hereunto set
18     my hand and affixed my seal of office at
       Cleveland, Ohio, on this 21st day of March 2022.
19
20
21
22
23
24          Kristin Wegryn, RMR, CRR
            Notary Public State of Ohio
25          Commission expiration:  July 23, 2023
```

Page 128

1                          Veritext Legal Solutions
                              1100 Superior Ave
2                               Suite 1820
                           Cleveland, Ohio 44114
3                          Phone: 216-523-1313
4
    March 21, 2022
5
    To: Samuel Robb, Esq.
6
    Case Name: Shibe, Abbie v. Cardinal Credit Union, Inc.
7
    Veritext Reference Number: 5124137
8
    Witness:  Abbie Shibe          Deposition Date:  3/7/2022
9
10  Dear Sir/Madam:
11
    The deposition transcript taken in the above-referenced
12
    matter, with the reading and signing having not been
13
    expressly waived, has been completed and is available
14
    for review and signature.  Please call our office to
15
    make arrangements for a convenient location to
16
    accomplish this or if you prefer a certified transcript
17
    can be purchased.
18
19  If the errata is not returned within thirty days of your
20  receipt of this letter, the reading and signing will be
21  deemed waived.
22
23  Sincerely,
24  Production Department
25
    NO NOTARY REQUIRED IN CA

```
1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 5124137
3       CASE NAME: Shibe, Abbie v. Cardinal Credit Union, Inc.
        DATE OF DEPOSITION: 3/7/2022
4       WITNESS' NAME: Abbie Shibe
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8

   _____        _____
9  Date                    Abbie Shibe
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 5124137
 3        CASE NAME: Shibe, Abbie v. Cardinal Credit Union, Inc.
          DATE OF DEPOSITION: 3/7/2022
 4        WITNESS' NAME: Abbie Shibe
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Abbie Shibe
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18             in the appended Errata Sheet;
          They signed the foregoing Sworn
19             Statement; and
          Their execution of this Statement is of
20             their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 131

1                    ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 3/7/2022
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                   Abbie Shibe
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24

25                  _____
                    Commission Expiration Date

| & | | | |
|---|---|---|---|
| **&**  2:8 | | | |

**0**

**01436**  1:7

**1**

**1**  3:9,15 35:11 96:16,19 99:5 117:12 119:22 120:8,14
**10**  3:14 112:9
**100**  46:21 105:11 117:13
**103**  3:18
**10th**  112:16
**11**  3:9 84:13
**1100**  128:1
**112**  3:20
**12**  105:11 116:12 117:14
**12-10**  104:13
**12-10-19**  104:8
**122**  3:5
**126**  3:6
**13**  85:25 86:1,5
**1375**  2:9
**14**  9:16 42:15,20 43:16
**15**  3:17 16:23 36:1
**15th**  63:22,22 64:4 64:5 65:4 66:8,12 86:16,20
**16**  16:23
**18**  15:9 24:16 35:24 104:9 124:14
**1820**  128:2
**19**  41:24 42:1,5,9 43:13,21 44:9 59:16,22 60:8,17 61:12 64:24 67:2

67:8 68:19 72:23 78:15 79:14 88:15 104:9
**19th**  55:18
**1:21**  1:7

**2**

**2**  3:10 39:20,21 105:17 107:25 116:7
**20**  3:5,12 9:12 15:9 129:16 130:22 131:22
**200**  2:4
**2018**  24:17 27:18
**2019**  25:10,14 26:24 28:8,9 29:10 46:20,22 49:1 80:17 81:1 92:17,18,25 93:6,8 93:8 104:13,22,23 108:7 116:11 117:25 125:2,13
**2020**  3:20 11:7 50:1 63:23 64:7 80:17,19 81:5 82:22,24 92:21,24 93:1,7,9 104:11,25 108:18 112:4 113:7 114:16 119:4
**2022**  1:15 4:2 127:18 128:4
**2023**  127:25
**21**  3:10 128:4
**216-523-1313**  128:3
**216.291.0244**  2:5
**216.344.9422**  2:10
**21st**  127:18
**2232**  127:23

**2250**  2:9
**22nd**  70:22,23
**23**  127:25
**234**  3:20 104:1
**237**  3:21 112:5
**239**  3:13 47:22
**24**  3:18 34:2,21,25 49:15 50:17
**246**  3:15 53:12
**25825**  2:3
**27**  50:1
**27th**  81:5
**28**  106:24
**28th**  48:17
**2:32**  1:15 4:2

**3**

**3**  3:6,12 40:15 47:19,20 106:5 107:8,19 120:15
**3.6**  109:23 111:20 111:21 113:24 114:1 119:7,20 120:2,13,16
**3/7/2022**  128:8 129:3 130:3 131:2
**30**  12:16,20 16:22 20:7 49:25 62:14 62:21 92:11,15,23 97:4 98:11,19 111:9 113:25 115:2 119:4,5
**35**  3:9
**39**  3:10
**3:25**  38:12

**4**

**4**  3:5,14,20 53:9,10 105:6 106:6 107:18,18,25 119:17,20 120:11

**44060**  4:18
**44114**  2:10 128:2
**44122**  2:4
**47**  3:12
**48**  49:15 50:17
**4:30**  84:1
**4th**  48:18

**5**

**5**  3:15 59:1 105:6 105:8,16 107:9 109:24 116:5,9,17 119:22,23,24 120:14
**50/50**  30:12
**5124137**  128:7 129:2 130:2
**53**  3:14
**59**  3:15
**5:00**  84:1
**5:27**  126:13
**5s**  112:1 120:11

**6**

**6**  3:17 72:15 84:8 84:9 122:22
**60**  55:17 58:10 63:17 64:1,12,15 64:20,21 65:8 78:14 79:15 89:7 89:9,22 91:10 97:4 98:11,19 111:9 113:25 119:6

**7**

**7**  1:15 3:18 4:2 103:24
**72**  3:17
**7400**  4:17
**7:00**  59:13

**8**

**8**  3:20 35:24 112:4
**89**  3:10 35:13

**9**

**9**  3:5
**90**  98:19
**90,000**  10:7
**91**  85:9
**99**  41:4
**9th**  2:9

**a**

**abbie**  1:4,11 3:3
  4:4,8,12 38:12
  64:10 122:17,19
  126:2 127:8 128:6
  128:8 129:3,4,9
  130:3,4,13 131:20
**ability**  5:22 7:9
**able**  62:8 69:3
  70:12 77:4
**abnormal**  97:20
  103:6 108:5,7,8
**aboard**  10:22
**absolutely**  5:10
  34:23 61:4 117:8
  121:14
**access**  25:8
**accidentally**  90:21
**accommodations**
  36:20,21 37:17
**accomplish**  128:16
**accomplished**
  39:10
**account**  46:16,18
  53:25 54:5,15,16
  54:18,19,20 55:1
  56:21
**accountable**
  123:16

**accounts**  56:21
**accurate**  54:10,11
**accurately**  54:9
  120:18
**achieving**  46:13
  124:24
**acknowledge**
  129:11 130:16
**acknowledging**
  49:16
**act**  36:16 129:14
  130:20
**action**  49:25 98:1
  98:10 101:3
  127:16
**actual**  46:12
**added**  28:4
**adding**  113:19
**additional**  3:17
  61:17 72:16
  113:19 114:5
  115:6 124:22
**additionally**  49:19
**address**  4:16
**adhere**  86:5
**adjournment**
  127:15
**admissions**  40:3
**admit**  84:5
**adp**  18:7
**advertised**  64:24
**advertisements**
  69:18
**affixed**  127:18
  129:15 130:21
**aforesaid**  127:10
**afterward**  84:12
**age**  4:4 79:24
**ago**  8:19 10:7
  13:10,10

**agree**  19:13,14
  40:17 51:16,17,20
  52:12 62:13 63:12
  63:17 65:6,7 67:1
  67:8,9,18 74:4,5
  74:11 79:20 88:21
  95:1 97:13 101:19
  104:12 105:7,12
  105:18 106:20,21
  107:22 109:24
**agreed**  40:9,13
  97:16 100:5
  101:21
**akron**  12:8
**alleging**  79:7
**allow**  86:4
**allowed**  75:23
  85:23 86:13
**alternative**  9:24
  65:20
**americans**  36:15
**amount**  51:9
  74:17 85:22 86:13
  96:15
**ancillary**  10:12
**andrea**  2:8 45:4
  125:24
**andrea.arnold**
  2:11
**ann**  35:7 55:3
**announced**  87:18
  87:23 124:6
**annual**  110:20
  117:14
**answer**  34:12
  36:10 42:7 43:18
  49:12 50:11 56:20
  64:10 65:14 66:14
  67:6,22 79:3
**antidiscrimination**
  40:9

**anxiety**  6:4
**anybody**  8:4 23:21
  38:19 39:1 44:15
  52:25 58:8,17
  73:9,11,14,18,22
  79:18 90:6 92:4
  101:10 121:8
**anyway**  19:1
**appear**  129:11
  130:15
**appearances**  2:1
**appearing**  1:12,21
**appears**  104:6
**appended**  130:11
  130:18
**applications**  56:19
**apply**  14:9
**appointment**  14:5
  14:21 61:2 68:23
  70:7
**approach**  33:19
**approved**  97:1
**approximately**
  24:14
**april**  81:5
**area**  12:19 29:13
  57:1
**areas**  6:8 9:10
  12:21 94:14 95:3
  95:12 113:4 114:2
  116:8
**argument**  119:1
**arnold**  2:8 11:8
**arrangements**
  128:15
**arrived**  25:25
**ashtabula**  27:21
  27:24 29:12 47:4
**aside**  29:10 43:20
  71:13

**asked** 41:16 44:7
51:24 61:7 95:23
99:9 111:9
**asking** 7:2 13:24
15:2 17:10 31:22
44:10 61:7,8 63:9
63:10 79:8 81:19
121:12
**asleep** 27:8
**aspect** 81:14 88:12
96:24
**aspects** 69:7
**assess** 26:1
**assessment** 31:9
33:5
**assets** 77:13
**assignment** 129:2
130:2 131:2
**assistant** 43:1,9,22
43:24 44:19 45:7
45:9 51:25 56:14
57:4,20 73:3,8
80:11 85:19 99:14
101:15
**assuming** 19:16,20
19:24 20:5 34:20
36:9 77:17 81:10
118:7
**attached** 130:7
**attempts** 34:14
**attendance** 32:17
**attention** 26:15
65:17 66:4 94:15
114:14
**attorney** 127:16
**audit** 90:5
**audited** 54:23 55:3
**audrey** 73:19 83:4
**austintown** 27:21
27:25 29:16,20
47:16

**authorize** 94:2
130:11
**availability** 95:22
**available** 11:17
69:15 128:13
**ave** 128:1
**average** 31:24
119:20
**awards** 80:24
**aware** 28:25 41:5
51:2 66:11 69:21
86:19 87:12 89:3

**b**

**b** 4:15 14:12,13
71:11 72:12 75:9
83:4 87:4
**back** 14:6 18:17
26:1 29:2 33:25
34:10 38:12,18
82:6 83:25 84:13
87:9 89:18 90:20
90:22,25 95:25
98:15 99:5 112:15
121:5 122:6
**bad** 20:9 31:15,24
89:24 91:3 104:24
114:25
**bank** 10:15,24
11:1,6 12:17
13:25 15:12,13,18
15:21 16:11,12,16
16:21 17:6,20
18:10,14,15,25
19:6,25 20:18,21
20:22 21:5,25
26:22 33:13 70:15
70:15 76:8,15
85:11,17 123:11
**banking** 12:19
16:22 19:22 20:7
30:17 62:15,21

70:10,17 84:19
97:23 105:24
119:3
**bankruptcy** 8:14
8:15
**banks** 12:24 13:13
13:15,21,22 14:1
18:23 20:22 69:10
69:11,13,14 84:20
**base** 21:13 117:9
**based** 38:20 41:8
56:2 80:4 85:24
88:10 91:10 101:4
109:25 111:5
121:15 123:13
125:20,21,25
**basically** 27:12
37:14 94:19 97:8
97:14
**basing** 117:10,11
**basis** 55:3
**bates** 3:9,13,14,16
3:18,19,21 35:12
47:21 53:11 59:2
72:17 103:25
112:5
**beachwood** 2:4
**becoming** 45:8
**bed** 100:12
**behalf** 2:2,7
**believe** 8:21 14:20
16:4 18:25 21:16
27:21 28:10 65:11
66:24 79:9 82:8
88:24 92:4 93:10
112:13 114:15
120:24 121:11
**believed** 80:14
111:2,3
**belong** 53:23

**bench** 119:14
**benchmark**
119:17,19 120:12
**benefits** 10:8,10
**berkman** 83:6
**best** 32:6,10 80:23
80:23 106:6
**better** 10:21 16:10
16:13,14 18:6
113:9 115:6,18
**big** 20:2 76:7
**bigger** 46:16
**bisgaard** 2:8
**bit** 19:7 27:17 36:2
52:22 55:10 84:17
91:1 115:18
**blake** 2:16 23:18
25:4,6 32:11,13,15
32:19 33:3 37:22
74:7,8,12,16,23
75:6 77:15,22,25
78:2,13,19,24,25
79:4,7 80:7,13,18
87:2 88:9 89:8
91:7,9,15 92:1,12
92:15 93:12,13,25
97:1 99:11 101:14
120:23
**blake's** 80:1
**blame** 108:17
**blank** 52:7
**blews** 83:4
**blowing** 100:12
**board** 29:17 55:12
77:5 102:5
**boards** 11:20
**bonus** 80:21 92:15
94:2 96:17,17,19
120:7 124:15,18
124:23

[booked - case]

**booked** 125:9
**bookings** 125:20
**boss** 116:25
**bottom** 47:3 68:13
  123:20
**branch** 10:17
  12:14 14:4 15:15
  15:18 16:2,3,20,24
  17:3,5,8,10,13,16
  17:18,21 18:9,14
  18:15 19:5,10
  20:6,7,9,19 21:3,7
  21:9,19,20 23:3
  24:8,18,18,22
  26:12,25 27:25
  28:6,7 29:10,12,18
  30:5,10,11 34:15
  34:15 36:5 40:20
  42:23,23,25,25
  43:9,19,20,23,24
  44:19 45:9,18,18
  45:21 46:4,6,11,15
  46:22,24,25 47:8
  47:16 50:4,25
  56:3 57:24 58:10
  58:20 60:25 61:9
  61:11 62:3,8
  63:19 64:1,14,25
  67:17 69:8,24,24
  70:2,14 71:3,12,16
  71:19,21,23 73:3,9
  73:13,20 74:1,25
  75:18,20 76:8
  78:12 79:13 80:13
  81:3,11,16,24
  82:11,17,19 83:2,3
  83:10,16 85:25,25
  88:4,18,23 89:6,21
  89:25 90:3,11
  91:11 101:8,15
  102:18,21,25

103:10,18 105:11
  108:9 112:11,20
  114:21 116:12,15
  117:7,12,16,18,25
  118:4,5,10,10,13
  118:21 120:3
  121:10,16,20,23
  122:3 123:17
  124:19,20,20
  125:4,17,21,22
**branches** 14:19
  27:17 28:1 29:18
  43:4 60:20 67:15
  73:13 74:9 75:9
  83:2 85:14 86:13
  87:4 88:20,21
  96:8 124:5,9
  126:8
**brand** 107:11
**break** 4:25 5:2,13
  35:9 38:11,18
  83:25 122:5
**breakdown** 30:9
**brecksville** 9:1
**brick** 16:24
**brief** 82:5,10
**briefly** 126:1
**bring** 7:5,9 20:8
**bringing** 25:22
**brisbois** 2:8
**broke** 62:19
**brought** 7:11 26:6
  26:14 94:15
  114:13
**bs** 75:19,20
**buckets** 123:16
**builder** 11:18
**building** 90:4
**busier** 69:24
**business** 14:6
  20:18 25:16 63:5

64:7 67:20 70:24
  75:24 76:1 84:25
  86:18 124:3
**businesses** 13:19
  13:19,20 62:1,1,17
  62:24 65:11,12,15
  65:19 66:1,8,13,16
  66:18 67:2 77:8
**busy** 21:12 31:17
  32:3 34:15 86:4

**c**

**c** 22:11
**ca** 128:25
**call** 16:23 44:10,11
  48:16 49:3 50:17
  52:19 59:14 86:23
  86:25 96:16 103:8
  120:25 128:14
**called** 4:4 18:7
  44:6 97:21
**calling** 59:14
**calls** 33:24 60:6
  61:2 76:18 95:21
  96:6
**calm** 61:3
**calmness** 43:4
**campbell** 2:7 3:5,6
  4:9 38:10,17
  39:17 83:24 84:7
  84:11,15 90:18,25
  91:2 95:7,8 122:4
  122:10,12 126:1,3
  126:9
**capacity** 15:14,15
  68:21 83:23 85:20
**caption** 127:14
**card** 54:16,20 55:1
**cardinal** 1:7 2:16
  7:23 13:22 14:8,9
  14:24 15:8,11,12
  16:9,16 20:17

21:4,6 22:5,15
  23:1 24:5,18
  25:12,14 26:3
  27:17 30:17,22,23
  30:25 33:3 35:5
  38:23 39:4,7,8
  41:25 42:5,8,24
  46:2 50:7 52:25
  58:14 63:5,17
  64:24 67:8 69:18
  75:7 76:20 78:13
  82:17 86:22 89:15
  96:13 98:21 100:7
  103:11,18 105:23
  106:9,23 110:18
  111:3 117:7
  122:23 124:15
  128:6 129:3 130:3
**cardinal's** 40:8
  41:12 47:3
**cardinal000001**
  3:10 35:12
**cardinal000229**
  3:19 103:25
**cardinal000235**
  3:21 112:5
**cardinal000238**
  3:13 47:21
**cardinal000245**
  3:15 53:11
**cardinal000269**
  3:18 72:17
**cards** 53:25 54:5
  54:15,18,19
**care** 61:18 68:21
  68:22 70:3 108:23
**career** 11:18
**case** 1:7 6:20
  119:25 120:22
  121:4 124:21
  128:6 129:3 130:3

[categories - continue]                                              Page 5

categories  116:25
cause  127:10
ceo  23:20 32:12
    63:4 67:10,13
    71:7 72:3,8 75:6
    75:11 77:14 78:2
    78:5,5,20
ceo's  67:3
certain  14:13
    20:20 26:14 30:2
    68:7,17 96:15
certainly  51:24
    61:23 62:14 63:21
    70:20 74:14 81:13
    87:7 92:24 98:24
    109:12 110:4,23
    111:17
certificate  127:1
    130:11
certification  129:1
    130:1
certified  4:6
    128:16
certify  127:8,13
    127:15
cetera  10:12 17:1
challenging  25:15
change  22:25 28:7
    31:7 71:1 91:11
    130:8 131:3
changed  10:6
    28:10,10 61:15
    70:16 84:25 118:2
changeover  25:17
    25:24
changes  60:24
    61:16 66:20 68:24
    72:9 129:7 130:7
    130:9
chapter  8:20

charge  6:18,19
check  90:6
checking  56:21
checkpoint  112:15
    112:18
chestnut  4:17
chose  77:23
christine  2:16 23:7
    23:17,18 46:2
    67:24 72:7 100:12
    100:16 117:18
    124:6
cindy  23:23 24:1
    25:7,8 36:12 41:3
    41:4,6,9,10,13,16
    44:9 59:13 60:2
    60:10,11 94:9,16
    97:21 105:20
    108:1 110:2 111:6
    115:14 123:5
cindy's  23:24
    94:15
civil  129:5 130:5
claim  7:17
cleaned  57:18
cleanup  57:14
cleveland  2:10
    127:18 128:2
close  34:18 62:6
    90:2 111:11
    118:23
closed  9:6 14:2
    121:23 124:8
    125:13,15
closer  16:13
closest  17:4
closures  70:24
coaching  49:2,11
    50:8 103:7 107:1
    107:3

coachings  49:8
collateral  9:3,7
collectively  117:18
college  83:11,12
    106:24 119:2
come  10:22 33:9
    38:12 49:6 56:6
    62:23 70:20 72:8
    75:7 83:25 93:15
    102:12 108:18
    114:23 122:6
comes  64:17
coming  14:18 16:9
    62:16 67:16 68:9
    69:8 70:1 71:7
    90:6,13 99:4,7,18
    106:23 113:6
comment  100:9
comments  38:20
    39:2 105:4
commission
    127:25 129:19
    130:25 131:25
commissioned
    127:8
common  50:6,7
    58:13
commons  4:17
communication
    49:16
communications
    25:4,5
companies  17:1
company  9:10
    12:7,9 18:7 26:9
    45:22 46:20 47:7
    71:21 105:10
    123:19 125:14
compensation
    7:17 124:14

competing  69:6
complain  38:2,7
complaining  6:24
complaints  7:5,10
    7:12
complete  55:14
    77:18
completed  110:17
    127:15 128:13
completely  85:14
    89:18
compliance  9:10
    27:7 35:4,6,7
    53:16,19 107:8
complied  87:11
comply  19:21
components
    109:25 110:2
computer  65:23
    90:18 114:4
concern  115:13
concerned  113:23
    114:1
concerns  33:22,24
    110:7,10,12 111:1
    111:18,19
concluded  126:13
conclusion  117:10
conference  96:6
consequences
    49:13
consider  98:5,6
considered  48:23
    55:24 57:11 120:7
consistency  50:16
consistent  41:11
consistently
    118:14
continue  25:8 37:9
    87:14

[continued - defer]

continued  11:3
contribute  118:11
contributor
  116:15,16
convenient  128:15
conversation  41:3
  48:14 49:2 55:9
  97:18 111:13
conversations
  114:4
copy  35:15 36:4,6
  36:7
corporate  8:25
correct  11:14
  16:19 17:17 19:23
  20:1,13,16 24:6,20
  25:2 28:9 30:6
  40:14 43:14 49:18
  49:22,23 50:3
  55:19 57:8 58:18
  68:5,12 73:21
  82:4,22 83:7,9
  85:7 87:22 89:15
  90:1,9 91:5 93:3
  99:3 100:18 107:5
  107:10 110:14
  118:15 119:12
  123:3,4 125:6,7
  127:12
corrections  130:17
correctly  57:7
  105:1
cost  71:5
counsel  40:4
  127:15
count  72:4
country  9:7
county  1:12,22 4:1
  127:5 129:10
  130:15

couple  10:7 14:1
  15:19 18:12 48:21
  90:16 94:13 95:12
course  26:5 46:17
  67:25 114:24
  121:13
court  1:1 5:8
  129:7
covid  13:1,4,6,9
  14:25 41:24 42:1
  42:5,9 43:2,13,21
  44:9 47:9 58:19
  59:16,22 60:4,8,17
  61:1,12 63:14
  64:24 67:2,8
  68:19 69:13,14
  70:9 72:23 75:25
  78:15 79:14 83:20
  84:21 85:5 86:7
  86:11 88:15 89:3
  119:5
create  61:16
created  119:19
creating  71:10
credit  1:7 2:16
  12:17 19:6 20:21
  32:22 33:6,10,14
  42:24 67:5,14,19
  68:1,4,16 75:7
  77:9 122:23 128:6
  129:3 130:3
critical  47:6
cross  23:15
crosscountry  8:23
  9:15,25 10:4,9,14
  10:22,24,25 11:4
crr  1:21 127:24
current  4:16 5:18
  7:4
curve  55:12

customer  21:12,13
  33:5 49:9 51:1,3,9
  68:8 74:9,16
customers  14:18
  34:10,16 63:15
  69:7,8,23 70:1,9
  70:13 87:21 90:12
cut  16:15
cuyahoga  1:12,22
  4:1 127:5
cv  1:7

d

d  3:1 22:11
daily  11:22
data  121:15
date  49:20 81:4
  102:14 104:7,13
  117:20,20 123:22
  123:22 128:8
  129:3,9,19 130:3
  130:13,25 131:20
  131:25
dates  15:8
dave  84:4 125:24
david  2:7 106:3
david.a.campbell
  2:11
day  5:17 11:22
  34:6 44:5 45:14
  45:20 49:25 53:21
  55:17 56:8 58:10
  77:7 89:7,9,22
  91:10 111:9,9
  113:25,25 119:5,6
  125:20 127:18
  129:16 130:22
  131:22
days  10:19 14:13
  48:21 51:14 52:7
  60:1 63:17,23
  64:1,12,15,20,21

64:23 65:8 78:14
  79:15 85:9 86:4
  92:11,15,23 97:4
  128:19
deadline  49:21
  54:1,6
deal  56:20 70:17
  75:14
dealing  33:15,16
  56:13 75:17
dealings  32:13
  96:5
dealt  14:25
dear  128:10
december  15:9
  24:16,17 48:17
  54:6,21 124:14
decide  78:3,20
decided  92:12,16
deciding  87:8
decision  15:23
  26:11,17 41:11,15
  44:21 45:13,14
  60:15,16 63:7,10
  77:15 78:1,24,25
  79:5,7,20,25 80:1
  88:9,12 91:7,9
  97:11 107:17
  109:15
decisions  41:9
  77:16 79:21,23
  107:21
deed  129:14
  130:20
deemed  128:21
defendant  1:8 2:7
defendant's  3:11
  39:22
defer  76:12,23
  117:1

deferring 74:22
definitely 35:6
delay 41:17 51:5
delivered 110:20
demands 21:2,7,9
21:11
dental 10:11
department 11:21
121:20 124:3
128:24
depended 34:6
50:16 100:11
depending 14:4
125:8
depends 50:21
deposed 4:6,19
8:10,12
deposition 1:11
3:9,10,12,14,15,17
3:18,20 11:8
35:11 39:21 47:20
53:10 59:1 72:15
103:24 112:4
126:13 127:14
128:8,11 129:1,3
130:1,3
depression 6:4
depth 114:5
derrick 22:9,10,18
22:19,23
derrick's 22:12,14
describing 108:4
desk 27:9,13 55:1
109:18
detail 114:15
detailed 97:18
124:2
determine 36:19
determined 41:20
determining 67:24

dewine 13:18
difference 20:15
33:13 64:4 85:21
differences 20:20
different 14:1
15:19 19:8 20:19
20:22,23,23 26:19
26:22 61:6 63:23
64:6 66:25 68:2
69:16 70:8 83:22
87:19 106:2
114:19
differently 79:22
difficult 19:12
20:9
dinner 80:24
direct 93:24,25
116:25
director 80:24
121:17
disabilities 36:16
disagree 51:8 67:1
67:18 71:25 74:4
74:11 79:18,25
99:6 101:19 105:7
105:18 107:22,23
109:24
disagreed 94:7,14
99:24 100:1,6
105:19 109:25
discharge 26:12
26:21 39:5,6,17,18
41:14 89:13
111:12
discharged 26:24
27:5 113:1
disciplinary 41:15
49:25 98:1,10
101:3 103:16
discipline 52:23
58:6 89:12 92:24

93:1 100:7
disciplined 53:1
53:23 57:21,24
100:14 108:12
110:13
discounted 57:11
57:13
discriminate 37:6
78:20
discriminated
78:17 80:4 92:4
120:22
discrimination
6:18,19 7:14 38:3
40:16
discriminatory
58:6
discussed 94:8
114:6
discussions 49:24
94:22 95:14 107:2
107:3
disliked 91:24
92:2
dismissed 43:6
district 1:1,1
21:10 23:9,16
24:23 39:15 41:4
81:24 114:10
119:15 120:11
diversity 37:2,3
divide 75:9 87:3
dividing 87:14
division 1:2
document 36:2
39:25 47:24 48:4
48:8 53:5,15
55:21 72:19
122:24
documentation
95:14

documented 94:22
documents 9:8
53:17
doing 14:6 20:18
57:5 61:19 75:19
97:12 112:20,21
114:25 115:1
124:16
dollars 46:23
123:18 124:21
125:15
door 6:24 34:17,18
doors 86:4
drastically 74:18
drawer 53:21
drive 2:3 4:17 9:9
14:2,22 61:1
68:23 70:5 85:16
due 18:22 41:25
42:5 43:13 44:8
59:16,22 60:8,25
61:16 63:13 64:24
67:8 78:15 79:23
80:16 83:20 88:14
88:15 120:23
duly 4:5 127:7,9
duties 19:18 71:13
82:11 105:14

**e**

e 3:1 4:15 22:11
83:4
earlier 35:2 48:15
55:9 62:7 74:25
82:25 87:5 104:15
125:11
easier 5:8
east 2:9
eastern 1:2
effect 72:12
effective 50:1

efficiency   107:20
eight   21:17
either   14:21 35:3
  37:17 60:2 127:16
electronically   36:7
eliminate   78:3
  80:7
eliminated   77:23
  80:4
eliminating   80:2
  86:23 87:1 89:6
eliminations   74:3
email   48:17 84:11
employed   9:15,16
employee   3:9,12
  3:14 7:13 19:16
  19:17 22:6 25:16
  35:10,11,24 40:21
  40:24 41:2 47:20
  53:10 54:25 56:13
  62:5 94:18,19
  98:16 99:10 105:5
  107:24 115:3
  117:16
employees   3:17
  9:11,13 21:16
  25:18,22,23 26:12
  26:23 30:11,19,24
  36:19 38:6 42:15
  43:17 52:14,15,17
  55:6,8 56:13 57:3
  57:5,10,14 72:10
  72:16,23 84:5
  98:24 99:4 103:9
  114:20 116:13
  124:16
employer   5:18 7:2
  7:4,6,22
employers   6:22
  7:3,12

employment   9:20
  9:23,25 11:16
  13:3 15:8 22:25
  24:5 28:2 36:14
  36:22 37:10,12,15
  38:20,23 63:11
  65:20,21,22 69:12
ended   25:20,21
  94:9 102:6
ends   114:8
energies   124:1
enforce   34:5
enforced   34:25
enforcing   40:16
  40:20
engines   11:20
enjoyed   23:1 39:8
entered   11:8 130:9
entire   25:1 31:1
  46:3,19 98:14
  105:9 109:14,16
  109:17 116:15
  129:5 130:5
entirely   74:22
entitled   10:9
environment
  20:10
equal   21:22 37:11
  37:14
ernstein   121:22
errata   128:19
  130:7,10,18 131:1
errors   108:17
escalated   99:20
especially   110:7
esq   2:2,7,8 128:5
essential   13:18,20
  62:5 75:24 105:14
essentially   68:3,9
estate   46:20
  105:10 116:16

121:24 123:15
et   10:12 17:1
evaluated   92:20
evaluation   3:19
  92:11,14,17,18,25
  96:25 103:22,23
  103:25 104:23
  110:23,24 111:20
  113:24 117:5
evaluations   92:9
  114:22
evening   59:13
  60:7 123:5
event   127:16
events   57:21
eventually   14:6
  82:19
everybody   20:6
  69:2 77:5
everybody's   106:2
evidence   103:13
exactly   42:13
  61:13 68:18 94:12
  99:22 112:1
examination   3:3
  4:5,8 122:19
  126:2
example   7:4 88:20
examples   101:1
exceeded   125:3
exceeding   26:3
  47:6 108:16
  116:11 117:25
excuse   95:4 109:7
  115:19
executed   130:10
execution   129:14
  130:19
executive   90:7
  91:4

exercised   22:22
exhibit   3:9,10,12
  3:14,15,17,18,20
  35:11 39:20,21
  47:18,19,20 53:5,9
  53:10 59:1 72:15
  84:6,8 103:24
  112:4 122:22
exhibits   3:8
exited   57:14
expect   61:21 76:3
  76:4
expectation   33:10
  112:22 113:23
expectations
  32:23 33:4,21
  52:16,18 68:8
  108:16 111:23
  112:8,11 114:16
  115:20 125:3
expected   14:17
  49:14,21 50:12,15
expecting   119:23
experience   33:7
  33:12 43:5 62:15
  72:1 97:25 98:18
  101:4 106:24
experienced   75:4
expiration   127:25
  129:19 130:25
  131:25
explain   5:13
explained   51:11
expressly   128:13
extensions   76:13
exterior   85:15
eyes   91:4,18 98:15

f

facebook   11:18
faced   60:4,24

facility 63:20
facing 56:23
fact 63:13 65:11
  67:14 78:11,13
  80:16 105:9
  108:21 125:7
factors 20:14
  67:24
facts 45:11 67:23
failed 52:23
fair 31:9 33:5
fall 21:6 50:13
  55:25 96:20
  113:12
falling 27:8
familiar 6:23
  42:12 86:7
far 13:7 31:5,8
  85:1 125:11
fashion 71:6
february 54:7,22
  55:17 80:18,19,25
  92:21 93:7 104:10
  104:18,20 112:14
federal 19:22
  62:15,22
feel 88:12 120:17
fell 57:18 120:3
felt 16:13 56:1
  95:13 100:6 112:2
  116:16
female 27:14
  28:21 29:16,18,24
  30:5,18,24 31:6
  45:17,18 47:8,16
  78:2,4,7,20,21
  79:12
females 30:14
fewer 69:7
field 13:3

filed 6:17,18,19
  7:16,19 8:2,13,15
fill 76:24
filled 26:13 78:15
  79:16
final 89:16 98:12
  98:14 99:20 102:1
  102:2
finalize 84:17
finally 82:14
financial 12:15,17
  12:19 13:2 63:12
find 11:15 22:4
  44:5 51:4 70:11
  111:16
finding 115:3
finish 33:12
firm 2:3
firms 79:21
first 3:11,11 4:5
  4:25 8:11 11:22
  13:8,24 35:9
  39:22,23 42:2
  48:3 59:7 76:22
  85:6,9,10 96:14
  105:22,22,23,23
  106:7,17,22,23,25
  115:13 127:9
five 6:8 21:16
  27:22 28:1 29:17
  109:3 122:6
fives 106:4 119:16
flagship 42:23
  81:16 89:25 118:5
flagstar 78:12
flexible 70:12
flip 76:16
float 73:12,13
floor 86:2
flow 74:17

focus 124:1
focused 56:22
  65:24 81:15
follow 48:14,18
  49:15 51:25 53:3
  114:21
followed 52:24
following 57:6
follows 4:7
foot 75:15,17,22
  87:11,15,19
force 41:25 42:4
  47:10 67:19 77:20
  87:25 88:5
forces 84:21,23
foregoing 127:11
  127:14 129:13
  130:18
form 51:16 96:16
  97:20
forth 13:18
forward 7:10,11
found 16:10,12
  44:6
four 17:7 21:4,8
  21:16 29:18,25
  30:5
frame 34:22 55:10
  92:23
frankly 116:6
free 129:14 130:20
friday 87:2,13
front 18:12 56:19
froze 90:16
ftes 61:10
full 10:10 86:11
  114:22
funds 69:3
funny 63:16
furloughed 76:6
  76:11

furnia 82:14,15,16
further 49:24,25
  94:21 125:23
  126:9 127:13,15

g

gender 37:6
general 7:3 13:7
  13:21,23,24,25
  19:5,9 20:16
  41:25 42:4 70:18
  121:24
gentleman 29:7
georgia 18:4,16
getting 33:24
  34:10 35:15,25
  57:2 64:8,11
  102:6 110:8,12,13
  113:24 118:6
  120:6
gil 73:15
gil's 73:16
gilbert 73:15
give 4:23 5:1 90:19
  96:15,18 106:4
  107:6 111:25
  114:22 119:23
  120:11,15
given 4:22 24:4
  44:7 48:10 85:23
  86:5,14 93:23
  94:2 99:9 110:14
  110:15 115:18
  119:24 127:10,12
gives 105:8
giving 98:25 99:1
  110:11
go 14:12 28:17,18
  31:5,8 32:7 35:3
  36:14 37:21,24
  43:10,13 44:2,4,13
  44:16,20 45:4,6,10

**[go - hiring]** Page 10

63:5 65:23 68:15
72:2 74:8 80:12
82:6 83:3 84:20
86:18 95:25 98:14
98:15 101:15,17
101:18 105:2,3
109:10 111:8
114:22 118:18
123:10,18 124:4
**goal** 46:22 47:5,6
47:7 105:11
116:12 117:12,14
124:16,20 125:21
**goals** 3:21 26:3
27:6 32:24 46:4,4
46:12,24 47:1
112:4 117:25
125:2
**going** 5:5 14:11,12
14:15,16,20,21
18:17 33:1 35:9
36:1 39:19 40:2,6
42:6 47:18 48:2
52:5,6 53:8 58:24
60:25 61:13 62:17
63:5 65:5,18
67:16,18,21 69:4,4
70:3,4,6 71:5,8,9
72:2,22 74:10,17
75:4,8,25 76:11,13
76:14,17,18,19
87:18,20 92:25
94:20 97:9,24
98:19 100:13
106:4,5,6 112:12
112:15 113:20
114:7,11 116:21
119:24 125:10
126:5
**good** 31:15,20,24
33:11,20 35:25

60:10 80:19 89:24
90:10 91:3 92:9
95:11,22 99:23
109:22 111:3
115:1 119:9,13,21
120:5,13 122:8
123:24
**gosh** 18:11
**gotten** 101:22,24
**government** 61:25
62:16
**governments**
62:23
**governor** 13:18
**graded** 98:10
**grasping** 115:7
**great** 39:9,10 69:2
77:3 104:21
111:22
**greater** 47:3
**green** 123:21
125:5
**gretchen** 29:4,23
29:23
**grew** 105:10
**gross** 105:10
**group** 9:5 14:13
15:23,24 31:1
55:2 109:4
**grovetown** 17:25
18:2
**growth** 124:22
**guess** 17:2 19:4,4
19:11 20:10 21:2
24:21 30:16 31:9
31:12 41:10 44:18
45:3,9,11 46:14
52:4,11,13 56:12
57:2,11 58:9 59:7
60:9 61:10 63:10
63:21 68:1 70:19

71:15,15 75:13
79:6,10,17 80:11
84:18 86:22 87:6
88:2,3 89:5,10,20
91:6,21 95:16
97:2 98:3,24 99:5
99:7 100:20
101:12 102:17
104:21 105:12
106:10 108:3
110:5,24,25 111:9
111:17,22 116:18
117:9 120:13
**guidelines** 33:21
33:23 52:15,17
**guiding** 60:23
**guy** 31:17 32:4
**guys** 123:10
125:24

### h

**h** 4:15
**half** 75:10,11,18
75:18
**hand** 127:18
**handbook** 3:9
35:10,12,16,23,24
36:3 40:21
**handed** 59:10
104:17
**handle** 87:18
**handled** 103:16
**happen** 14:11
**happened** 14:24
52:19 58:17 81:17
**happening** 62:9
**happy** 5:1,14 9:18
23:4 68:10 92:10
94:4,6 110:25
**harassment** 6:25
7:14 40:12

**head** 5:6 18:17
72:4
**heading** 67:1
**headquarters**
15:25 81:15 90:2
90:3
**heads** 107:7
115:18 116:22
**hear** 42:2 90:23
115:12
**heard** 22:24 115:4
**hearing** 57:12
109:9
**held** 27:3 52:17
108:12 123:16
**help** 36:18 76:18
116:7
**hereinafter** 4:6
**hereunto** 127:17
**hey** 7:13 62:16
67:4 69:3 71:4
79:19 89:8 111:10
111:16 112:19,24
114:20,24,25
115:16 116:7,21
116:22
**high** 21:11 32:23
33:4 68:8 105:15
106:9 107:12
**highest** 117:7,12
118:4 119:17,19
120:12
**hill** 22:20
**hire** 26:7 64:20
91:24 92:1
**hired** 9:25 27:18
30:1,4 31:11 37:7
86:11 91:23 92:8
108:11,13 109:21
**hiring** 63:13 69:17
85:5 86:9,17

**hit** 13:4 58:19 74:2 86:8
**hits** 119:5
**hold** 52:14 109:12
**holding** 52:13
**holiday** 48:19 51:23
**home** 14:14,15 15:21 16:13 17:7 71:11 75:10,19,20
**honest** 22:13 34:7 96:5
**honestly** 28:19 50:14
**hopefully** 72:1 99:2
**hour** 34:21,25
**hours** 14:3 34:2,19 34:21 49:16 50:18 72:5 74:9
**hr** 23:23 25:7 26:16 36:24 37:21 37:24 38:2 40:25 41:13 59:13 94:9 110:16 111:10 114:7 116:21 120:1,2
**huddles** 121:19
**huh** 83:18 107:5
**hung** 59:19

**i**

**idea** 81:12,22 83:23
**identification** 35:14 39:24 47:23 53:13 59:3 72:18 104:2 112:6
**identifying** 75:1
**imagine** 71:24
**immediate** 13:4

**immediately** 15:11
**impact** 5:22 13:12 13:14 47:2 61:10 63:14 75:25 77:9 88:9,11
**impacted** 43:17,21 60:18 69:12 72:23 77:19 93:1
**impacting** 69:13 69:14
**important** 19:11 35:5,6 42:25 56:15,16,17 60:22 63:2 108:24
**improve** 99:2 107:21
**improvement** 123:24
**improves** 113:1
**inappropriate** 39:2 89:8
**include** 42:15
**included** 40:8
**including** 27:23 89:17
**income** 10:21 65:24
**inconsistencies** 100:6,10,21,24
**inconsistent** 100:17,19 101:4 116:19
**incorporated** 130:12
**increase** 69:5 76:17
**indeed.com** 11:19
**indefinitely** 62:24
**indifferent** 31:24
**individual** 28:20 46:4,18,24 48:16

48:20 50:19 82:4 85:24 121:22 124:17 125:12
**individually** 46:7
**individuals** 26:7 26:18 33:18 41:21 43:3 67:16 71:14 86:4,13 98:9 120:25 122:23 124:5,10 126:8
**industry** 12:15 84:19 119:4
**initially** 61:7,8
**inspection** 50:24 54:13
**instance** 99:8
**institutions** 63:12
**instructions** 4:23
**insurance** 10:12
**interact** 32:15
**interested** 97:11 127:16
**interior** 85:15,17
**internal** 6:22
**internally** 7:13
**interview** 23:5,21
**interviewed** 12:6 23:7
**interviews** 12:4,23
**introduced** 122:22
**invited** 80:23
**involved** 44:21 93:13 110:16
**involvement** 32:20
**issue** 37:24 49:1 76:8 91:1 95:1,15 98:5,7 99:15 102:11 110:22 114:7
**issues** 35:4 36:25 37:23 91:17 94:24

95:16,18 118:8 119:3
**items** 49:8 60:12 99:21 113:11

**j**

**james** 22:20
**january** 48:18 50:1 52:7 54:7,21 104:20,22,24
**jared** 82:14,15,16 82:18,23
**jason** 44:1,2,4 73:4,5 99:13 100:25
**job** 10:23,25 11:1 11:2,2,20,21 12:10 12:11 13:5 16:11 16:13,25 18:5,6,22 19:3,12 24:13 42:8 44:9 56:14 56:17 57:8 59:21 59:22 64:23,24 65:24 72:7 78:14 82:5,6,7,24 85:10 105:13 106:8 108:13,16 109:22 113:14,15 115:8 116:20 117:1
**jobs** 12:13 13:7 15:25 56:15,16 77:8
**jonathan** 81:20,21 82:1,1,3,3
**jr** 1:5
**judge** 1:4
**july** 127:25
**june** 65:10,10 66:12

**k**

**k** 22:11
**kaitlin** 73:23
**keep** 69:4,11 71:10
71:14 77:4
**keeping** 61:3
75:10
**key** 62:7
**keybank** 82:8
**kind** 12:12 26:1
**kinds** 118:7
**knew** 22:19 32:24
61:13 86:3
**know** 5:5 6:17,24
7:8 11:19,21 14:6
14:23 15:1,5
20:22,24 21:15,16
21:17 22:10,12,18
23:24 26:1,2,6,16
26:18 27:9 28:16
28:18,22,23 29:9
32:21 33:10,11,13
33:15,17 34:11
36:22 37:5,18
38:22 42:8,10,13
43:12 44:2,15
45:5,6,15,24 49:10
50:4,11,14,20 51:6
51:7,18 52:20
57:17,23 58:1,8,12
58:16,19 59:21
60:7,12,13,14,16
60:18 61:3 63:16
64:8,11,18 65:15
66:19,19,20,21
67:10,17,25 69:9
69:10,15 70:15
72:3 74:12,19
75:8 76:6,9,10,16
76:22 77:15,22
78:22,25 79:4

81:18 83:13,22
85:8,19 86:16
88:3,13 89:21
91:7,15,19 92:3
93:21,24 95:20
96:6 97:15 98:11
98:15 102:17,21
102:23 103:5,12
103:17,20 105:14
106:10,12 108:14
108:24 111:11,23
112:1,1 114:20
115:10,16,21,21
115:25 116:2,21
117:24 118:17,18
118:19,19,20,22
118:25 120:5
121:2 124:1
**knowing** 44:19
**knowledge** 27:1
29:19 31:2 38:7,8
43:11 45:19 47:15
50:6 66:15 82:13
83:14,21 84:19,22
85:2,4 89:1 92:5,7
100:3 105:13
106:8 118:14
120:12
**known** 58:13
**kristin** 1:21 127:7
127:24

**l**

**l** 83:4
**labeled** 3:9,13,14
3:16,18,19,21
35:12 47:21 53:11
59:2 72:17 103:25
112:5
**labor** 11:20
**lady's** 29:15

**laid** 76:6,7,11
110:4
**lakeland** 27:20,25
28:11,24,25 29:3
29:11 47:4 83:11
83:12,13,16 88:24
89:2
**lakeland's** 29:24
**large** 21:11,12
**larger** 21:18 46:25
**largest** 21:20 74:1
74:1 90:11 117:11
**late** 108:20,21
110:15
**lateral** 16:17
**law** 2:3 41:12
66:18 67:3 79:21
**lawful** 4:4
**lawsuits** 8:8
**leader** 61:4
**leaders** 68:20
**leadership** 60:23
**learn** 114:4 115:5
**learning** 55:12
105:18
**leave** 10:20 16:10
16:11 18:5 52:9
**leaving** 25:21
**left** 10:21,24 16:12
18:6,21 23:14,15
24:2 25:18 48:20
55:13 57:16 82:6
**legal** 128:1 131:1
**lending** 80:24
121:18
**letter** 3:16 59:2,4
59:6,8 123:3,7
128:20
**level** 32:14 61:22
98:2,4,10 101:22
101:25 102:4

117:16 118:11,13
**lewis** 2:8
**lewisbrisbois.com**
2:11,11
**life** 10:12 64:7
**lifetime** 72:1
**liked** 60:2 114:21
**limited** 32:20
**line** 3:4 30:14 47:3
68:13 119:14
130:7 131:3
**lines** 58:2
**list** 3:17 72:15
77:18,18 78:8
79:12 84:5 120:24
121:6 122:22
**listed** 73:6 104:25
130:7,17
**listen** 59:17
**listing** 130:7
**lists** 124:2
**literally** 53:22
**litigation** 6:15
**little** 19:7 27:17
36:2 52:22 55:9
68:2 79:2 84:17
91:1 96:4 107:14
108:5 115:17
**live** 123:13
**livingston** 81:20
81:21 82:1,3,10
**liz** 121:2
**llp** 2:8
**loan** 9:8 27:4
56:19 73:6,17
76:23 85:18
**loans** 9:6,8 46:20
121:23 123:14
124:8
**lobbies** 14:2,5

**lobby** 14:16 85:23 86:5

**located** 15:22 54:6

**location** 9:1 16:21 17:23 128:15

**locations** 21:23

**long** 9:14 10:18 13:10 15:17 18:9 45:22 61:13,14

**longer** 52:22

**look** 11:3 35:19 50:25 61:12 63:3 77:25 88:19 91:16 111:22 112:7 114:17 118:24

**looked** 61:14 67:25 76:2 77:16 107:2

**looking** 9:21,22 12:8,12,14,16 22:25 23:3 46:24 61:25 62:3 64:15 64:25 65:24 67:13 74:7 76:12,13,14 78:6 88:17 91:11 91:22 111:18,24 111:24 117:4,5,5 119:18

**looks** 33:2 48:25 49:14 53:25 54:3 54:5 55:16 72:21 73:25 74:6 104:7 112:17

**lose** 68:15

**losing** 44:9 77:8

**lost** 15:25 16:1 18:22,24 19:2,2 42:8 64:23

**lot** 5:4,8 21:12 31:18 77:19 97:7 97:24 108:9 113:9

**lots** 11:19 20:12 21:12 79:21 90:11 90:12

**low** 114:2

**lower** 113:5,20

**lump** 96:17

**luxury** 69:2

**m**

**ma'am** 106:20

**madam** 128:10

**mail** 59:25

**mailed** 59:10

**maintain** 67:5

**maintaining** 43:4

**major** 10:11

**majority** 30:24 31:7,8 66:22 76:5

**making** 26:11 34:13 47:5 56:8 56:24 57:5 61:2 66:20 68:6 78:1 79:22 103:12 107:17 110:18

**male** 27:14,15 28:21 29:22 30:8 30:15 45:10,20 78:16 79:16 125:16

**man** 61:10

**manage** 9:5,11 20:24 56:7 62:8 71:9 81:11

**managed** 15:22 21:21,23

**management** 12:11,21 16:24 19:17 33:3 34:25 46:3 64:14 81:10 90:7 105:24 107:24 109:10 113:12

**manager** 9:3 10:17 12:8 15:16 15:18,21 16:3,20 17:3,5,6,11,16,19 17:21 18:8,9,14,15 19:6,11 20:6,8,19 21:7,9 23:4,10 24:8,18,22,23 26:13 28:15 29:1 29:3,12,24 30:3 31:15,16,20 32:4 32:14 37:22 41:4 43:1,1,10,23,25 44:19 45:9,18,19 47:16 51:25 57:4 57:20,25 58:10 60:23 62:3 63:19 64:1,25 71:3,17,24 73:3,8 75:1 78:8 79:13 80:11 81:3 81:24,24 82:11,17 82:19 83:10 85:19 89:6 99:14 101:15 102:25 103:18 106:22,23 110:11 112:11 113:15 114:10,11,12,21 115:2,8 117:7 118:10 119:15 120:11 121:10 123:17 124:19,20

**manager's** 32:16 56:15

**managers** 12:14 12:17 21:3 28:6,7 29:10,18 30:5 32:1 45:21 46:11 47:8 50:5 58:20 83:3 88:4,18 89:21 91:11 102:18,22 117:19

**120:3** 121:16 125:17

**managing** 78:12

**mandate** 85:21 86:12

**manufacturing** 12:7

**march** 1:15 4:2 11:11 15:9 63:22 64:4,11,13 65:4,4 65:9 66:8 70:22 70:23 72:24 86:15 86:19 112:8,16 127:18 128:4

**marie** 35:7 55:3

**mario** 23:7,8,9,15 24:23 31:13,14,17 32:3,3 41:16 49:5 49:6 50:24 51:2 51:11 81:10 82:12 93:23 94:17,18 95:17,18,20,20,23 96:3,4,5,7 97:5,7 97:21 104:15 105:8 108:10 110:11 111:10,21 111:25 115:17 116:7,19,23 119:14 121:14

**mario's** 23:11 82:5 117:1

**marked** 3:8 35:13 39:20,24 47:22 53:8,12 59:3 72:17 86:1 104:1 112:2,6

**market** 13:3,5 65:18

**markings** 112:2

**marks** 110:21

**mask** 85:21 86:12
**masks** 85:16
**matter** 6:18 97:14
　128:12
**mattered** 51:15
**max** 96:20,21
**mean** 9:4 21:10
　31:23,24,25 32:8
　33:8 34:8,9 37:14
　38:22 39:5 52:13
　52:20 53:1 54:24
　61:24 62:12 63:10
　66:24 68:6,7,16
　69:16 70:10,19
　76:4 77:12 79:1
　79:20,23 86:16
　89:11,24 90:6,10
　91:22,23 92:22
　93:2,17 96:4 97:6
　97:15 98:25
　100:23 103:10
　104:19,21 105:21
　106:1,7,15 107:13
　109:12 110:4,6,7,9
　111:11,16 112:24
　113:8 114:19
　115:1 116:5,5
　117:4,22 118:3,5
　118:23,24,25
　121:12
**meaning** 54:17,25
　101:24 123:22
**means** 9:5 54:16
　54:22 89:11
**measured** 120:18
**measurement**
　119:25
**medical** 10:11
**medications** 5:22
　6:1

**meet** 34:21 49:21
　87:15 112:12
　117:13
**meeting** 26:3 27:6
　32:14,16,16 87:1
　108:16 112:8
　113:23 116:11
　117:23,24
**meetings** 46:1,9
　96:7 121:19 123:9
　123:13 124:7
　125:18
**meghan** 29:12,20
　47:15 83:6
**member** 33:9,22
　49:15,19 51:10,12
　51:13 52:1,2,6,9
　52:10,21 56:22,23
　72:11
**members** 33:16,25
　34:16 55:14 56:4
　56:5,7,7,18,18,24
　57:1 60:19 61:9
　61:18 67:15 68:3
　68:6,17,20 70:11
　70:17 71:9 76:5,6
　76:10,18 77:6,7,13
　87:15 89:17 90:12
　108:23,25 109:17
　109:22
**memory** 28:9 82:4
**mention** 107:1
**mentioned** 116:24
**mentions** 108:6
**mentor** 4:18 21:10
　22:2 24:9,18
　27:20,23,24 30:7
　34:15 39:9 40:20
　42:23 46:15,25
　47:2 56:7 63:20
　64:1,25 73:24,25

　81:4 82:11,19
　89:25 117:25
　124:13
**merger** 18:22 19:2
**merging** 18:23
**message** 48:20
　52:9
**messes** 57:17
**met** 47:5 124:16
　124:20 125:2
**middle** 80:19
　92:20 112:13
**middlefield** 10:15
　10:15,16,24 11:1,5
　11:24,25 85:11,12
　86:7,10
**middlefield's**
　12:24
**midwest** 131:1
**million** 46:23
　105:11 116:12
　117:12,14 124:21
**mills** 16:3,21 17:3
　17:11,16 22:1
**mind** 67:4 120:8
　120:14
**mine** 4:23 89:17
**minnesota** 15:24
**minor** 98:2
**minutes** 84:13
　122:6
**missed** 56:11
　84:10
**missing** 54:20
　108:21
**modified** 61:19
**moment** 82:5 95:4
**momentarily** 95:5
**monday** 4:2 46:1
　59:20 72:13 96:7
　117:17 123:9,12

**mondays** 46:9
　126:6
**money** 68:15
　81:14 96:15
**monitored** 86:3
**month** 46:13,13,13
　46:23 47:6 80:21
　112:15 113:21
　117:13,20 123:22
　124:16,22,24
**months** 9:16 11:13
　13:4,8 16:4 17:4
　63:6,6 85:6
　110:15
**morning** 96:7
　100:13 123:13
**mortar** 16:24
**mortgage** 8:23
　9:15 10:1,5 12:20
　15:21,22 17:1,7
　121:20 124:3,7
　125:12
**mortgages** 125:12
**motion** 75:8
**move** 15:24 16:17
　43:5
**moved** 11:3 16:2
　26:22
**moving** 16:15 17:7
**multiple** 21:23
　25:22 27:9 56:25

| n |
|---|

**n** 3:1
**name** 4:10,12
　12:10 18:17 22:9
　22:12 23:11,24
　28:19 29:4,6,8,15
　128:6 129:3,4,15
　130:3,4,21
**named** 127:8

names  72:25
natural  79:19
nature  58:15 75:5
  97:22 98:2 99:19
  111:14
necessarily  85:5
  87:8 100:5 119:2
necessary  67:10
  67:12
necessitate  67:3
necessitated  60:19
need  4:25 5:12,12
  5:13 41:2 60:3
  61:4 68:19 70:2
  71:4,5 75:24
  76:18 112:19,25
  116:1,7
needed  11:2 36:11
  36:19 53:23 55:4
  57:17 59:17,18
  61:11 68:24 75:2
  95:23,24 113:9
  123:25
needing  114:4
  123:24
needs  70:3,11
  107:21
negatively  92:25
never  62:15 75:4
  94:8,18,19 97:17
  105:8 115:4,12,25
  116:1 124:13
new  9:20 23:16
  25:22 26:7 55:11
  56:5,13 57:3,10
  107:11 108:22
  116:13 124:21
newer  114:11
news  44:8
night  44:7

ninety  10:19
nod  5:6
nondiscriminatory
  37:18
nonessential  13:19
norm  98:8
normal  55:24
  85:17,18 96:6
  112:23
north  4:17
northeast  84:20
northern  1:1
notary  127:7,24
  128:25 129:10,18
  130:15,23 131:23
noted  93:2
notice  59:11,12
number  40:15
  74:7,9 75:22,24
  105:9,15,17 107:9
  107:17,25 113:8
  116:5,14 125:13
  128:7
numbers  33:17
  118:6 122:2
  123:11,13 126:5,7
  130:7

o

object  42:6 67:21
objection  64:9,9
  65:14 66:14 67:6
  74:20 78:23 79:3
  106:13
obtained  9:24
obviously  34:9
  39:5 41:3 43:2
  48:19,22 77:18
  87:19 120:6
  123:23
occasion  50:23

occurrence  58:13
october  11:7,11
odd  79:2 97:23
offer  12:24 24:4
offered  24:7,8
offers  11:23 12:3,4
office  8:24,25 16:3
  21:10,11 24:9
  39:9 75:11 127:18
  128:14
officer  35:7 53:19
  73:6,17
officers  27:4 85:18
official  129:15
  130:21
officially  82:23
oh  13:25 29:2 45:5
ohio  1:1,12,22 2:4
  2:10 4:1,18 10:15
  13:13,15 65:10
  66:9 84:20,20
  127:3,7,18,24
  128:2
okay  4:19,22 5:2,3
  5:4,6,9,14,15,16
  5:21,25 6:3,7,11
  6:14,17,22 7:8,16
  7:19,22,25 8:3,6
  8:10,13,20,22,24
  9:2,4,11,14,18,20
  9:23 10:3,8,13,18
  10:20,23 11:5,9,15
  11:23 12:5,23
  13:1,9 14:8,8,17
  14:23 15:7,10,13
  15:17 16:6,15,20
  17:2,15,18,21 18:3
  18:5,9,13,19 19:4
  19:4 20:5 21:2,14
  21:20,24 22:1,4,4
  22:8,10,12,14,17

22:21,23 23:5,5,8
23:11,13,17,19,21
23:24 24:1,4,7,10
24:14,17,21 25:3,7
25:10,24 26:11,20
26:23 27:2,5,11,14
27:16,16,23 28:1,4
28:6,12,21,23 29:5
29:9,14,17,21 30:4
30:7,13,16,16
31:11,11,20 32:7
32:11,18 33:1,20
34:3,20,24 35:4,8
35:8,18,19 36:9,9
36:13,13,18,24
37:2,9,16,20 38:1
38:6,9,9,11,18
39:1,4,12,19,25
40:2,6,23 41:7,10
41:14,22,22 42:10
42:14,14,17 43:8
43:12,12,15,19,24
44:2,4,12,15,15,18
45:24 46:8,8,14,14
47:8,14,17,17,17
48:2,7,10,10,13,25
49:4,7,13,13 50:4
50:10,23 51:4,7,19
51:22 52:4,11,11
53:4,4,8,25 54:13
54:23 55:5,16,20
56:12 57:2,9,20,23
58:1,4,8,23,23
59:4,6,9,24 60:2,9
60:9,14,14,17,17
61:6,20,23 63:1,21
65:2,8,17 66:2,17
66:23,23 69:10,20
69:22 70:23 71:3
71:15,22 72:14,19
72:21 73:2,5,9,11

73:14,16,18,22,25
74:6,14,21 75:13
75:21,22 77:3,12
77:17,17,22,25
78:10,18 79:1,6,17
79:18 80:6,10,10
81:2,9,13,19,23
82:7,9,14,18,21,21
83:1,6,15,19,24,24
84:9,11,13,16,18
85:3,8,12 86:6,15
86:21,21 87:6,17
87:17,23 88:2,2,7
88:16 89:5,20,24
90:5,18,20,22,22
90:25 91:6,9,14,21
92:3,7,7,8,13,17
92:22 93:10,14
94:4,11,16 95:9,15
96:2,2,10,10,19,23
96:23 98:3,22
99:4,12,14,24,24
100:8,8,16,19
101:5,8,10 102:2,8
102:8,12,12,16,16
102:24 103:9,17
103:21,21,21
104:3,5,7,10,19
105:13,21 106:1
107:1,11,17,24
108:3,17 109:20
109:23 110:3,3,22
111:7,15 112:7,7
112:17,23 113:8
113:17,22 114:18
115:15,15,24
116:3,18 117:3,3
118:1,16 120:2,20
120:20 121:1,8
122:4,4,10,12
126:9,9

oliver  1:5
onboarded  57:6
once  72:1 116:11
ones  105:20
open  6:24 24:11
   24:11,12 34:17
   62:1 66:16 75:23
   77:8 85:14
opened  14:5 65:16
opening  23:3
openings  65:19
operate  60:25
operated  50:9
   85:16,17 98:21
operating  83:22
operations  12:8,10
   12:16,21 15:20
   16:25 17:6 18:8
   63:15
opinion  99:9
opportunity  10:22
   18:6 26:7 37:12
   37:15
order  34:21 61:11
   67:4 87:14
orders  13:12,12,14
   66:5
organization
   98:25 100:3
organizations
   97:25 98:17
original  59:12
   82:6,7
ourself  110:18
outbound  61:2
outperforming
   46:11
outside  33:2
outsider  19:10
overall  13:5,22
   20:21 30:19 33:7

47:7 93:8 95:9,11
   100:7,21,24 101:3
   103:11 111:23
   116:10,12 124:9
overtalking  109:6
   119:11
owners  68:3,9,10

**p**

p.m.  1:15 4:2
   126:13
package  10:10
page  3:4 36:1 99:5
   130:7 131:3
pandemic  13:2
paper  36:7 97:12
paperwork  26:14
   27:7 76:24 102:11
   123:6
par  20:11
paragraph  59:18
parameters  57:19
park  2:3
part  32:14 42:2
   55:12,13 57:8
   68:7 73:19 93:9
   93:12,20 124:14
   130:9
partially  71:11
particular  15:19
   48:16 51:11 52:2
   55:10 56:1,23
   70:13 79:15 85:25
   94:3 95:3 99:8,10
   115:10
particularly  70:14
partner  22:19
   45:8
partners  124:8
parts  94:7,11
party  8:7 127:16

pass  23:4
path  98:20
paused  95:5
pay  16:15,18
   96:12,13
paying  65:17 66:4
payments  76:12
payroll  17:1
people  33:16
   43:20 50:7,15
   58:14 60:7 62:8
   69:17 77:6 85:22
   86:1 89:16 98:13
   108:10 109:13
   122:1
percent  41:5 46:21
   96:17,19 105:11
   117:13 120:8
percentage  74:2
   109:3
percentages
   125:22
perform  105:14
performance  3:19
   71:18,21 78:11
   80:15,16,17,20
   88:14 99:2 103:24
   105:4 111:3,5
   112:25 116:10
   118:21 119:23
   120:16,18 121:17
   123:8
performances
   94:24
performed  118:13
performer  105:15
   106:9 107:12
performers  80:25
   124:5
performing  45:23
   45:25 78:16 79:16

80:14 108:11
109:19 115:20
117:7,15 118:4
121:10 123:11
**period** 14:3 55:17
58:11,21 66:21
70:18 71:2 82:10
86:11 89:7,9
91:10 93:4,5 99:2
99:7 117:21 119:5
119:6
**periods** 89:22
**permanently**
64:18
**permitted** 66:18
**person** 43:13 78:7
101:6 119:18
**personal** 70:15
84:24 121:21
**personalized**
33:19
**personally** 13:25
98:13 116:14
117:14 122:3
125:4 129:11
130:15
**perspective** 25:13
25:16,17
**petrie** 83:8
**phone** 33:24 44:10
48:16 49:3 50:17
60:6 61:2 70:4
76:17,25 86:23,25
123:4 128:3
**picked** 47:12
53:22 80:7
**picture** 20:2
**piece** 56:17 89:11
**pieces** 42:25 58:5
77:15

**pile** 107:13,15,16
**pipeline** 121:24
**place** 23:1 63:25
68:20 71:10 72:9
87:3 100:2 127:14
**placed** 55:16
103:19
**places** 12:6 65:23
69:17
**plaintiff** 1:5 2:2
**plaintiff's** 3:11
39:21
**plan** 75:7,12,14
87:3,7,10,12
**plans** 71:8 72:9
**platform** 21:17
30:12 109:2
**play** 72:8
**played** 45:12
**playing** 34:13
**please** 4:10 128:14
**pleased** 95:12
**plus** 17:7 46:21
124:15
**point** 33:2 58:17
62:6,10,12 68:2,18
87:16 93:5 101:6
114:12 115:15
120:15
**policies** 6:24 36:14
40:8 41:12 52:24
**policy** 6:25 36:16
37:4,12,13 38:2
40:9,16 107:8
**pop** 90:20
**portion** 19:17
75:14
**position** 16:1 22:5
23:13 24:7,11,12
63:18,25 64:13,14
64:19 66:25 67:11

73:16 74:3 77:23
79:15 80:2,3,7
86:24 87:1
**positions** 27:2
66:25 69:15 77:19
**possible** 34:11
**posted** 63:18,24
64:14,19
**potential** 26:21
**potentially** 19:12
55:1 61:10 98:11
98:20 100:14
**practice** 50:7
**prefer** 128:16
**prepared** 110:19
**prescription** 5:25
**prescriptions** 6:3
6:8
**presence** 127:11
**present** 2:15
**presented** 48:22
123:1
**presumably** 92:10
96:25
**pretty** 12:18 34:16
76:7 119:20
**previous** 28:25
48:25 118:9
**previously** 15:20
21:23 94:8 99:18
114:3,6 118:14
123:9
**prided** 110:18
**primarily** 30:8,18
30:21,23,23 31:5
**primary** 81:15
**prior** 10:13 11:25
12:24 14:11 15:11
15:12 16:7,9,21
17:2,7,11,14,15
18:13,24 30:3

38:1 39:6,14
70:20 93:9 94:22
95:14 99:18
114:14 115:5
120:12 122:21
**proactive** 71:8
72:4 75:1
**probably** 17:12
74:1 84:1 106:5,5
**probation** 50:5
88:4,8 97:4,5,8,9
103:19 111:8,9,20
113:25
**probationary**
49:25 55:17 58:11
58:20 89:7,9,22
91:10 99:1,7
102:19,22 103:4,7
119:5,6
**problem** 95:7
109:14 120:9
**problems** 96:2
**procedure** 53:2
129:5 130:5
**procedures** 6:23
52:24 57:6 118:3
**process** 9:7 41:1
41:20 63:3 86:1
98:14
**production** 3:12
39:23 128:24
**products** 10:12
**profitability** 67:5
**profitable** 19:25
**program** 76:23
**programs** 20:23
76:12
**progressing** 66:20
**progression** 66:4
**prohibited** 40:12

**properly** 27:8
55:14
**protect** 77:12
**proved** 117:24
**provide** 76:21
**provided** 78:9
**provisions** 7:5
**psychiatric** 6:5
**pto** 48:21
**public** 127:7,24
129:10,18 130:15
130:23 131:23
**published** 78:14
**purchased** 128:17
**pure** 126:4,7
**purposes** 35:13
36:23 39:24 47:22
53:12 59:3 72:18
104:1 112:6
**pursuant** 38:2
**put** 31:25 32:12
53:22 58:9,9,10
64:18 72:9 75:8
80:1 87:3 94:20
99:17 102:6,8,18
102:22,25 103:3
105:15 107:8,9
**putting** 114:14

**q**

**qualified** 127:8
**question** 31:18
34:24 36:12 42:7
43:15 46:14 61:6
62:11 63:1 66:6,7
67:11,13 78:18
84:4 86:16 102:17
102:20 106:14,18
119:8 121:13
**questions** 33:22
36:10 56:20 111:6
122:14,15,17

125:25 126:10
**quick** 34:11 39:14
84:4 122:16
**quickly** 95:21
**quite** 18:18 55:10
77:1 116:5

**r**

**r** 22:11,11
**race** 79:24
**rachel** 73:12
**raise** 96:12,16
111:1 120:7
**raises** 96:13
**ran** 121:18
**random** 54:13
**rank** 125:17
**ranked** 125:19
**ranking** 95:10,11
123:19
**rasmussen** 73:19
**rated** 95:13 113:4
113:19 114:2
**rating** 95:2,10
114:1 116:4,6,8
120:15
**raving** 80:20
**reach** 51:12 52:21
52:21
**reached** 48:20
50:19
**read** 48:12 49:17
49:22 50:2 54:8
59:18 112:18
113:2 126:11
129:5,6,12 130:5,6
130:17
**reading** 54:9
112:24 128:12,20
**real** 39:14 46:20
65:3 105:10
116:16 121:23

123:13,15
**realize** 44:23
**really** 32:15 34:6
57:5 92:19 95:14
97:10,17 98:5
99:9 100:5 116:7
117:6
**realm** 12:19
**reason** 18:21
44:24 68:7 79:14
130:8 131:3
**reasonable** 36:21
**reasoning** 75:17
**reasonings** 50:18
**reasons** 26:19 37:7
108:20 109:1
**recall** 12:5,9 13:17
22:13 23:25 24:12
26:24 27:2 28:12
28:14 29:15 34:1
35:15 36:6,15
81:23 101:2
102:10,14
**receipt** 128:20
**received** 36:6
44:10,11 48:17
51:18 59:12,25
123:2 124:18,23
**recess** 38:16 84:14
122:11
**recognize** 53:15
59:7,8 72:25
**recollection**
125:16
**recommendations**
41:8,18
**recommending**
41:15
**record** 4:11,14
95:5 130:9

**records** 50:25
84:10
**recruited** 108:10
**recruiting** 63:19
**red** 68:15 123:21
123:25 124:11
**reduce** 61:21 67:4
71:4,5 72:4,5 75:2
**reduced** 42:20
44:8,24 45:19,21
60:8 65:25 67:7
74:10,13,18 78:14
79:13 86:13
127:10
**reducing** 74:15
85:1
**reduction** 41:25
42:4 43:21 47:9
59:17 60:3,19
67:19 72:24 77:5
77:20 84:23 85:22
86:8,17 88:5
**reductions** 84:21
87:25
**refer** 41:4
**reference** 36:11
128:7 129:2 130:2
**referenced** 48:15
123:10 124:12
125:1 127:10,12
128:11 129:11
130:15
**referral** 124:2
**referrals** 121:21
121:23 124:4,7
125:12,14
**referred** 22:6
46:20
**referring** 13:22
64:12 88:23

| | | | |
|---|---|---|---|
| **regards**  7:1 28:14 30:10 31:21 32:23 33:23 100:22 115:22,23 | **reporter**  1:21 5:8 30:20 39:13,18 54:3 90:16,24 95:4,6 109:8 129:7 | 117:15 | 50:2 52:1,8 54:8 55:21 62:18 63:15 64:7 65:13 66:13 68:4,11,17 69:5,8 |
| **regions**  17:20 18:10,14 19:3 20:17 21:4 | **reporting**  4:1 37:20 115:7 116:23 | **restricted**  14:4 **restrictions**  6:11 13:20 14:9,25 **result**  49:24 | 70:25 71:19 74:18 74:23 75:15 76:1 76:8 77:10,13,20 79:2,25 81:11,16 |
| **regular**  123:14 | **reports**  114:5 121:15,18 | **results**  39:10 80:20 106:25 | 87:11,20,21 88:22 89:13,25 90:8,8 |
| **regulations**  19:22 **rehire**  25:20 | **reposted**  79:15 | 117:19,20,20,24 | 91:4,23,25 92:10 93:1 99:2 104:8 |
| **rehired**  109:21 | **represent**  72:22 | **retain**  72:10 **retained**  9:9 47:9 | 104:11 105:22 |
| **rehiring**  116:13 | **request**  40:3 130:9 130:11 | 47:11 | 107:4,9 108:6,7,18 109:14 110:8,12 |
| **rejected**  41:16 **related**  6:5 | **requests**  3:12 | **retract**  29:2 **return**  48:15 | 110:13 111:4 112:20,21,21 |
| **relationship**  33:18 60:10 | 39:23 56:9 **require**  55:7 | 50:17 95:21 **returned**  128:19 | 113:1,10 115:1,20 118:8 121:2,2,8 |
| **relative**  127:15 | **required**  55:6 128:25 | **returning**  33:24 **review**  80:18,20 | 122:8 126:5 |
| **released**  59:16,23 64:13 67:7 78:8 80:16 88:14,14 | **requirement** 85:15 | 93:3,7,8,13,15,18 93:21,22,23 94:1,5 94:6,7,21 96:10 | **riter**  44:1 73:4,5 99:13 100:25 **rmr**  1:21 127:24 |
| **remain**  9:21,22 28:2 | **researching** 107:21 | 97:3 104:7,13,17 104:25 106:16 | **road**  45:20 **rob**  83:8,10 |
| **remainder**  16:25 56:6 | **reserves**  68:14 **resign**  26:21 | 108:14 110:3,4,5,8 110:14,17,20 | **robb**  2:2 3:5 38:15 42:6 64:9 65:14 |
| **remember**  18:16 28:19 29:6 40:2 55:8 99:22 105:1 | **resigned**  26:9,20 **resources**  77:4 **respect**  7:22 14:24 | 112:13,14 113:20 114:8,14 115:4,13 119:7,18,19,25 120:5,9 128:14 | 66:14 67:6,21 74:20 78:23 79:3 84:4,9 106:13,18 |
| **remote**  2:1 | 65:18,19 80:10 83:2 97:2 101:13 | 129:1 130:1 | 109:7 122:8,16,20 125:23 126:11 |
| **remotely**  1:12,21 4:1 127:14 | **respond**  5:7 49:20 | **reviewed**  26:16 46:3,4 97:1 | 128:5 |
| **reopen**  64:6 | **response**  3:11 33:22 39:22 52:14 | 104:15 | **robert**  29:8 121:22 **rockside**  15:22 |
| **reopened**  65:12 66:13,18 | **responses**  40:3 **responsibilities** | **reviewing**  104:20 113:18 | **role**  22:14 23:16 23:19 45:5,12 |
| **reopening**  65:11 | 113:14 | **reviews**  110:19 123:8 | 88:10 89:6 |
| **rep**  23:23 **repeat**  5:12 79:10 | **responsibility** 31:19 113:15 | **rid**  109:13,15,16 109:17 | **roll**  40:6 **rollover**  55:11 |
| **replacement**  64:15 64:25 | **responsible**  21:18 40:15,19 43:3 | **right**  5:19 19:18 20:11 24:19 36:21 | |
| **report**  24:22 59:20 **reported**  93:24 121:21,22 | 71:18,20 96:8 | 40:10,13,21 49:17 | |

rona 73:10
rookie 106:25
room 93:17
rotating 125:8
rotation 56:4
rule 34:25 75:15
75:17,22 87:11,15
87:19
rules 129:5 130:5
run 32:22 40:24
runs 105:3
résumé 18:12 23:4

**s**

s 4:15 83:4 130:8,8
131:3
salary 10:4,6
124:15
sales 105:4 126:4,7
sam 4:22 38:12
122:6,14
sam.robb 2:5
samuel 2:2 128:5
sat 46:2 117:17
satisfied 120:17
save 81:14
saved 9:9
savings 56:21
saying 43:8,9
51:23 52:5 57:9
64:3,21 65:2,9
74:21 98:7,23
100:22 103:5,15
106:8 107:12
112:19,24 116:7
116:19,21,21
118:12 120:10
says 37:14 54:11
105:17 107:24
108:1,3
scale 95:2

scanned 9:8
scheduled 70:6
science 2:3
screen 35:18,20,20
35:22 39:19 47:25
53:6 58:24 72:14
104:3
scripts 6:7
scroll 48:2 53:14
seal 127:18 129:15
130:21
search 11:2,19
searched 11:21
seasonal 73:23
second 27:11,12
27:19 90:19 95:25
108:2
seconds 90:17
section 115:22
see 35:20,22,23,24
37:20 39:25 47:24
48:1 49:11 59:4
71:25 72:19 75:25
90:14,15 98:23
104:3 105:2,3
110:5,23 113:6,9
115:14 116:5,6
seeing 35:21 61:25
67:2 71:24
seeking 9:20 63:11
65:20,21,22 69:12
seen 48:4 89:16
98:13 100:5
106:12 122:21,24
select 44:21
selected 88:10
121:11
sense 67:20 79:19
88:16
sent 36:7

separation 81:4
serious 98:5,7
seriously 50:10
serves 28:9 82:4
service 32:23 33:5
49:9 51:1,3 68:8
70:12 72:11 77:6
87:14
serviced 56:25
services 76:14
servicing 87:20
set 3:11 13:18 27:7
39:22 71:13
119:14 127:17
setting 17:13
seven 8:21 17:13
17:15 21:17
sex 38:20 44:21,23
45:12 78:1 79:8
79:24 80:5,8
88:10,12 120:23
shape 97:20
share 35:18 39:19
58:24 72:14
shared 115:12
sheet 130:7,10,18
131:1
shibe 1:4,11 3:3
4:4,8,12,13 62:12
65:3 78:19,19
109:11 112:24
121:9 122:12,19
126:2,4 127:8
128:6,8 129:3,4,9
130:3,4,13 131:20
shibe000007 3:16
59:2
shock 61:24 62:3,7
62:10
short 25:21 38:11
38:18 83:25 97:17

109:4 122:5
show 35:9 39:20
103:21,22 117:1
shown 114:9 116:1
shut 62:17,23 66:9
67:2 83:13,16,20
83:21 88:22,24
89:2
shutdown 13:11
13:12,14 66:5
70:10 75:5,25
85:13
shutting 61:25
64:5
sic 78:12
side 76:16
sign 51:16 93:15
93:22
signal 80:12
signature 48:7
126:12 127:23
128:14
signed 51:20,21
55:20 97:12
129:13 130:18
significant 63:14
91:17 109:3
signing 51:17
97:15 128:12,20
similar 99:21
similarities 20:25
simple 65:3
simply 63:2
sincerely 128:23
sir 6:6,10 128:10
sit 26:1
site 15:20
sitting 68:14
situation 18:21
62:22

**six**  11:13 16:4 17:3 17:13,15 75:15,17 75:22 85:6 87:11 87:15,19
**sixty**  64:23
**size**  21:22 22:2 46:16,17,24 125:21
**skew**  111:24
**sleeping**  27:13 109:18
**smith**  2:8
**snyder**  73:10
**sobbing**  59:15
**sole**  109:15
**solid**  112:2
**solomon**  1:4
**solutions**  70:12 128:1 131:1
**somebody**  51:25 64:21 76:25 78:3 89:7,9 91:22,23 92:8 106:2 114:23 118:25
**sorry**  16:8 24:24 30:20 39:13 42:2 54:3 59:19 61:8 62:19 81:25 90:13 95:6 104:9,12 109:8
**sort**  32:16 35:1
**sought**  9:23,24
**sounded**  39:15 63:11
**sounds**  60:2 71:17 74:21 122:8
**space**  85:24
**span**  64:7
**speak**  5:1,14 52:3 52:10 76:25 101:13

**speaking**  41:6 94:9 115:22
**specific**  37:7 49:20 79:14 114:16
**specifically**  11:20 43:2 48:12 58:12 103:20 123:5
**specifics**  101:2,2
**specified**  127:14
**spectrum**  120:3
**spell**  4:13 22:10 23:12
**spent**  56:24 107:20
**spiker**  73:12
**spitz**  2:3
**spitzlawfirm.com** 2:5
**spoke**  87:5 94:17 105:20 108:1 110:1,2 123:5
**spoken**  51:9
**spot**  82:19 118:17
**ss**  127:4
**staff**  26:2 30:8,10 42:19 46:12 49:15 49:20 53:21 55:11 55:11,13 56:4,5,6 56:18,25 59:16 60:24 61:11,22 67:4,7 69:4,5 71:4 71:10 75:2,18 85:1 87:14 89:17 108:14,15,23 109:2,14,16,17,21 116:14
**staffed**  109:4
**stand**  80:6 86:3
**standard**  103:8,9 103:11,15 112:10 112:11 113:12

**standards**  108:12 109:13
**standing**  117:6
**standpoint**  19:10 46:19 118:22,24 123:17
**standstill**  13:6
**start**  11:5 24:15 33:12
**started**  5:16
**starting**  5:17 64:6 71:1 89:19
**state**  4:10 19:21 62:16,22 66:9 127:3,7,24 129:10 130:15
**stated**  12:1 74:24 75:3,6 97:19 104:15 114:3 119:15 120:4
**statement**  35:1 103:13 129:13,14 130:19,19
**states**  1:1
**stating**  44:25 49:19 74:24
**statistics**  123:10
**status**  102:19,22 103:4,7
**stay**  75:23
**stellar**  80:17 98:16
**stenger**  73:23
**stenotypy**  127:11
**step**  87:8
**stepped**  81:11
**stood**  32:25 46:6
**stop**  70:16 86:8,17
**stopped**  70:11
**street**  2:9
**structure**  12:18 61:15

**stuff**  57:15 116:22
**subject**  89:12
**submitted**  54:1 120:24
**subscribed**  129:10 130:14 131:21
**succeeds**  20:6
**successful**  124:23
**sudden**  45:7 118:2
**sued**  8:4
**suite**  2:4,9 128:2
**suited**  16:14
**sum**  96:17
**sun**  19:1,1
**sunday**  44:7 59:13 60:6 72:13
**superior**  128:1
**supervision**  19:17
**supervisor**  26:15
**support**  61:5 99:6 103:14 120:21 121:3 122:1
**supposed**  53:18,20 104:14,16 110:15
**sure**  4:22,24 19:6 19:21 26:2 32:2 34:10 36:17 43:22 47:5 56:9,24 57:5 60:5 61:17 64:17 68:10,20 69:1 76:20 77:1 84:10 87:10 93:21,25 94:1 110:19 112:20,25 118:12 122:18
**surpassed**  47:1
**surprise**  42:14 62:2 81:3,6,8 83:15,17,18 90:5 94:19

**surprised**  42:18
42:19 43:7,16,18
71:16 74:25 86:22
86:25
**surprising**  106:10
106:15,19 107:14
**sweet**  97:17
**switch**  14:14
**sworn**  4:5 127:9
129:10,13 130:14
130:18 131:21
**system**  16:2 61:24
116:15

**t**

**tag**  34:13
**take**  14:17 15:23
16:15 29:2 35:9
36:1 37:11 38:10
38:11 40:19 41:23
47:17,18 50:10,11
53:4 55:23 63:25
68:22 69:22 83:25
86:22 87:8 88:21
96:11 122:5
**taken**  29:7 38:16
46:16,17 52:22
61:18 68:21 70:3
84:14 122:11
127:14 128:11
**takes**  9:5
**talent**  37:7
**talk**  52:7
**talked**  21:3 27:10
42:22
**talking**  5:7 7:8
13:17 30:25 49:8
65:10 86:6 122:2
**talks**  14:10
**targets**  20:4
**taught**  114:9
115:9

**team**  14:12 20:11
33:3 39:9 46:3
50:24 71:10,11
72:12 75:18 87:4
90:7,7 91:4
109:17
**teams**  75:10 87:4
**teeth**  35:1
**telephone**  34:13
59:14
**tell**  14:10 15:10
20:15 22:23 24:21
25:10 27:16,16
31:12 54:14 59:15
61:23 78:16 94:12
95:9 97:5,6,7
100:8 101:2,14
112:9 114:24
119:7 121:3,8,14
122:1
**teller**  22:16 30:14
73:19
**tellers**  21:17 74:8
74:13,15,17
**telling**  69:25 98:4
115:3
**ten**  8:19
**tenure**  25:1
103:18
**term**  13:21
**terminate**  25:19
26:18 41:21 92:12
92:16
**terminated**  3:17
14:11 26:5 56:5
57:15 70:21,22
72:13,16 80:22
84:5 98:20 122:23
123:2
**terminating**  40:24
41:2 116:13

**termination**  3:16
38:1 59:1 123:3
**terms**  16:18 74:2
**terrible**  104:22,24
**testify**  5:23 127:9
**testimony**  127:10
127:12 129:6,7
130:6,9,12
**thank**  5:17 39:18
122:13
**thanks**  122:10
**thing**  11:22 27:13
45:3 63:16 79:18
84:23 97:23
108:24
**things**  26:14 34:18
37:19 45:15 52:19
55:14 58:15 69:16
70:2 71:1 75:19
76:9 78:6 98:2
105:1,25 108:20
108:21 110:17
112:20,21 113:5,9
113:13,14,19
114:10 115:6,11
116:24 124:17
125:9
**think**  13:5 16:4
17:12 20:4 21:3
23:15 25:11 27:19
29:21 31:12,14,23
32:19 35:2 37:10
39:6 40:7 44:20
45:2,11 46:10
48:15 58:5 59:25
60:5 61:4 69:22
72:4,5 78:1 79:20
80:6,13 84:16
88:17 89:1 90:20
91:17 93:14 99:1
101:5,17,18,22

102:3,10,24
103:22 104:23,25
106:3 111:16
112:16 116:19
119:13 121:6,6,9
122:4
**thinking**  71:4,6
72:2,6 74:8,12,16
75:21 108:5
**third**  95:25
**thirty**  128:19
**thoroughly**  121:7
**thought**  63:2 98:4
100:16 101:14
119:9
**threat**  26:21
**three**  5:11 19:24
20:3,4 29:18,19
49:7 63:6 75:24
109:2 125:8
**time**  5:1 8:11
13:10 14:3,20
15:19 17:4 18:13
22:16 23:9 24:24
26:6,10,17 33:22
34:17,17,21 39:11
41:5 45:10 48:19
51:10,12,24 55:10
56:23,24 60:13
65:5,8,12 66:10,21
70:18,24 73:19
82:10 85:24 86:5
86:14 88:5,8
92:19 94:3 95:25
95:25 101:7,9
104:16 107:20,20
115:11,13 116:20
122:13 127:14
**timely**  55:3
**times**  5:5 15:19
27:9,10 43:2

52:18 64:6 68:19
68:24 70:13 92:10
**title**  73:7
**today**  5:23 6:1,12
8:22 48:5 94:13
122:14,21,24
123:7
**told**  22:24 25:25
44:12 95:20 88:7
94:17 102:24
105:8 108:13
**tomorrow**  67:17
**tool**  11:17
**tools**  11:16
**top**  18:17 46:19
80:25 107:13,15
107:16 117:21
120:14 121:10
124:5,10 125:7
**total**  43:16
**track**  69:11
**traffic**  76:17
**train**  114:11 117:1
**trained**  115:25
**transcribed**
127:11 129:7
**transcript**  5:9
128:11,16 129:5
129:12 130:5,11
130:17
**transcription**
127:12
**transpired**  45:15
76:10 92:19
**tried**  51:12
**true**  127:12
**truth**  127:9,9,9
**truthfully**  5:23
**try**  52:21,21
**trying**  18:16 19:25
56:7

**turn**  108:15
**turned**  27:8 53:17
53:18,19 54:15,17
54:19,19 90:21
99:16 108:20
**turnover**  56:13
108:4,6,18,22
**twenty**  9:13
**two**  5:4 12:21
13:10 18:22 19:20
27:1,1 29:21 52:7
58:5 63:6,22
69:16 75:22 91:16
94:13 109:25
110:15 111:7
114:2 123:16
**type**  12:10 14:9
16:25 18:20 19:16
37:17 49:1 58:2

**u**

**uh**  83:18 107:5
**ultimate**  71:18,20
**ultimately**  14:23
15:1 26:13,15
93:24
**uncertain**  65:5
**uncertainties**  62:4
**uncertainty**  63:4
**understand**  17:9
37:11,13 59:15
64:22 66:24 82:9
82:18,23 83:19
89:10 119:2
**understanding**
24:10 37:3,3,5
66:8 84:24 96:14
**understood**  23:2
37:21 71:22 94:1
**unemployment**
7:20 8:2 65:25

**unfortunately**
56:10 98:8 108:8
**unintelligible**
30:18 54:2 62:18
114:18
**union**  1:7 2:16
12:17 19:7 20:21
32:22 33:6,10,14
42:24 67:5,14,19
68:1,4,16 75:7
77:9 122:24 128:6
129:3 130:3
**unique**  62:13
71:25
**uniqueness**  20:25
**united**  1:1
**unknown**  13:6
**unlimited**  69:2
77:4
**unnecessary**  56:2
**unusual**  102:25
103:2
**ups**  41:19 50:8
103:7
**upset**  60:3,6 94:25
**use**  11:17 14:1
**usual**  14:7 86:18
**usually**  125:7
**utilize**  76:23

**v**

**v**  2:8 128:6 129:3
130:3
**vacation**  5:18
**variety**  122:1
**vast**  12:19 76:5
**verbal**  3:13 47:20
107:2,3
**verbally**  5:7
**verified**  40:7
**verify**  41:11 49:14
50:25 51:2

**veritext**  128:1,7
131:1
**victim**  7:14
**view**  21:6 33:2
91:12 106:5
**viewed**  123:7
**vignero**  73:15
**violations**  37:20
**vision**  10:11
**visiting**  60:20 61:9
66:1,3 69:23
**visual**  46:5
**voicemail**  34:12
**vs**  1:6

**w**

**w**  83:4
**wachovia**  18:25
20:17 21:4,25
**waiting**  56:17
**waived**  126:12
128:13,21
**want**  19:1 34:9
38:12 68:10 76:20
92:23 103:8
109:12 111:10,16
115:5,6,16
**wanted**  45:6 52:2
78:3,20 84:9
113:6 115:11
116:23 118:16
**warning**  3:13,14
47:21 53:11 89:16
99:19,21 102:1,3
**warnings**  49:1
91:16 111:7
**washed**  89:18
99:11
**water**  61:3
**way**  35:3 50:8
87:18 88:11 96:13
97:20 98:21

100:11 103:16
**ways**  20:18,23
    61:19 70:8 84:25
**we've**  75:4
**web**  11:19,19
**website**  63:19 64:2
    64:16 65:1
**week**  70:25 75:19
    121:16,21,22
    124:4,6,10 125:8,8
    125:9,19
**weekly**  117:19,22
    117:23 121:18
**weeks**  10:7
**wegryn**  1:21 127:7
    127:24
**went**  19:3 26:9,16
    41:19 45:20 64:22
    72:12 75:20 79:10
    84:22 90:18 98:17
    114:15 115:14,18
    117:19 120:1
    121:16
**whatsoever**  99:10
**whereof**  127:17
**willoughby**  27:20
    27:24 28:10,13,14
    29:10 30:2 47:4
    82:17
**wilson**  16:3,21
    17:2,11,16 22:1
**wind**  100:11
**wise**  74:2
**witness**  38:14 84:3
    122:18 127:8,10
    127:11,12,17
    128:8 129:1,4,11
    130:1,4,15
**witnesses**  120:21
**woman**  29:3

**women**  91:24 92:2
**wondering**  66:3
**word**  39:16 87:13
**work**  6:11 8:1,23
    10:3,13,18 11:9
    12:22 13:19 14:15
    14:16 15:10 18:7
    36:24 38:13 61:17
    71:11 74:17 84:2
**worked**  15:12 19:7
    22:7,17,25 26:9
    35:25 60:11,12
    82:8,16 98:18
    100:4
**worker**  73:23
**workers**  7:16
**workforce**  62:6
**working**  8:22 23:2
    39:4,8 45:4 67:15
    71:14 75:10 76:19
    86:10
**works**  84:3
**world**  12:15 62:4
    62:9 64:4,5 70:16
    89:14,15 115:17
    119:20,22
**worst**  32:4,9
**wrap**  84:1 122:7
**wrapped**  84:16
    122:5
**write**  41:19 48:22
    48:24 50:8 56:1
    97:22 103:7
**written**  3:14 40:8
    50:20,21 53:10
    56:11 58:14 89:16
    99:20 102:1,2
**writtens**  98:14
**wrong**  73:7 110:24

| x |
| --- |
| **x**  3:1 |

| y |
| --- |

**yeah**  13:16 18:25
    19:14 28:16 30:2
    30:11 31:2,4,15
    33:23 38:24 45:1
    84:7,7 89:1 95:19
    106:19 126:1
**year**  11:12 25:11
    25:13,15,21,23
    46:22 81:1 96:18
    105:22,22,23,24
    106:3,3,7,17,22,23
    106:25 112:3
    113:6 114:25
    116:16 117:20,23
    120:19 123:22
    125:4,15
**years**  6:9 8:19
    12:16,20 13:10
    16:22,23 17:7,13
    17:15 18:12,18
    20:7 62:14,21
    94:13 97:23
    106:24 115:2
    119:4
**yellow**  123:21
    124:25
**yep**  53:16 55:22

| z |
| --- |

**zone**  123:21,21,21
    123:23,25 124:11
    124:25 125:5

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.