# **<u>EXHIBIT 2</u>**

Page 1

1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3                   - - - - -
4
    Abbie Shibe,                    ) Judge Solomon
5                                   ) Oliver, Jr.
                Plaintiff,          )
6                                   )
        vs.                         )
7                                   ) Case No.
    Cardinal Credit Union, Inc.,    ) 1:21-cv-01436-
8                                   ) SO
                Defendant.          )
9
                    - - - - -
10
11                  Deposition of:
                      ABBIE SHIBE
12              Appearing Remotely from
                 Cuyahoga County, Ohio
13
14
15                  March 7, 2022
                     2:32 p.m.
16
17
18
19
20
21      Reporter:  Kristin Wegryn, RMR, CRR
                Appearing Remotely from
22               Cuyahoga County, Ohio
23
24
25

1      Q.    Okay.  What was the -- with COVID and

2      the pandemic, what was it like in the financial

3      field market for employment during those

4      immediate months after COVID hit?

5      A.    Well, I think the job market overall was

6      at a standstill because of the unknown of COVID.

7      So it was -- the jobs in general were few and far

8      between for the first few months.

9      Q.    Okay.  How did, how did the COVID -- it

10     seems like a long time ago, two years ago now,

11     but the -- when we were having the shutdown

12     orders, how did those shutdown orders impact the

13     Ohio banks?

14     A.    How did the shutdown orders impact the

15     Ohio banks?

16     Q.    Yeah.

17           Well, do you recall what I'm talking

18     about, how Governor DeWine set forth essential

19     businesses, nonessential businesses, and work

20     restrictions for essential businesses?

21     A.    So you say banks as a general term.  Are

22     you referring to Cardinal or overall banks in

23     general?

24     Q.    I'm just asking you in general first.

25     A.    Oh, so, in general, personally, I bank

1   with a couple of different banks.  We had to use

2   the drive-through and the lobbies were closed for

3   a period of time.  Some of the hours were

4   restricted, depending upon what branch.  And then

5   the lobbies opened by appointment and they

6   eventually got back to, you know, doing business

7   as usual.

8          Q.    Okay.  Okay.  So as to Cardinal, did the

9   same type of restrictions apply to Cardinal?

10          A.    I can tell you that the talks of what

11   was going to happen prior to me being terminated

12   was that we were going to go to an A and B team

13   and the A group would be in certain days and B

14   would be at home, and then they would switch.  So

15   they were going to have some work from home and

16   they were going to have some work from the lobby.

17          Q.    Okay.  I take it that it was expected

18   that customers would not be coming into the

19   branches?

20          A.    I believe at that time it was going to

21   either be by appointment only or they were going

22   to do drive-through only.

23          Q.    Okay.  Do you know what ultimately

24   happened with Cardinal and with respect to how

25   they dealt with the COVID restrictions?

Page 15

1          A.    Do I ultimately know?  Is that what
2      you're asking?
3          Q.    Yes.  Yes.
4          A.    I do not.
5          Q.    You don't know?
6          A.    I do not.
7          Q.    Okay.  So as to -- or what were your
8      dates of employment at Cardinal?
9          A.    December of '18 through March of '20.
10         Q.    Okay.  And tell me, where did you work
11     immediately prior to Cardinal?
12         A.    Prior to Cardinal, I worked for US Bank.
13         Q.    Okay.  What did you do for US Bank in
14     that capacity?
15         A.    In that capacity, I was a branch
16     manager.
17         Q.    Okay.  How long?
18         A.    I was a branch manager for US Bank a
19     couple of different times.  That particular time,
20     I had previously to that been the site operations
21     manager for US Bank Home Mortgage, which was
22     located in Rockside, and managed the mortgage
23     group.  They had made a decision to take our
24     group and to move it to Minnesota where the
25     headquarters were, so we all lost our jobs there.

1    and I want to say Sun -- Sun something.  Anyway,

2    there was a merger and then we lost -- I had lost

3    my job and I went over to Regions.

4        Q.    Okay.  Okay.  As to -- I guess, I guess

5    let me ask you as to just in general as a branch

6    manager.  And I'm sure that each bank or credit

7    union you worked for would be a little bit

8    different.

9            But, in general, it would seem to me,

10   from an outsider standpoint, that a branch

11   manager would be I guess an important and

12   potentially difficult job.

13           Would you agree with that?

14       A.    Yeah, I would agree with that.

15       Q.    And I say that because, one, I'm

16   assuming you have some type of employee

17   supervision, employee management portion of your

18   duties, right?

19       A.    Yes.

20       Q.    And then, two, I'm assuming you have to

21   make sure that you comply with all of the state

22   and federal banking regulations?

23       A.    Correct.

24       Q.    And then, three, I'm assuming you're

25   trying to be a profitable bank?

Page 20

1          A.     Correct.

2          Q.     Anything else in big picture other than

3     those three?

4          A.     I think those are the three targets.

5          Q.     Okay.  And I'm assuming that not

6     everybody succeeds as a branch manager.  You've

7     been in banking for 30 years, but being a branch

8     manager may bring with it -- you could be in a

9     bad branch.  You could be in a difficult

10    environment.  You could just be -- I guess just

11    have a team that maybe isn't up to par, right?

12    There's lots of --

13         A.     Correct.

14         Q.     -- factors.

15                So tell me the difference, if you may,

16    just in general, did you -- am I correct as to

17    whether your Wachovia, Regions, Cardinal, or US

18    Bank, that some of the ways of doing business

19    would be different as a branch manager?

20         A.     Yes.  There are certain differences

21    between a bank overall from a credit union to a

22    bank.  Different banks do -- you know, have

23    different programs and the different ways that

24    they manage.  Each of them have, you know, their

25    uniqueness, I would say, but similarities, as

Page 21

1    well.

2        Q.    Okay.  How about, I guess, the demands

3    on the branch managers?  We talked about I think

4    four of them now:  Regions, Wachovia, Cardinal,

5    US Bank.

6              Where would Cardinal fall, in your view,

7    as to the demands on a branch manager between

8    those four?

9        A.    The demands on the branch manager at

10   Mentor, I mean, it is the district office.  It's

11   a large office.  So the demands are high.  It's

12   busy.  Lots of -- a lot -- customer -- a large

13   customer base.

14       Q.    Okay.

15       A.    We have, you know, anywhere from I

16   believe four to five, you know, employees on your

17   platform and, you know, seven or eight tellers

18   that you're responsible for.  So it was a larger

19   branch.

20       Q.    Okay.  Was it the largest branch that

21   you had managed?

22       A.    No.  It was about equal to the size I

23   had managed previously in multiple locations.

24       Q.    Okay.  Where?

25       A.    At Wachovia, at US Bank.

1    for Cardinal and it was a place he enjoyed

2    working and that he understood they had an

3    opening and they were looking for a branch

4    manager and was happy to pass my résumé along.

5         Q.    Okay.  Okay.  And who did you interview

6    with?

7         A.    I interviewed with Mario and Christine.

8         Q.    Okay.  Who is Mario?

9         A.    Mario at the time was the district

10   manager.

11        Q.    Okay.  What is Mario's last name?

12        A.    I couldn't spell it for you, but...

13        Q.    Okay.  What was his position when you

14   left?

15        A.    When I left, Mario was I think a cross

16   between the district and taking over a new role.

17        Q.    Okay.  And Christine who?

18        A.    Christine Blake.

19        Q.    Okay.  What was her role?

20        A.    CEO.

21        Q.    Okay.  Did you interview with anybody

22   else?

23        A.    Cindy, also, the HR rep.

24        Q.    Okay.  Do you know Cindy's last name?

25        A.    I don't recall.

Page 24

1          Q.    Okay.  Was Cindy still there when you

2      left?

3          A.    She was.

4          Q.    Okay.  And you were given an offer of

5      employment with Cardinal?

6          A.    Correct.

7          Q.    Okay.  What position were you offered?

8          A.    I was offered the branch manager of the

9      Mentor office.

10          Q.    Okay.  Did you have an understanding of

11      why it was open, why the position was open?

12          A.    I don't recall why the position was open

13      when I took on the job.

14          Q.    Okay.  And approximately when did you

15      start?

16          A.    December of '18.

17          Q.    Okay.  December of 2018, you came in as

18      branch manager of the Mentor branch of Cardinal,

19      right?

20          A.    Correct.

21          Q.    Okay.  And I guess -- tell me about --

22      who did you report to as the branch manager?

23          A.    To Mario, the district manager.

24          Q.    I'm sorry.  Is that the whole time?

25          A.    Yes.

Page 29

```
 1          manager.
 2                    Oh, I take it back.  I retract that.
 3          Yes, a manager of Lakeland was a woman by the
 4          name of Gretchen.
 5              Q.    Okay.
 6              A.    I can't remember her last name.  And
 7          then it was, it was taken over by a gentleman by
 8          the name of Robert.
 9              Q.    Okay.  Do you know any of the other
10          branch managers in 2019 aside from the Willoughby
11          and Lakeland?
12              A.    Meghan was a branch manager in Ashtabula
13          area.
14              Q.    Okay.
15              A.    And I can't recall the lady's name in
16          Austintown, but it was a female.
17              Q.    Okay.  So when you came on board, five
18          branches, three or four female branch managers?
19              A.    Three, to my knowledge.  It would be
20          myself, Meghan, and the Austintown.
21              Q.    Okay.  And you think the other two were
22          male?
23              A.    Well, Gretchen -- Gretchen was actually
24          a female.  She was Lakeland's manager.  So that
25          would be four.
```

Page 30

1          Q.     You were hired there --

2          A.     Yeah.  Willoughby, I was not certain of

3     who was the manager prior to.

4          Q.     Okay.  So when you were hired, there was

5     at least four female branch managers?

6          A.     Correct.

7          Q.     Okay.  What's the -- like in Mentor, did

8     you have -- was it primarily male staff?  What

9     would be the breakdown?

10         A.     In regards to the branch staff?

11         Q.     Yeah, the branch employees.

12         A.     On my platform, I had about 50/50.

13         Q.     Okay.

14         A.     And on the teller line, all females and

15    one male.

16         Q.     Okay.  Okay.  And so I guess with the

17    banking, did -- would Cardinal -- what would you

18    say primarily -- [unintelligible] -- female

19    employees overall or --

20                THE REPORTER:  I'm sorry.  Say that

21    again.  Primarily...

22         Q.     With Cardinal, would you say that

23    Cardinal was primarily -- or not primarily --

24    majority female employees?

25         A.     When you say "Cardinal," you're talking

Page 31

1           about the entire group?

2                Q.    Yeah, to your knowledge.

3                A.    Myself?

4                Q.    Yeah.

5                A.    I wouldn't go so far to say "primarily

6           female," no, I would not.

7                Q.    And I'd change that to "majority."

8           Would you go so far as to say "majority"?

9                A.    I guess that would be a fair assessment,

10          yes.

11               Q.    Okay.  Okay.  So you're hired.  What

12          did -- I guess tell me, what did you think of

13          Mario?

14               A.    What did I think of Mario?

15               Q.    Yeah.  Was he a good manager?  Bad

16          manager?

17               A.    Mario was a busy guy.  He was there if

18          you had a question, but he had a lot of

19          responsibility.

20               Q.    Okay.  A good manager, or no?

21               A.    In regards to?

22               Q.    I'm just asking you.

23                     I mean, was he a -- did you think he was

24          good?  Bad?  Indifferent?  I mean, average?

25          Where would you put him as -- I mean, you've had

1       Q.    Okay.  And that's where I was going to

2     get to.  From an outside point of view, it looks

3     like Ms. Blake and the Cardinal management team

4     are -- they do have high expectations as to

5     customer service; is that a fair assessment?

6       A.    I would say in the credit union

7     experience overall.

8       Q.    What do you mean by that?

9       A.    So when a -- when a member would come

10    into the credit union, you know, the expectation

11    would be that, you know, they had a good

12    experience from the start to the finish.  And,

13    you know, from -- the difference between a bank

14    and a credit union, there's many.

15        But, you know, we, we were dealing with

16    members.  We weren't dealing with people that

17    were numbers.  And, you know, we had a

18    relationship with those individuals.  So, yes, it

19    was a more personalized approach.

20      Q.    Okay.  And that's good.

21        Were there guidelines or expectations as

22    to response time to member questions or concerns?

23      A.    Yeah, we had guidelines in regards to

24    concerns or returning phone calls and getting

25    back to our members.

Page 34

1          Q.    What were those?  What do you recall?

2          A.    Within 24 hours.

3          Q.    Okay.  Was that something that they just

4     would say, or is that something that they would

5     enforce?

6          A.    It really depended on the day, to be

7     honest with you.

8          Q.    What do you mean by that?

9          A.    Well, I mean, obviously, we want to make

10    sure that we're getting back to our customers as

11    quick as possible and that, you know, we get that

12    answer to them, whether it's via voicemail or

13    you're playing telephone tag.  You're making

14    those attempts.

15          The Mentor branch is a very busy branch,

16    so we are with customers or members pretty much

17    from the time we open the door until the time we

18    close the door.  So some of those things are done

19    after hours.

20          Q.    Okay.  But I'm assuming that you do it

21    after hours in order to meet that 24-hour time

22    frame?

23          A.    Absolutely, you would.

24          Q.    Okay.  My question to you is whether

25    management enforced the 24-hour rule or whether

Page 37

1      A.    Yes.

2      Q.    Okay.  Diversity.  What was your

3   understanding, understanding of the diversity

4   policy?

5      A.    My understanding is that, you know, we

6   didn't discriminate against any gender, and we

7   hired for specific reasons on talent and not

8   anything else.

9      Q.    Okay.  Let's continue on.

10         Employment at will, I think we

11  understand that.  Let me take you to the Equal

12  Employment Opportunity policy.  What did you

13  understand this policy to be?

14     A.    Basically, what it says.  I mean, equal

15  opportunity employment.

16     Q.    Okay.

17     A.    For either accommodations or any type

18  of, you know, nondiscriminatory -- all those

19  things.

20     Q.    Okay.  We see here reporting violations.

21  You understood that you could go to HR or to

22  Ms. Blake or to your manager if there was any

23  issues?

24     A.    If I had an issue, I would go to my HR,

25  yes.

Page 38

1          Q.    Okay.  Prior to your termination, did

2     you ever complain pursuant to this policy to HR?

3          A.    About discrimination?

4          Q.    Yes.

5          A.    No.

6          Q.    Okay.  Did any of your employees

7     complain about you, to your knowledge?

8          A.    Not to my knowledge.

9          Q.    Okay.  Got it.  Okay.

10               MR. CAMPBELL:  Let me take us off that.

11               Okay.  Why don't we take a short break.

12     You want to come back at 3:25, Sam and Abbie?

13     Does that work?

14               THE WITNESS:  Yes.

15               MR. ROBB:  Yes.

16               (A recess was taken.)

17     BY MR. CAMPBELL:

18          Q.    Okay.  We're back after a short break.

19               Let me ask you:  Did anybody during your

20     employment make any, any sex-based comments to

21     you?

22               Do you know what I mean?

23          A.    During my employment at Cardinal?

24          Q.    Yeah.

25          A.    No.

Page 39

1          Q.     Okay.  Did anybody make any

2      inappropriate comments to you?

3          A.     No.

4          Q.     Okay.  How was it working at Cardinal?

5      I mean, obviously, we're now after discharge.

6      Prior to the discharge, what did you think of

7      Cardinal?

8          A.     I enjoyed working at Cardinal.  We had a

9      great team that I had in the Mentor office and we

10     accomplished some great results together during

11     the time I was there.

12         Q.     Okay.

13             THE REPORTER:  I'm sorry.  Could I ask

14     you real quick, you said "prior to the" -- it

15     sounded like "district."

16             What was the word?

17             MR. CAMPBELL:  "Discharge."

18             THE REPORTER:  Discharge.  Thank you.

19         Q.     Okay.  I'm going to share my screen and

20     show you what will be marked as Exhibit 2.

21             (Deposition Exhibit 2, Plaintiff's

22             Response to Defendant's First Set of

23             First Requests For Production, was

24             marked for purposes of identification.)

25         Q.     Okay.  Can you see that document?

1    A.    Yes.

2    Q.    Okay.  Do you remember going through

3 some responses to a request for admissions with

4 your counsel?

5    A.    Yes.

6    Q.    Okay.  And I'm just going to roll

7 through some of them.  I think we just verified

8 that Cardinal's written policies included an

9 antidiscrimination policy, and you agreed with

10 that, right?

11    A.    Yes.

12    Q.    And they also prohibited harassment, and

13 you agreed with that, right?

14    A.    Correct.

15    Q.    Number 3, that you were responsible for

16 enforcing the policy against discrimination, you

17 agree with that?

18    A.    Yes.

19    Q.    And I take it you were responsible for

20 enforcing, at least in the Mentor branch, that

21 employee handbook, right?

22    A.    Yes.

23    Q.    Okay.  What did you do when -- if you

24 were terminating an employee, did you have to run

25 it by HR?

Page 47

1     we surpassed our goals.

2              And the impact that Mentor has on

3     Cardinal's bottom line is much greater than what

4     a Willoughby or a Lakeland or, say, an Ashtabula

5     would have, making sure that that goal was met

6     each month.  And exceeding that goal is critical

7     to the overall company goal.

8          Q.    Okay.  Were there female branch managers

9     that were retained after the COVID reduction in

10    force?

11         A.    That were retained?

12         Q.    Yes, that were not picked to --

13         A.    Yes, there were.

14         Q.    Okay.  How many?

15         A.    To my knowledge, Meghan and the

16    Austintown branch manager were both female.

17         Q.    Okay.  Okay.  So -- okay.  Let me take

18    you to another exhibit.  I'm going to take you to

19    Exhibit 3.

20              (Deposition Exhibit 3, Employee Verbal

21              Warning, Bates-labeled Cardinal000238 -

22              239, was marked for purposes of

23              identification.)

24         Q.    Can you see that document on your

25    screen?

Page 58

1        Q.    Okay.  You don't know if he got the same
2    type or anything along those lines?
3        A.    He did not.
4        Q.    He did not.  Okay.
5              Did you think that the two pieces of
6    discipline were discriminatory?
7        A.    No.
8        Q.    Okay.  Do you know of anybody else who
9    actually had been put on, I guess, put on -- any
10   other branch manager who was put on a 60-day
11   probationary period?
12       A.    I don't know anyone specifically.  It
13   was well known that it was a common occurrence
14   within Cardinal for people to be written up for
15   things of this nature.
16       Q.    But you don't know of any -- you can't
17   point to anybody that has happened to?
18       A.    Correct.
19       Q.    Do you know if -- when COVID hit, if any
20   other branch managers were on a probationary
21   period?
22       A.    I do not.
23       Q.    Okay.  Okay.  Well, let me ask you --
24   and why don't we -- I'm going to share my screen
25   again.

Page 62

1    businesses and many businesses not open.

2            That didn't, didn't surprise you or

3    shock you as a branch manager, looking at the

4    world and having uncertainties?

5        A.    Well, as an essential employee in a

6    workforce where we didn't close, to your point

7    earlier, it did shock me that we were taking key

8    people out of the branch to not be able to manage

9    through what was happening in the world, to your

10   point.  So yes, it did shock me.

11       Q.    And, again, my question to you, Ms.

12   Shibe, was more to the point of -- I mean,

13   this -- we can agree that this was unique.

14           Certainly, in the last 30 years of your

15   banking experience, you've never had the federal

16   and state government coming in to say, hey, we're

17   going to shut down businesses --

18   [unintelligible] -- right?

19       A.    I'm sorry.  You broke up at the end

20   there.

21       Q.    Over your 30 years in banking, have you

22   ever had a situation where state or federal

23   governments have come in and shut down many

24   businesses indefinitely?

25       A.    I have not.

Page 65

1    on their website.

2         Q.    Okay.  And what I was saying to you, Ms.

3    Shibe, was real simple.

4              On March 15th, or at the end of March,

5    we were going into a very uncertain time; would

6    you not agree with that?

7         A.    I'd agree.

8         Q.    Okay.  And by the time the 60 days came

9    up -- and you're saying it was the end of March,

10   so we're talking June.  In June in Ohio, many

11   businesses were reopening.  In fact, I believe

12   most businesses were reopened by that time,

13   right?

14             MR. ROBB:  Objection.  You can answer.

15        A.    I don't know whether most businesses

16   were opened or not as a whole.

17        Q.    Okay.  You weren't paying attention to

18   the market and what was going on with respect

19   to -- with respect to the openings of businesses

20   if you were seeking alternative employment?

21        A.    I was seeking my employment through

22   the -- I was seeking my employment through the

23   computer.  I didn't go to many places because I

24   was focused on looking for a job.  And my income

25   was very much reduced on unemployment, so I was

Page 67

1          Do you agree or disagree that heading

2     into COVID-19 and seeing many businesses shut

3     down by law, that that may necessitate in a CEO's

4     mind, hey, we should reduce staff in order to

5     maintain the profitability of the credit union?

6          MR. ROBB:  Objection.  You can answer.

7     A.    I was reduced in staff.  I was released

8     from Cardinal due to COVID-19.  Do I agree with

9     that?  I do not agree with that.  Was it

10    necessary?  I'm not a CEO, so I don't know.

11    Q.    My question isn't whether your position

12    was necessary.

13          My question is:  You're the CEO looking

14    at the fact that many of your credit union

15    members may not be working; that your branches

16    are not going to have individuals coming into the

17    branch; that you don't know what tomorrow is

18    going to be.  Do you agree or disagree that a

19    reduction of force at a credit union would make

20    business sense?

21          MR. ROBB:  I'm going to object again,

22    and you can answer.

23    A.    I don't have enough facts as of -- to

24    what determining factors Christine or anyone else

25    looked at during that course, so I don't know.

Page 72

1       hopefully once-in-a-lifetime experience here and

2       you're not thinking, what am I going to do to go

3       to my CEO and say, you know what, I'm being

4       proactive and I think we can reduce head count.

5       I think we can reduce hours.  You weren't

6       thinking at all about that?

7           A.    That wasn't my job because Christine, as

8       the CEO, had already come into play and had made

9       the changes in the plans and put it in place so

10      that she could retain the employees, as well as

11      the member service.  And that's where she came up

12      with the A and the B team that went into effect

13      the Monday after I was terminated on the Sunday.

14          Q.    Okay.  Let me share my screen again.

15                (Deposition Exhibit 6, List of

16                additional employees terminated,

17                Bates-labeled Cardinal000269, was marked

18                for purposes of identification.)

19          Q.    Okay.  Can you see this document?

20          A.    Yes.

21          Q.    Okay.  So it looks like here -- and I'm

22      going to represent to you that these are all of

23      the employees who were impacted by the COVID-19

24      March reduction.

25                Do you recognize any of these names?

Page 73

1          A.    I do.

2          Q.    Okay.  And who -- which one is your

3     assistant branch manager?

4          A.    Jason Riter.

5          Q.    Okay.  Jason Riter.

6                And he's listed as loan officer.  Was

7     that the wrong title?

8          A.    He was the assistant manager, but yes.

9          Q.    Okay.  Anybody else from your branch?

10         A.    Rona Snyder.

11         Q.    Okay.  Anybody else?

12         A.    Rachel Spiker was a float.  She was a

13    float to my branch and other branches.

14         Q.    Okay.  Anybody else?

15         A.    Gil, Gilbert Vignero.

16         Q.    Okay.  What was Gil's position?

17         A.    He was a loan officer.

18         Q.    Okay.  Anybody else?

19         A.    Audrey Rasmussen was a part-time teller.

20         Q.    At your branch?

21         A.    Correct.

22         Q.    Okay.  Anybody else?

23         A.    Kaitlin Stenger was a seasonal worker at

24    Mentor.

25         Q.    Okay.  So it looks to me that Mentor was

Page 78

1    sex when making the decision?  Why do you think

2    Ms. Blake would, as being a female CEO, would

3    somehow decide she wanted to eliminate somebody

4    because they were female?

5        A.    Well, I would -- if I was the CEO, CEO

6    and I was looking at all of those things, I would

7    say this:  The only person that was a female

8    manager that was released was myself in the list

9    that you just provided.

10       Q.    Okay.

11       A.    So the fact that my performance had been

12   what it was, managing the flagstar [sic] branch

13   of Cardinal, and the fact that Ms. Blake also

14   published my job 60 days later after she reduced

15   it due to COVID-19 and then filled it with a

16   less-performing male, that would tell me that I

17   was discriminated against.

18       Q.    Okay.  Well, my question to you is:  Why

19   would Ms. Shibe -- or not Ms. Shibe -- Ms. Blake,

20   a female CEO, decide she wanted to discriminate

21   against you because you're female?

22       A.    I don't know why Ms. --

23             MR. ROBB:  Objection.

24       A.    -- Blake made that decision.  I don't

25   know when Ms. Blake made that decision.

Page 79

1       Q.      Okay.  Well, I mean, that does seem a
2   little odd, right?
3               MR. ROBB:  Objection.  You can answer.
4       A.      Again, I don't know why Ms. Blake made
5   that decision.
6       Q.      Okay.  Well, I guess I would say, you're
7   alleging that Ms. Blake made the decision because
8   of your sex, and I'm asking you, what makes you
9   believe that?
10      A.      I guess I'll repeat what I just went
11  over.
12              So of your list, I was the only female
13  branch manager that was reduced that same -- for
14  the specific reason for COVID-19.  And that
15  particular position was reposted 60 days later
16  and it was filled with a less-performing male.
17      Q.      Okay.  And I guess I would say it's one
18  thing to disagree, okay?  Anybody can -- it's
19  natural and it makes sense and -- hey, I don't
20  think that I agree with that decision.  I mean,
21  there's lots of decisions at law firms that, if I
22  were making them, I might make it differently,
23  but that doesn't mean that the decisions were due
24  to my race or my sex or my age.  It may be that I
25  just disagree and it wasn't the right decision.

Page 83

```
1        Q.    Okay.  And then, as to the other

2    branches, with respect to the other branch,

3    branch managers when you were let go, there was

4    Audrey Blews?  B-L-E-W-S.

5        A.    Yes.

6        Q.    Okay.  Meghan Berkman?

7        A.    Correct.

8        Q.    And then Rob Petrie?

9        A.    Correct.

10       Q.    Where was Rob the branch manager?

11       A.    Lakeland College.

12       Q.    Lakeland College.

13             Was Lakeland shut down, do you know?

14       A.    I have no knowledge of that.

15       Q.    Okay.  Would it surprise you that the

16   Lakeland branch was actually shut down?

17       A.    Would it surprise me?  No, it wouldn't

18   surprise me.  Huh-uh.

19       Q.    Okay.  Did you understand that it was

20   shut down due to COVID?

21       A.    I had no knowledge that it was shut down

22   or if it was operating, you know, via a different

23   capacity.  I have no idea.

24             MR. CAMPBELL:  Okay.  Okay.  Why don't

25   we take a short break.  Why don't we come back at
```

Page 92

1      A.    I -- Ms. Blake did not hire me because
2    she disliked women, no.
3      Q.    Okay.  Do you know, did she -- or do you
4    believe she discriminated against anybody else?
5      A.    I have no knowledge of whether she did
6    or if she didn't.
7      Q.    Okay.  You have no knowledge.  Okay.
8            Okay.  Well, here's somebody who hired
9    you.  You said that you got good evaluations, so,
10   presumably, you were happy at those times, right?
11     A.    My evaluation was less than 30 days
12   before Ms. Blake decided to terminate me.
13     Q.    Okay.  Well, Ms. --
14     A.    The same, the same evaluation where
15   Ms. Blake gave me a bonus, less than 30 days
16   before she decided to terminate me.
17     Q.    Okay.  Was the evaluation for 2019?
18     A.    The evaluation was for 2019 and it
19   transpired and through, really, to the time that
20   I was evaluated, which was in the middle of
21   February of 2020.
22     Q.    Okay.  Well, was it -- I mean, however
23   you want to frame it.  You have 30 days of
24   discipline in 2020, and most certainly your
25   evaluation for 2019 is not going to be negatively

1      A.    It also says I also spoke with Cindy

2      about this one.  That was the second one.

3      Q.    Okay.  Well, he says -- and I guess I

4      was -- when you were describing the turnover, I

5      was thinking it seemed to be a little abnormal.

6           And he mentions that, right?  Turnover

7      in 2019 was abnormal, right?

8      A.    It was abnormal, but, unfortunately,

9      when I took over the branch, we had a lot of

10     people that actually Mario had recruited and

11     hired that were not performing and had not been

12     disciplined or held to the standards.  And that

13     was my job and I was told that when I was hired,

14     that I may have to, you know, review staff and we

15     may have to turn some staff because they weren't

16     meeting or exceeding the job expectations.

17     Q.    Okay.  Well, they don't blame the errors

18     that come up in 2020 on turnover, right?

19     A.    Well, what I said was that one of the

20     reasons that we had some late things turned in

21     late and we had some things missing was the fact

22     that we had turnover and then we had some new

23     staff members and we were still taking care of,

24     you know, the most important thing, which was our

25     members.

Page 110

1         that we just spoke about, which were the

2         components I spoke to Cindy about.

3             Q.   Okay.  Okay.  So you got your review.

4         And so the review laid out -- I mean, certainly,

5         I guess I would say this:  I don't see the review

6         as -- I mean, it would seem to me that I might

7         have a few concerns.  I mean, especially if

8         you're getting that review later, right?

9                  I mean, here's, here's, here's some,

10        some concerns that you are having on -- from

11        Mario, your manager, who is giving you some

12        concerns, and you're getting that right when

13        you're also getting disciplined, right?

14            A.   Correct.  My review was given to me over

15        two months late after it was supposed to be given

16        to me, and I had to get HR involved to even get

17        the review completed because one of the things

18        that we prided ourself on at Cardinal was making

19        sure that we had those reviews prepared and that

20        we had them delivered at those annual review

21        marks.

22            Q.   Okay.  So you had that issue with the

23        evaluation.  So I certainly don't see that

24        evaluation -- I guess maybe I'm wrong -- as being

25        one that I would be happy with.  I guess I would

1    say that would seem to me to raise some concerns

2    about whether they believed -- "they" being

3    Cardinal believed that my performance is good,

4    right?

5         A.    Which is why, based on my performance, I

6    took those questions to Cindy.

7         Q.    Okay.  So then you get your two warnings

8    and they both say "probation."  And you go from a

9    30-day probation to 60-day.  I guess you asked

10   Mario, or did you ask HR about, hey, I want to

11   know what does this mean?  Am I, am I close to

12   discharge?

13        A.    There was no conversation of that

14   nature.

15        Q.    Okay.  Well, did you -- you didn't

16   think, hey, I want to find out because -- I mean,

17   to me, I guess I would say I certainly would be

18   looking at that and would have some concerns

19   as -- you didn't have any concerns being on

20   probation and having a 3.6 on your evaluation?

21        A.    Well, according to Mario, a 3.6 was

22   great.  So I guess you have to look at the

23   overall, you know, expectations and who is

24   looking at the -- who is looking at the skew.

25             According to Mario, he doesn't give any

# **<u>EXHIBIT 4</u>**

## Cardinal Credit Union

**EMPLOYEE WRITTEN WARNING NOTICE**

Employee Name:_____ Abbie Shibe _____            Employee Number: 243

Department: ___ Mentor ___ Position: ___ Branch Manager ___          Date: __02/19/2020__

**A.    Explanation of current problem or violation, including specific dates and examples. (Attach any additional documentation).**

During random inspection by Chief Operating Officer of account cards on 02/19/2020 account cards were located past due from deadline date. The deadline for account card submission was 02/10/2020 for Mentor branch – Account cards located out of deadline: Dec (5), Jan (125), Feb (27). Additionally, these account cards were not audited prior to submitting to compliance audit.

Additionally, during inspection of onboarding procedures the Chief Operating Officer reviewed that onboarding procedures were not being validated by branch manager, per procedures presented 01/06/2020. Item attached referencing accounts opened and onboarding completed.

**B.    List previous warnings and corrective action:**

| Previous Action | | Previous Action | |
|---|---|---|---|
| Same Problem?<br>x☐ Y ☐☐☐N | Date: 01/27/20 | Same Problem?<br>x☐ Y ☐ N | Date: 12/04/19,  12/10/19, and 01/10/19. |
| Type of Action: Verbal Warning | | Type of Action: Coaching | |
| Nature & Circumstances: Not Meeting Deadline | | Nature & Circumstances: Not Meeting Deadline | |

**C.    Explanation of the consequences/importance and necessity of correction.**

Account cards to be submitted to compliance by deadline monthly without errors and prior review completion. Each account card is to be audited prior to end of day. Branch Manager to complete review of automated deposit log the day after to confirm all cards submitted and reviewed. Additionally, onboarding procedures to be inspected daily for validation of onboarding procedures by staff. Effective 02/19/2020 Abbie is on a 60 day probationary period.

**Failure to correct this problem and any other performance problems has resulted in further disciplinary action up to and including termination.**

| I have read this "Written Warning Notice" and understand it.  I acknowledge that a copy of the above written warning has been given to me this day and realize that a copy will also be placed in my personnel file. |
|---|

Employee Signature*: _____          Date: 2/19/20

Manager's Signature: _____          Date: 2/19/20

Cardinal000245

EXHIBIT
4

Human Resources Signature: _____     Date: _____

*Employee signature indicates that the manager discussed the above matter with the employee and does not necessarily indicate the employee's agreement.

Cardinal000246